```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION

 3   UNITED STATES OF AMERICA,        Docket No. 3:18CR26

 4            Plaintiffs,             Toledo, Ohio

 5            v.                      September 23, 2019

 6   KARL J. ROGERS,

 7            Defendants.

 8   ------------------------------

 9                 TRANSCRIPT OF SENTENCING HEARING
                  BEFORE THE HONORABLE JAMES G. CARR
10                  UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the Plaintiffs:  Tracey Ballard Tangeman
                          Office of the U.S. Attorney
14                        Four SeaGate, Suite 308
                          Toledo, Ohio 43604
15                        (419) 242-5675

16

17   For the Defendant:
                          Russell V. Leffler
18                        65 Christie Avenue
                          Norwalk, Ohio 44857
19                        (419) 681-5399

20

21   Court Reporter:      Angela D. Nixon, RMR, CRR
                          1716 Spielbusch Avenue
22                        Toledo, Ohio 43624
                          (419) 260-5259
23

24   Proceedings recorded by mechanical stenography, transcript

25   produced by notereading.
```

```
 1              COURTROOM DEPUTY:  Case 3:18CR26, United States

 2    of America versus Karl Rogers, matter called for

 3    sentencing.  If counsel would identify themselves for the

 4    record, please, starting with plaintiff.

 5              MS. TANGEMAN:  Your Honor, Tracey Tangeman and

 6    Matthew Simko on behalf of the government, with our case

 7    agent Ryan Amstutz with the FBI.

 8              THE COURT:  Okay.  And the pretrial service and

 9    probation officer Julie Meyers is here.  And Ms. Meyers,

10    give me the guideline calculation.

11              COURTROOM DEPUTY:  Judge, defense counsel didn't

12    get to identify themselves yet.

13              THE COURT:  I'm sorry.

14              MR. LEFFLER:  Attorney Russell Leffler

15    substituting for Reese Wineman, Your Honor.

16              THE COURT:  Sorry to hear that Reese has got some

17    medical issues.  Thank you for making yourself available.

18    Otherwise, quite candidly, would be another month at

19    soonest before Mr. Rogers would find out what's going to

20    happen.  And I have no doubt that that's, for him, the most

21    important --

22              MR. LEFFLER:  Thank you, Your Honor.

23              THE COURT:  -- thing that's been on his mind

24    since the agents knocked on his door, I really do.  I think

25    it's important not to protract that anymore.  It's been a
```

1   long time.

2           So Julie, the base offense level again is 33?

3           PROBATION:  Total offense level 33, criminal

4   history category of one with 135 to 168 month range.

5           THE COURT:  Counsel, would you concur that that's

6   the -- that the guideline range is accurately computed?

7           MS. TANGEMAN:  Yes, Your Honor, on behalf of the

8   government.

9           THE COURT:  Counsel?

10          MR. LEFFLER:  We filed a memorandum in opposition

11  to that, Your Honor.  We know what they said, though.

12          THE COURT:  Okay.  Let me -- I overlooked that,

13  I'm sorry.  I usually read these things two or three days

14  in advance.  I did it a little sooner because I've got a

15  couple arguments later in the week.  Let me find the

16  Presentence Report.  Give me a moment.  Deanna, can you --

17  let me jump ahead a little bit on the restitution.

18  Ms. Tangeman, has that been resolved?

19          MS. TANGEMAN:  I believe so, Your Honor.  Would

20  you like me to put that on the record now?

21          THE COURT:  Let's wait few a moments.

22          MS. TANGEMAN:  Okay.  Will do.

23          THE COURT:  Counsel, let me do this, first of

24  all, Mr. Rogers, are you satisfied that your lawyer

25  standing in for Mr. Wineman has undertaken to prepare both

1  him and you for today's proceeding?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  You're ready to proceed?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  And, counsel, why don't you restate

6  your objection.  I'm having some trouble finding -- I mean,

7  I read it, thought about it.

8          MR. LEFFLER:  Yes, Your Honor.  Essentially some

9  of the enhancements were based on the things that we think

10  are included, and we attached the decision I think that

11  Judge Zouhary had made attacking those things.

12          THE COURT:  Right, now I recall.

13          MR. LEFFLER:  And I think that was our objection.

14          THE COURT:  Are there any beyond, Ms. Tangeman,

15  what I would call sort of the conventional objections made

16  to -- I mean, none came to mind in reading it?  Those are

17  matters for appeal.  But in light of my understanding of

18  prevailing Sixth Circuit law I must overrule them.

19          MS. TANGEMAN:  That is correct, Your Honor.  I

20  did not see any new arguments.  The Court has addressed

21  those arguments.

22          THE COURT:  Counsel, would you agree with that,

23  that these are principally --

24          MR. LEFFLER:  Generally, yes.

25          THE COURT:  Any that do not fit that category?

1        MR. LEFFLER:  I mean, the only -- obviously we

2   also have some interesting issues on whether the testimony

3   he gave admitting to his sexual addiction at the trial

4   qualifies for any reduction when he actually went to trial

5   and didn't make --

6        THE COURT:  I believe it does.  Ms. Tangeman's

7   going to object, but he clearly and forthrightly admitted

8   that he was addicted to child pornography.

9        MR. LEFFLER:  Yes, Your Honor.

10       THE COURT:  And Ms. Meyers has reminded me that

11  very often impediment to rehabilitation in these cases is a

12  reluctance to be as forthright as he was.  He did so in a

13  way most unfortunate.  I think the most I can do is a

14  two-level reduction.  I don't think I have had -- I mean,

15  was unusual.  None of us knew, Mr. Rogers, why you wanted

16  to go to trial until you went to trial, until you

17  testified.  And then it was clear.

18       Ms. Tangeman, I think that reduces the guideline

19  to 108 or something; right, Ms. Meyers?

20       PROBATION:  Yes, Your Honor.  If we apply two

21  levels for acceptance, is a 31 and a 108 to 135.

22       THE COURT:  Ms. Tangeman, I'm -- I've stated my

23  reasons for that.  I realize I am short circuiting your

24  chance to argue, by all means preserve the matter for the

25  record and make your objection, please.  And I know it

1    might well lead to an appeal because, you know, the law is

2    generally that how can you accept responsibility if you

3    contest the charges, put the government to its proof.

4    Well, to do what he did was a convoluted, expensive and

5    inconvenient way for it to happen, but I think applying the

6    sense of an acknowledgment, an admission, particularly in

7    these cases, is an important first step.  I think in every

8    criminal case that's why we give it the weight that we do

9    at the time of sentencing because it's a sign, signal that

10   when the individual returns, there's some greater hope that

11   he or she will, in fact, be a law abiding citizen rather

12   than the person who says I didn't do it, I didn't do it,

13   I'm innocent, I've been framed, fake news, so to speak.

14   And that's my rationale.

15        Go ahead.  By all means preserve it.  And I don't

16   mean to cut you short, but, you know, once again, I want

17   you to know exactly what I'm thinking about.

18        MS. TANGEMAN:  I appreciate that, Your Honor.

19   And I would note that I filed a sentencing memo that

20   addresses this very argument, it's Subsection A of the

21   argument section of my sentencing memo, document 65, that

22   was filed on September 17th.  Not going to go through,

23   obviously, all the case law that I cited.  I would just

24   note that I incorporate all of those arguments.  And the

25   government's opinion is that the defendant went to trial

1    not to preserve any legal issues, which is really the only

2    rare situation that the guidelines contemplate for someone

3    who goes to trial and still receives acceptance, so he does

4    not fall within that.  We would respectfully disagree.  We

5    felt that the trial was more his opportunity, and his

6    family's opportunity, to make sure the public knew that his

7    family knew nothing about it.  I saw it almost as if he

8    wanted to clear the rest of his family members.

9            And in my opinion, and I think the prosecution

10    team's opinion, we felt that the defendant minimized

11    with -- within his testimony by downplaying the

12    significance of having sex toys next to child pornography.

13    In fact, I think he, very defensively, said those sex toys

14    are legal.  Well, that wasn't the point of the questioning.

15    Point of the questioning is that he was using them to

16    masturbate to children's items, childrens' underwear, and

17    child pornography.  And then, likewise, he minimized --

18            THE COURT:  I agree, Ms. Meyers, on both, and I

19    agree the paraphernalia is a troubling aspect of the case.

20            MS. TANGEMAN:  He also minimized with the agents

21    when he was being interviewed.  And, in fact, there's a

22    whole exchange where one of the TFOs tries to explain to

23    him, quote, just viewing, as he describes it, how that

24    really isn't bad because it's not hurting the child.  And

25    the TFO, to his credit, in a very professional and

1    courteous way, basically says we're going to have to agree

2    to disagree.  He tries to explain it to the defendant

3    repeatedly and the defendant doesn't get it.  He literally

4    does not get it.  And that, unfortunately, is the problem

5    that we see time and time again, even with defendants who

6    admit to receiving or distributing child pornography, in

7    this case receiving.  But he didn't really understand that

8    aspect of it.

9           We would also note that while technically he was

10   not distributing, because this kind of dark web may -- was

11   filtering portions of child pornography files through other

12   people's IP addresses, perhaps even unbeknownst to the

13   users.  This defendant was very tech savvy, knew all about

14   this program, and, in fact, said, I thought that this

15   program was going to ensure me anonymity.  So we would

16   dispute the fact that the defendant denies his distribution

17   to the extent that we would say he knows that these

18   programs are filtering child pornography through other

19   people's systems.  Perhaps not enough to warrant the

20   enhancement, but enough that when he takes the stand and he

21   denies distribution, we feel that's another form of his

22   minimization.

23          And lastly, of course, is the fact that we didn't

24   elicit some things which are somewhat disturbing, like the

25   fact that he had videos about how to groom a child.  And

1    nowhere in his interview did he sort of express remorse for

2    that.  So for all of those reasons and the arguments we

3    noted, Your Honor, the government's position is that he

4    should not receive any reduction for acceptance.

5              THE COURT:  Okay, those are fair points.  I was

6    cognizant -- I'm sorry, as you know, sometimes I have a lot

7    to do on these Mondays, I obviously remember the trial.

8    One thing I do remember, though, he even admitted I'm

9    addicted to child pornography.  I think that's an important

10    starting point.  I'm going to -- you know what I'm going to

11    do, I'm going to ignore that.  I'm going to reach the

12    sentencing, and I'm not there yet, trust me, depends what I

13    hear from Ms. Tangeman.  I've heard part of it and read

14    your sentencing memorandum and heard from him.  I'm going

15    to impose the sentence within the 3553(a) factors, and

16    without reference to whether I should give the

17    enhancement -- give the reduction or not for acceptance,

18    quite candidly, one way or the other.  If I would permit

19    Ms. Meyers to testify, I think she would agree with me

20    that's not the focus of what I'm trying to accomplish or

21    get to today.  It's just that -- on the other hand,

22    Ms. Tangeman, it's an odd kind of set of acceptance when

23    you put 12 ordinary people and The Court and its personnel

24    to the task of viewing that stuff.  It's one thing to talk

25    about child pornography, but I'll be quite candid, there

1   are some of those images, and from an earlier trial like

2   this I had, you can't forget them.  You can't erase them,

3   the nightmarish aspect of them.  In this case, if I

4   remember, I think there was a child in diapers.  I mean, my

5   God, and to take pleasure in that.

6           And the other thing I would say, Ms. Tangeman,

7   because you may have mentioned this, and we have 800 pages

8   I think it is, right, Julie, victim impact statements?  I

9   didn't read those.  I didn't have time.  However, I read

10  enough to know that the -- the -- the impact of being a

11  victim certainly went above a certain age, one who, in

12  fact, has the ability to recollect.  I recollect things

13  when I was three years old, my brother coming home

14  February 1943 or '44, Roosevelt's death was -- I was not

15  even five years old.  There's certain things that make an

16  impact at a very young age.  And my dad went off to war in

17  December of 1944.  These are things I remember from a very

18  young age.  You have to read but two or three victim impact

19  statements to realize the potential life-long impact that

20  being a victim has.  It's bad enough to be put to the task

21  of looking at the stuff as a juror, as a prosecutor, as a

22  defense attorney, and as a pretrial service probation

23  officer, but, you know, especially with somewhat older

24  children.  And to some extent, maybe it's an impossible

25  thing to ask for somebody to understand that, indeed, just

1    viewing is exactly the kind of thing that is on the minds

2    of many victims, that there are people out there that will

3    never go away, right Ms. Tangeman?

4              MS. TANGEMAN:  Yes.

5              THE COURT:  That's a very common theme, right,

6    Julie, in terms of it will never go away, it's out there, I

7    can't stop it.  And I don't -- I don't think there were

8    older, you know, but still underage victims in this case.

9    But nonetheless, with them, what if somebody recognizes me,

10   I don't look that much different 15 years later than I did

11   when I was 15 years old, maybe one of those people who

12   looked at me in that moment of degradation will recognize

13   me, and if you saw me then, then what now.  So I'm going to

14   set that to one side.  I'm simply not going to take that

15   into account.  Thank you, Ms. Tangeman, for your apt and

16   appropriate remarks.

17             The other thing, quite candidly, counsel, I will

18   have given her the case, which could well be appealed, in

19   all likelihood would, which is simply if I got reversed

20   we'd be right back here, I would probably give the same

21   sentence which is the point I'm trying to make, okay.  I

22   found acceptance once after a trial where the defendant, in

23   a presentencing session, finally admitted, yes, or kind of

24   perhaps maybe I did sell the drugs, because I was trying to

25   avoid a then mandatory life term of imprisonment.

1    Ms. Tangeman, I had the panel with Cissy Daughtery, Ron

2    Gillman and Eric Clay.  And if I had chosen a Sixth Circuit

3    panel to get away with that, those are the three judges,

4    and they came to me with about a page and a half, you can't

5    do that, and I'm aware of that too, okay.  So why give her

6    that opportunity because that was simply leave Mr. Rogers

7    in a position, well, what's going to happen now, 18 months

8    from now, and that doesn't do any good, okay.  So

9    Ms. Tangeman, I -- that's how I'm going to handle your --

10   thank you very much.  Counsel, is that okay with you?

11           MR. LEFFLER:  Yes, Your Honor.

12           THE COURT:  Both of you, you've preserved it for

13   possible appeal.  But obviously I'm going to take the

14   conduct and all of its circumstances into account,

15   including those Ms. Tangeman's called to my attention.

16           That being said, Ms. Tangeman, on behalf of the

17   government?

18           MS. TANGEMAN:  Thank you, Your Honor.  Again, we

19   also address the sentencing issues in our sentencing

20   memorandum, and so I won't, in the interest of time, rehash

21   all of those arguments.  But the -- the bottom line is that

22   we do not feel that the mandatory minimum is appropriate in

23   this case.  We would respectfully disagree with the judges

24   in this courthouse who do not give guideline sentences in

25   receipt of child pornography cases, so we're not going to

1   make that argument.  The Court knows my feeling on that.

2          But then moving away from that, and obviously all

3   the arguments I made are arguments in support of a

4   guideline sentence, but knowing that that is not typically

5   the practice of The Court, I guess my focus would be more

6   on why the mandatory minimum is not appropriate, that this

7   sentence needs to be higher than that.

8          THE COURT:  I would agree with that.

9          MS. TANGEMAN:  Very good then.

10          THE COURT:  I mean, as I say, as apparently

11   willing and ready to accept rehabilitation --

12   rehabilitative efforts, and also being of the view sooner

13   we get him out of the prison system, the more effective

14   those efforts are likely to be.  On the other hand, I don't

15   really know what goes on in prison, just that the flood of

16   people who long ago outgrew the capacity of Butner where

17   they used to go, five, ten -- ten years or so ago.  And

18   so -- I -- I agree with that most certainly.

19          MS. TANGEMAN:  And with that in mind, Your Honor,

20   then we would just note some of the factors that we believe

21   support a sentence well above the mandatory minimum.  First

22   of all, this defendant had an enormous collection.  By

23   guideline calculations, he had close to -- little over

24   6,000 images, and then the videos were 2,000.  And all

25   together then if you were to multiply that times 75, you're

 1   talking about tens of thousands of images under the

 2   guideline since the videos are converted.  One video equals

 3   75 images.  His collection also included the worst of the

 4   worst, believe it or not.

 5            THE COURT:  I agree with that.

 6            MS. TANGEMAN:  Believe it or not --

 7            THE COURT:  I'm all too well aware of that.

 8            MS. TANGEMAN:  We do categorize these, and he had

 9   the kind of stuff that we put in the worst category,

10   infants, toddlers, penetrative sex acts, The Court knows,

11   well aware, and, frankly, The Court doesn't even have to

12   imagine, The Court was forced to view it, as was the jury.

13   And we would also note that the other items that he had are

14   concerning, and I've mentioned those.  His -- the presence

15   of childrens' underwear, his, you know, the videos on how

16   to groom a child.

17            THE COURT:  I really am aware of those

18   aggravating factors.

19            MS. TANGEMAN:  Even the fact that he refused to

20   take a polygraph, which is well within his right.  And I

21   don't suggest The Court should hold that against him,

22   that's not what I'm saying.  What I'm saying is we will not

23   ever know whether or not there was any hands-on conduct

24   because of that.

25            And we would also note that, while admitting that

1   you have an addiction is important, you know, he had the

2   means to get help.  He worked for the railroad, he had a

3   very good income.  He had savings, he lived alone.  He

4   managed to hide this from his family.  He could have very

5   easily gone and sought out counseling and he didn't.  He

6   didn't do that.  In fact, he allowed it, even with the

7   means that he had, to continue.

8          And I think the most powerful thing is really to

9   read these victim impact statements.  I mean, The Court hit

10  on it perfectly --

11         THE COURT:  I did not -- there was simply too

12  many.

13         MS. TANGEMAN:  Yes, but you hit on it perfectly,

14  based on what was even just the PSR, the quotes from the

15  victims, that the initial abuse recedes into the past.

16  These children grow up, and believe it or not, their abuser

17  actually becomes the least exploiting of all of the people

18  in the child pornography realm.  What takes over as the

19  years pass are people like this defendant, the ones who are

20  continuing to receive and distribute, or one or the other.

21  Those are the ones that keep their harm multiplying,

22  compounding and worsening.  And I think several of them

23  said it best, you know -- you know, one woman said, one

24  parent said, If we fail them now, we fail ourselves.  You,

25  Your Honor, have the power here today to say enough is

1    enough.  Please, Your Honor, here today say enough is

2    enough.  I mean, those are the words of a victim, and

3    that's their feeling on it, is that they can't ever get

4    ahead of this.  They can't ever get ahead of this.  And

5    that's reflective in the psychological evaluations, the

6    financial records.  Some of these children grow up to be

7    adults who literally cannot leave the house, who cannot

8    function, who have substance abuse issues to try to cope,

9    who have multiple suicide attempts behind them, who have

10   psychiatric stays behind them.  And then, of course, there

11   are those that somehow manage to find some kind of normalcy

12   amidst all of the abuse.

13          But we would note the defendant's noticeable lack

14   of remorse during the trial.  He admitted his conduct, and

15   he has admitted it since, but not once did we hear in the

16   interview, or at the trial, or even in the PSR, him ever

17   express any understanding as to what this has done to the

18   victims.  The only thing we heard was him lament his

19   addiction and what it's done to him.  In fact, in the

20   interview, it would have been -- if I had been gay, that

21   would have been better, that would have been more

22   acceptable.  This is much less acceptable.  I could never

23   ever talk about this with my family.  Well, that's all fine

24   and good, but, you know, the reality is he had resources,

25   and he didn't avail himself of those.  And in the absence

1  of that remorse, in the absence of any expression of

2  understanding, just what he has -- his actions have done to

3  these victims, we would argue that a sentence well above

4  the minimum, regardless of The Court's position on

5  acceptance, would be appropriate in this case.  Thank you.

6          THE COURT:  Counsel?

7          MR. LEFFLER:  May I respond?

8          THE COURT:  Absolutely.

9          MR. LEFFLER:  Just --

10          THE COURT:  Otherwise I would be giving

11  Mr. Rogers a gold plated --

12          MR. LEFFLER:  I know, I haven't seen you probably

13  in about 35 years when you were a magistrate and I had a

14  few cases up here in the old days.  I was the elected

15  prosecutor in Huron County for 24 years and had a lot of

16  child abuse cases, not so many child pornography cases, a

17  few.  Of course the sentences were not quite as harsh for

18  some of that period of time.  I don't take child abuse as

19  anything but horrifying.  I think it's a little bit crazy

20  to argue that it's more horrible to look at something than

21  the actual rapist and abusers, boggles me a little bit.

22  But I understand there's continuing effects that are

23  horrible, and this is bad.

24          THE COURT:  I think there's -- it's a difference

25  in kind, obviously, than the actual physical assaults.  Of

1    course for many of these victims, whether it's one video or

2    picture or whatever, these aren't one time occasions in

3    their lives.

4           MR. LEFFLER:  It's horrible, it's horrible.  I've

5    seen this, it's really, really bad.  And I know the

6    sentences are horrific, I've put people away for life in

7    prison without parole for various sex offenses.

8           I want to focus on what's good about this

9    defendant.  He was a hard working man, worked for the

10   railroad for 14 years, and I know this Court has had some

11   experience with railroad cases.  He's a hard working

12   person.  Sometimes I know the implication is that all he

13   does is sit there looking at this video, but most of the

14   time he's working and sleeping.  Probably every Saturday

15   he's doing this crazy stuff with these addiction to these

16   sex offenses.

17          And he's also hiding it from his family.  That's

18   his big thing, and I don't disagree that that's part of his

19   motivation.  It's horrible.  He knows what he was doing,

20   that the addiction is so horrible, and he knows that.  But

21   he is a hard working person.

22          I also want to note for The Court that he went

23   into the Marine Corp. for four years at a relatively late

24   age.  I think part of that was a way of his to try to treat

25   this problem, that he went into the military thinking I'll

1   change my life, I'll do something different, and went

2   into -- went into the Marine Corp. for four years.

3           THE COURT:  I know it's in the Presentence

4   Report.  When did he serve?

5           THE DEFENDANT:  It was October of 2009 to October

6   of 2013, Your Honor.

7           THE COURT:  Deployed?

8           THE DEFENDANT:  I never got the chance, Your

9   Honor.

10          THE COURT:  Okay.

11          MR. LEFFLER:  And -- but I do think that was part

12  of the motivation for that, to do that.  And obviously he

13  recently then decided he couldn't -- he only had a four

14  year leave of absence from the railroad or he couldn't keep

15  the job, then he went back and went to work.

16          He's been a hard working person.  He's done these

17  things, he can't hide it.  I don't really grasp myself how,

18  on this kind of thing, you know, on the -- an older child

19  at 16 or 17 or 15 or 14, I understand there's 7 billion of

20  us, and the sex drive is as the good Lord thinks that's

21  where we're at.  For these children, that's obviously a

22  drive that went nuts in his case.  That is inappropriate,

23  and I don't know how that happened, where the psychology

24  is, that's a matter for the professionals and psychiatrists

25  to work on.

1          I knows that he's been in counseling.  I know

2     he's going to go to prison for a significant period of

3     time, and when he gets out he's going to have to deal with

4     this problem.  I think he knows he has to deal with it.

5     There's certainly been some hiding from the family about

6     the depth of the images and what he's seen.  Doubt that his

7     mother is wanting to see these things, that's part of maybe

8     the hiding of this.

9          But he's accepted his responsibility, and he

10    really does want to change, Your Honor.  We sat and agreed

11    to the restitution.  He's gone through the numbers of

12    the -- of the victim statements himself, and I think gained

13    some knowledge of how this affects people going on.  I

14    think I've learned some of that myself looking at that,

15    that this is terrible for people.  Some of that is the

16    internet, I guess anything we ever do is preserved forever

17    for all of us, whatever -- whatever we've done.

18         Those are just some thoughts I've had.  Obviously

19    I haven't had a lot of time to work on this, Your Honor.  I

20    got to spend a couple of hours with him on Friday.  I don't

21    know the family well.  But I did want to add those things,

22    Your Honor.

23         THE COURT:  Mr. Rogers, you have the right to

24    speak on your own behalf before I decide what I'm going to

25    do.

1          THE DEFENDANT:  I would like to address The

2     Court, please.

3          THE COURT:  Absolutely.  You have that absolute

4     right.

5          THE DEFENDANT:  Your Honor, ladies and gentlemen

6     of The Court, first of all I'd like to apologize for taking

7     the time of The Court in this matter.  And I would like to

8     say that at the time that I was downloading this material I

9     didn't fully understand the impact that it had on the

10    persons involved, the victims.  And through working with a

11    counselor, she has opened my eyes to the lasting effects of

12    child pornography, and she's given me different

13    perspectives on how they feel about these kind of things

14    being out there in the public view.  And it's changed my

15    whole view about it.  It's, like, I -- I understand that,

16    you know, making an apologize is not going to fix things

17    for these victims, but I do want to make an apology, and I

18    can only ask for their forgiveness.

19          THE COURT:  Anything further?

20          THE DEFENDANT:  No, Your Honor.

21          THE COURT:  Julie, have you got a moment?  I'm

22    going to step down with the probation officer for a moment.

23               (A brief recess was taken.)

24          THE COURT:  I'm obviously having trouble in

25    reaching -- Ms. Tangeman, something occurs to me.  To your

1  knowledge, have other judges in the building, Judge

2  Zouhary, Judge Helmick, perhaps Judge Potter, I'm not sure

3  you were here when he was here, but I think that's -- have

4  you -- have you had, or do you know in your office, or

5  maybe do the agents know, where people have gone to trial

6  in front of my colleagues, may have had a guideline range

7  in this range, what they have done?

8        MS. TANGEMAN:  Are you speaking specific to child

9  pornography, Your Honor?

10        THE COURT:  Child pornography, yeah.

11        MS. TANGEMAN:  I have not had, I believe, any

12  other child pornography case go to trial except in front of

13  you.

14        THE COURT:  Okay.  And you don't know -- I

15  mean --

16        MS. TANGEMAN:  I'm trying to think of one

17  offhand.  I had one that got close, the defendant pled a

18  week before, it was a case in front of Judge Helmick.  That

19  was a little bit different because the defendant had been

20  accused of actually basically kidnapping and actually

21  assaulting a child when he was a juvenile.  So that

22  sentence, I think, was more reflective -- we had the victim

23  come back and testify.  So that would probably not be

24  exactly on --

25        THE COURT:  Do you recall what the -- what the

1    sentence was in that case?

2              MS. TANGEMAN:  I believe it was in the 90s, 92

3    maybe, 92 months maybe.  It was --

4              THE COURT:  You don't recall the base offense

5    level or whatever?

6              MS. TANGEMAN:  I do not.

7              THE COURT:  Likely have been in this

8    neighborhood?

9              MS. TANGEMAN:  It would have been slightly higher

10   because the defendant in that case was actually

11   distributing.  And I can tell you that in front of Judge

12   Helmick I received a 72 month sentence for a defendant who

13   had no prior record, admitted, did not go to trial, worked

14   for Chrysler for 30 some odd years, went to Maumee Valley,

15   and also had had a heart transplant, so with what I would

16   call more mitigation than this defendant.

17             I have had a case in front of you where you did,

18   in fact, give the mandatory minimum.  It was the Sean

19   Magner case where he was a --

20             THE COURT:  What was that mandatory minimum?

21             MS. TANGEMAN:  That mandatory minimum was 60

22   months, and you gave 60 months.  He took care of elderly

23   women.  He had been raped as a child, and he basically had

24   lived a life of essentially a hermit.  He did not leave the

25   house often, so forth.  So to give some perspective both on

1    the higher end and on the lower end --

2              THE COURT:  All right.

3              MS. TANGEMAN:  I can go on if you'd like.

4              THE COURT:  No, I understand.  The only case I've

5    tried I gave -- actually 21 year old Boy Scout who

6    testified, you know, blamed his roommate who testified he

7    was bogus, he couldn't admit it.  I gave him 72 months.

8    But, candidly, that was some time ago when we were sort of

9    just getting the on slot of the mandatory minimums.  Okay.

10   Okay.  Anything further, counsel?

11             MR. LEFFLER:  No, Your Honor.

12             THE COURT:  I'm going to impose a term of 96

13   months.  Quite candidly, in light of what she indicated,

14   there was particularly aggravating circumstances in that

15   case, as I think are in this case.  I realize it's a long,

16   long, an awful long time, that's what's troublesome to me.

17   I think the longer we warehouse people, we may not be

18   serving the desire.  And I think Mr. Rogers has it, to

19   become rehabilitated, and to become free of this.

20             But on the other hand, I do think that it's

21   appropriate to try, however ineffective it may be, to

22   maintain some consistency at least within the same

23   courthouse.  Ms. Meyers indicates that in Cleveland in this

24   case, there are many judges there who give guideline

25   sentences.  That's not the custom here.  I think

1   Ms. Tangeman has made arguments in almost every case you've

2   had, guidelines.  And rarely, if at all, that -- this is

3   about 24 months, two years longer than any sentence I've

4   previously given in any child pornography case.  And I'm

5   doing it without regard to whatever the -- I realize, I

6   guess, you know, it's even -- be a variance even from -- so

7   it's a very significant variance.  It's, what, about around

8   a quarter, a third to a quarter off of what -- if I do the

9   math correctly, I don't know, but that is my sentence.

10          So formally to pronounce sentence, pursuant to

11  Sentencing Reform Act of 1984, it's the judgment of The

12  Court defendant be and hereby committed to the custody of

13  the Bureau of Prisons to serve a term of 96 months.  You

14  will -- you will be remanded forthwith to custody of the

15  Bureau of Prisons.  I hope you are aware of that

16  likelihood.  As you know, I released you following the

17  trial, over the vigorous objection of Ms. Tangeman.  And

18  objection that was well taken, I disregarded it, perhaps

19  unlawfully.

20          In any event, that will be followed by a life

21  term of supervised release.  You shall report within 72

22  hours upon your release from the custody of the Bureau of

23  Prisons to begin serving that term.  You shall report to

24  pretrial service and probation office either in this

25  district or in the district in which you are released.

1          You do have a life-long obligation to register as

2     a sex offender.  There is a limited period of time if you

3     change residences, whether in the same community or

4     elsewhere, within which you have to make that registration.

5     That is -- failure to do so is prosecuted vigorously by

6     this office, and I assume that practice is going to

7     continue forever.

8          While on supervised release you'll be required to

9     comply with all the standard conditions adopted by this

10    Court, of which you'll be made aware now and at the time

11    you are released.  Among other things, will include, at the

12    discretion and direction of the probation officer, sex

13    offender rehabilitation and treatment, inpatient or

14    outpatient.  Such other treatment or such condition as the

15    probation officer shall deem necessary.  I don't think

16    drugs or alcohol are a problem; is that correct?

17         THE DEFENDANT:  No, Your Honor.

18         THE COURT:  Okay.  While on supervised release,

19    among other things, for the rest of your life you can never

20    again lawfully possess a firearm, I'm sure that won't be a

21    problem.

22         On supervised release you have to -- wherever

23    you're living, wherever you're working, your automobile,

24    any storage containers, your computer, all can be subject

25    to a search, based on reasonable suspicion that you've

1    committed a violation of supervised release, and/or

2    committed another offense, state, local or federal.  And

3    obviously you cannot commit another offense.  Failure to

4    consent to a search will be grounds for revocation.  And

5    you have to notify those with whom you may be living of

6    that condition.

7            You will have to submit a DNA sample to -- to the

8    Bureau of Prisons.  There's a special -- there's a --

9    there's some -- there's a special assessment of $5,000; is

10   that correct, Ms. Tangeman?

11           MS. TANGEMAN:  The JVTA assessment, correct, and

12   then there's also just a special assessment of $100 as

13   well.

14           THE COURT:  $100.00 dollars for the conviction.

15           With regard to restitution, it's my understanding

16   that the parties have reached agreement, that agreement

17   will be incorporated into the judgment entry.

18           MS. TANGEMAN:  And Your Honor, if I may, there

19   are two corrections on that point in the PSR.  On -- this

20   is the final copy, so it's document 59, page ID 448, or

21   Ms. Meyers' Page 26.  It should be noted that the victim

22   for the Jan Socks one series, should be Sierra,

23   S-I-E-R-R-A, not Violet.  And for the SweetSugar series,

24   while there are three victims who are part of that series,

25   the defendant had in a video depicting only one of those

```
 1    victims, and that victim was Pia, P-I-A.  So the other two

 2    victims, Mia and Ava, should not be mentioned there.  And

 3    then, lastly, I would note there are three additional

 4    series that did not make it into the PSR, and my apologies

 5    for not bringing this to Ms. Meyers' attention sooner so

 6    that they could be added.  I did confirm with my victim

 7    witness advocate, we went through the 800 plus pages, and

 8    found, in fact, the request to confirm those.  One

 9    additional series is Two Crazy Gurls, spelled G-U-R-L-S,

10    and that victim is Chelsea.  And then there's also the

11    Vicky series, Vicky spelled with a Y.

12            THE COURT:  I'm familiar with those.

13            MS. TANGEMAN:  And also the Tara series.

14            THE COURT:  I'm familiar with those.

15            MS. TANGEMAN:  And we would note that the request

16    for Two Crazy Gurls, or the Chelsea victim, is at least

17    $10,000.  Vicky requested $10,000, Tara requested

18    $18,136.40.

19            Now, having said that, I would note that

20    Mr. Leffler was very good in responding and getting back

21    with the government multiple times on Friday in an effort

22    to resolve this.  And I believe we have tentatively, and he

23    can confirm or dispute this, that we have tentatively

24    worked out an agreement for restitution as follows.  And I

25    explained how I came up with it.  I made a chart of
```

1    degrees.  So in other words, depending on the number of

2    files the defendant had of each series, and then that

3    obviously would go up, depending on the number of files he

4    had.  Then I cross referenced each series to determine how

5    many files he had within each series.  So that broke down

6    to being $5,000 for the AtSchool series for victim Violet,

7    $4,000 for the Cindy series, $3,000 for the Jan Socks one,

8    and victim Sierra, $4,000 for the Lighthouse series, and

9    victim Marine, $6,000 for the Marineland series for victim

10   Sarah, $30,000 for the PinkHeart Sisters series, which

11   includes two different victims; $3,000 for the Jenny

12   series; $3,000 for the SweetSugar series; $4,000 for the

13   Jessica series; $8,000 for the Two Crazy Gurls series;

14   $5,000 for the Vicky series; and $5,000 for the Tara

15   series, for a total of $80,000.

16          And along those same lines, Your Honor, I did

17   note in my sentencing memorandum that we have concerns over

18   the defendant not disclosing his vast collection of

19   firearms and ammunition, some of which my TFO said appeared

20   to almost -- some of them appeared to be older and almost

21   collectibles.  So we would ask that a valuation of those

22   firearms be permitted by The Court in order to address and

23   pay for the restitution.  And we would note that every

24   single restitution request came with financials that

25   supported those requests.  And, in fact, the financial

1    supported requests much higher than the numbers where we

2    arrived.  But I would note that in the extensive 800 plus

3    pages, most of that is actually psychological evaluations

4    and financial forecasts done by experts, as The Court is

5    aware, that these victims go out and have to have in order

6    to meet the confines of Paroline.

7             And then lastly, Your Honor, I would note the

8    defendant is a homeowner as well, owns his own home.  And

9    so to the extent that the restitution order may be

10   questioned, I would note the defendant does have both

11   property and assets, and we would ask for that valuation of

12   the firearms.

13            THE COURT:  Okay.  Counsel, have you had a chance

14   to consider -- have you had a chance to consider the

15   additional data in that regard?

16            MR. LEFFLER:  Yes, Your Honor.  We agreed to that

17   figure.  And we -- of course we don't like it, but we've

18   agreed to that figure.  There is -- the home is there's a

19   big mortgage on it, obviously he's going to be going to

20   prison, and the family's going to try to sell the home, and

21   there's some issues with that.  We could provide a

22   suggested auctioneer for the -- for the guns that we know

23   is more likely to get a decent price to the -- to them, and

24   that's kind of where we're at with it, Your Honor.

25            THE COURT:  Okay.  Mr. Rogers, did you hear

1    Ms. Tangeman?  And do you understand what's going on with

2    regard to the restitution computations?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  Do you object to your counsel being

5    willing this morning to consent to those figures and

6    resulting whatever that total restitution figure is?

7              THE DEFENDANT:  No, Your Honor.

8              THE COURT:  Okay.  Then, counsel, if you'll,

9    before the end of the day if you could, or sometime

10   tomorrow, get that to Deanna so she can incorporate it --

11   Deanna, why don't you check with both counsel just to make

12   sure that that still concords with their understanding and

13   agreement, please.

14             COURTROOM DEPUTY:  The final restitution

15   breakdown, Judge?

16             THE COURT:  Yes, that's what I'm saying because

17   there have been some last minute changes.  I just want to

18   make sure that the figure is something that -- that counsel

19   agree with, and Mr. Rogers indicated his agreement to.

20             One other condition is that you'll be required

21   diligently to seek, and if you obtain, to maintain lawful

22   gainful employment.  You shall work with the pretrial

23   service probation officer with the efforts that he or she

24   makes on your behalf.  And you shall make full and complete

25   financial disclosure promptly forthwith upon request from

1    the probation officer.  Do you understand that?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  Okay.  And anything else?

4              MR. LEFFLER:  Your Honor, we were wondering if we

5    could go to Elkton Federal Corrections.

6              THE COURT:  I will make that recommendation.  And

7    counsel, if there are any particular programs that he could

8    benefit from that are available through the Bureau of

9    Prisons, I've just started adding that as a footnote to my

10   sentencing orders.  I don't think you got that, I just

11   started actually within the past few weeks.  But there is a

12   Bureau of --

13             MR. LEFFLER:  There is a sex offender management

14   program at Elkton that we think he should be enrolled in.

15             THE COURT:  I will -- I will make that

16   recommendation.  I will do so with emphasis given to the

17   fact that the defendant has acknowledged his addiction and

18   his need for re -- and desire for rehabilitative treatment.

19   And that is all without overlooking at all Ms. Tangeman's

20   very -- very substantially convincing response to my

21   initial thoughts.

22             MS. TANGEMAN:  Your Honor, your esteemed deputy

23   clerk, once again, reminded me that the Vicky series also

24   requested a no-contact order be issued.  I would say that

25   probably would be a fair order with respect to every single

1    C.P. series.

2         THE COURT:  To the extent the identity of the

3    victims becomes known to you at any time, for whatever

4    reason, you're to have no contact with them.  I realize

5    that's highly unlikely, but, nonetheless, that's a fair

6    request.  You can make that request in all further case in

7    front of me, Ms. Tangeman.

8         Okay I've considered the Section 3553(a) factors

9    in reaching the sentence that I have just pronounced.

10   Obviously would have made -- what has been said in the

11   courtroom makes clear of the very serious nature of the

12   offenses.  It's not a victimless crime, quote, mere, closed

13   quote, viewing, adds injury to the injury, or injury to the

14   insult, physical insult or emotional insult of the original

15   trauma or traumas these victims suffered whether among

16   those recorded or not.

17        And I've considered the history, nature and

18   characteristic of the defendant.  Obviously except for this

19   very severe and deep seeded perversion, and that's what it

20   is, obviously lived a law abiding and productive life.  The

21   fundamental purpose is both individual deterrence.  I think

22   that the sentence serves that purpose.  Once again, as

23   always, I urge the government to publicize, particularly in

24   the media and the, you know, region of his -- I think Huron

25   County or wherever it is, whatever publications and

1    otherwise see to it a press release so others who may be so

2    inclined -- and obviously The Blade and TV media, and

3    broadcast media so that people understand, and so that also

4    the -- I would suggest to the government, if it would, that

5    this is a defendant who thought that he was, quote, immune,

6    that he couldn't be caught.  And in fact, the government

7    has means and methods of apprehension that it's employing

8    vigorously to -- to -- to detect and apprehend, prosecute,

9    and have incarcerated, persons who otherwise appear on the

10   surface, outside their own four walls to be living, quote,

11   a normal life, closed quote, when the opposite is quite the

12   contrary.  I really think that public deterrence -- we can

13   talk all we want about -- we're never going to stop this

14   traffic, but on the other hand we can, at the very least,

15   try to make clear to those who indulge in its opportunities

16   out there, the self gratification or otherwise, understand

17   that the consequences may be severe, and to that limited

18   extent perhaps we can reduce some of the consequences,

19   though we can never eradicate indicate them.

20           Anything further you wish me to say with regard

21   to the 3553(a) factors?

22           MS. TANGEMAN:  Not with respect to that, Your

23   Honor.  I'm sorry, did I miss you ruling on the request for

24   valuation of the firearms?

25           THE COURT:  That's fine.  Absolutely.

1          MS. TANGEMAN:  Thank you.  Nothing further.

2          THE COURT:  And the proceeds, of course, will be

3     applied to the restitution.

4          Counsel, anything further on behalf of your

5     client?

6          MR. LEFFLER:  Your Honor, I just understood you

7     to say that he is to be held then, no self surrender on

8     this?

9          THE COURT:  That's correct.  I mean, I -- I bent

10    to let him out.  I just don't think I can now.  And there

11    was -- I do think that those familiar with it would find

12    the sentence just.  I do think it's sufficient but not

13    greater than necessary to fulfill the purposes of

14    investigation, prosecution, conviction and sentencing.

15         One other thought, it passed through my mind as I

16    was speaking a moment ago, does either party have any

17    objection to any part of these proceedings not otherwise

18    made?

19         MS. TANGEMAN:  No objection by the government,

20    Your Honor.

21         MR. LEFFLER:  No, Your Honor.

22         THE COURT:  I do want to make clear,

23    Ms. Tangeman, I would have reached the same sentence from

24    the get go, that's the issue I have, what is sufficient but

25    not greater than necessary.  And the fact that my sentence

 1    of acceptance I expressed coming in was going to be a

 2    factor, has not been one way or the other -- and, counsel,

 3    likewise with your objections.

 4              Now, anything further from the government?

 5              MS. TANGEMAN:  No, Your Honor.

 6              THE COURT:  Counsel, anything further?

 7              MR. LEFFLER:  No.

 8              THE COURT:  Mr. Leffler, anything further?

 9              MR. LEFFLER:  No, Your Honor.

10              THE COURT:  Okay.  Mr. Rogers, all I can say is

11    good luck to you, and I hope that you do come out basically

12    cured, and that you work closely with the probation

13    officer.  Oh, you will be required, at the direction of the

14    probation officer, to take a polygraph, or such other

15    examinations that the probation officer may deem

16    appropriate.  Failure to submit to such may result in

17    revocation and return you to prison, do you understand

18    that?

19              THE DEFENDANT:  Yes, Your Honor.

20              THE COURT:  Okay.  No computer usage, that's

21    absolutely important.  No computer usage without the prior

22    approval of the probation officer who will have the right

23    to inspect any device that you may have, and failure to

24    concede to that request will also definitely result in

25    revocation.  Do you understand that?

1           THE DEFENDANT:  Yes, Your Honor.

2           THE COURT:  When you return you'll be -- you'll

3    have half your life ahead of you with any luck.  And I

4    certainly hope that working with the probation officer you

5    will never encounter any problems in that regard or any

6    other with the law.  Ms. Tangeman?

7           MS. TANGEMAN:  Your Honor, I forgot about

8    forfeiture.

9           THE COURT:  Absolutely.  Okay.  That will

10   conclude this proceeding.

11

12                          - - -

13                  C E R T I F I C A T E

14

15           I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17

18   s:/Angela D. Nixon            November 12, 2019

19   --------------------------              -----------

20   Angela D. Nixon, RMR, CRR        Date

21

22

23

24

25