1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF OHIO
2                     WESTERN DIVISION

3   UNITED STATES OF AMERICA,        Docket No. 3:18CR26

4           Plaintiffs,              Toledo, Ohio

5              v.                    March 5, 2019

6   KARL J. ROGERS,

7           Defendant.

8   ------------------------------

9           TRANSCRIPT OF JURY TRIAL, VOLUME 1
            BEFORE THE HONORABLE JAMES G. CARR
10              UNITED STATES DISTRICT JUDGE

11

12  APPEARANCES:

13  For the Plaintiffs:  Tracey Ballard Tangeman
                         Matthew D. Simko
14                       Office of the U.S. Attorney
                         Four SeaGate, Suite 308
15                       Toledo, Ohio 43604
                         (419) 242-5675

16

17  For the Defendant:
                         Reese M. Wineman
18                       6 West Main Street
                         Norwalk, Ohio 44857
19                       (419) 668-6840

20

21  Court Reporter:      Angela D. Nixon, RMR, CRR
                         1716 Spielbusch Avenue
22                       Toledo, Ohio 43624
                         (419) 260-5259

23

24  Proceedings recorded by mechanical stenography, transcript

25  produced by notereading.

```
 1              THE COURT:  If counsel could come over here for
 2   one minute.
 3                   (A side bar conference was had on the
 4                   record.)
 5              THE COURT:  Couple things.  I assume you want me
 6   to confirm that he has been -- what the plea offer is and
 7   discuss that it's his decision to exercise his right to
 8   stand trial.
 9              Okay, secondly, one of the CSOs told Deanna that
10   apparently the jury -- the defendant came back into the
11   courthouse simultaneously with the jurors.  Did you know
12   that?
13              MR. WINEMAN:  No, I didn't know that.
14              THE COURT:  Why don't you have him come over
15   here.  I don't want to ask the jurors.  I want to ask him
16   first.
17                   (Defendant at side bar.)
18              THE COURT:  One of the court security officers
19   told my deputy clerk that apparently yesterday during the
20   noon recess you came back and entered the courthouse more
21   or less concurrently with the jurors, is that right?
22              THE DEFENDANT:  I was just walking back from
23   eating lunch at the same --
24              THE COURT:  You didn't have any contact or
25   conversation with anybody?
```

```
 1              THE DEFENDANT:  No, it was just walking back from

 2   the cafe a couple blocks --

 3              THE COURT:  Glass City Cafe?

 4              THE DEFENDANT:  Yeah.

 5              THE COURT:  Did they happen to go over there too,

 6   is that where they were?

 7              THE DEFENDANT:  That's where The Court officers

 8   sent everybody.

 9              THE COURT:  Okay.

10              THE DEFENDANT:  They told everybody that's the

11   place to eat.

12              THE COURT:  Did you have any contact or

13   conversation of any kind with them?

14              THE DEFENDANT:  No.

15              THE COURT:  Even say hello or nod your head?

16              THE DEFENDANT:  Maybe, like, hello or something,

17   but not --

18              THE COURT:  You can have absolutely no contact at

19   all with the jury, okay.  I can understand how sensitive

20   that is.  And, candidly, walking in there seeing that they

21   were there, you should have left and gone someplace else.

22   Do you see what I'm saying?

23              THE DEFENDANT:  Okay.

24              THE COURT:  My instinct is not to inquire of the

25   jurors if that's agreeable to you.  Do you want to talk
```

1    about it for a minute?  Let me know.

2                MS. TANGEMAN:  It's okay.

3                THE COURT:  And the other thing, I'm going to ask

4    Ms. Tangeman to state the plea offer that I assume you

5    rejected, which is your right, but I just want it on the

6    record.  That's my standard procedure when I understand

7    there have been plea negotiations in advance, and then, you

8    know, for whatever reasons the parties couldn't agree.

9    Doesn't matter to me, but I think it's important for

10   purposes of the record that she state, and I want -- if

11   that's the offer as you understand you've gotten it, and

12   you don't want it.  You don't have to tell me why, I don't

13   want to know why, okay, that's up to you.

14               MS. TANGEMAN:  I can actually state for the

15   record, Your Honor, there were no plea offers made.

16               THE COURT:  I'm sorry, I misunderstood.

17               MS. TANGEMAN:  That's okay.  There were no plea

18   negotiations.  We did not make any offers, and there were

19   never any efforts by the defense to approach us with any

20   offers.

21               THE COURT:  Okay.  I simply mis -- is that

22   correct?

23               THE DEFENDANT:  That was my understanding, there

24   was never any negotiations.

25               THE COURT:  Okay.  And that's acceptable to you?

1              THE DEFENDANT:  Well, that's why I -- I'm having

2    a trial.

3              THE COURT:  That's fine.  That's your desire to

4    proceed to trial in any event?

5              THE DEFENDANT:  Yes.

6              THE COURT:  Okay.  And what are the potential

7    consequences of conviction?

8              MS. TANGEMAN:  The charge carries a mandatory

9    minimum of five years and up to 20 years in prison.  He

10   will also be designated a sex offender.  And we would note

11   for the record that acceptance might have been a

12   possibility before, but obviously not now.

13             THE COURT:  I understand.  Okay, that's fine.

14   And so that basically there are no other mandatory minimums

15   that could affect the outcome?

16             MS. TANGEMAN:  There is a supervised release

17   mandatory minimum of five years.

18             THE COURT:  No, I'm talking about other --

19             MS. TANGEMAN:  Correct, no other prison mandatory

20   minimums.

21             THE COURT:  Okay, that's absolutely fine.  And

22   what else did you want to talk about before trial?

23             MS. TANGEMAN:  We wanted to confirm that

24   Mr. Wineman is able to go forward in light of his motion.

25             THE COURT:  You ready for trial?

1                THE DEFENDANT:  I believe so.

2                THE COURT:  Mr. Wineman, you ready for trial?

3                MR. WINEMAN:  Yes.

4                THE COURT:  You're confident that you're both set

5     to go?

6                MS. TANGEMAN:  Is that an audible yes for the

7     record?

8                THE DEFENDANT:  Yes.

9                MS. TANGEMAN:  Thank you.

10               THE COURT:  That's fine.  And I'm sorry, I got

11    interrupted.  And you're confident that both of you are as

12    prepared as you can be?

13               THE DEFENDANT:  Yes.

14               THE COURT:  All set to go.  Okay.  Good.  That's

15    fine.  Very well.

16               MR. WINEMAN:  Your Honor, just one other thing.

17    The witness that we were going to bring in late this

18    afternoon is not going to be available.

19               THE COURT:  At all?

20               MR. WINEMAN:  At all.

21               THE COURT:  Okay.  That's fine.  No problem.  The

22    other thing I just want to confirm, I don't want to know

23    whether you're going to take the stand or not.  I don't

24    want that disclosed.  But I want you to understand that

25    that's your choice.  In other words, Mr. Wineman can be

1    telling you you've got to take the stand, no, I don't want

2    to; or he can be telling you, you know, don't take the

3    stand and you say, no, I want to.  That's your choice, just

4    like it's your choice and nobody else's ultimately to

5    exercise your fundamental right to go to trial.

6              Okay.  The other thing I want you to understand

7    is that your going to trial doesn't matter to me, okay.

8    I'm perfectly content to sit up at the bench in the

9    courtroom as I am anywhere else.  I get paid no matter what

10   I do.  This is true.  And a lot of defendants, I think,

11   gee, if I go to trial I'm going to get in trouble with The

12   Judge.  No, I want you to understand that my job is to see

13   to it that, to the best of my ability, that the case is

14   tried -- that what the jury gets is fair and impartially

15   presented.  My job is really to keep the players in bounds.

16   Okay?

17             THE DEFENDANT:  Okay.

18             THE COURT:  So that's -- I just want to assure

19   you of that fact.  I don't even know -- I know generally

20   what the charge is, but without knowing what the possible

21   penalty was, I don't do that kind of preparation in advance

22   of trial because I want to be like a juror, although I'm

23   not a juror.  My function is totally different, okay?

24             THE DEFENDANT:  Okay.

25             THE COURT:  You understand that?  Okay.

1            THE DEFENDANT:  Yes.

2            THE COURT:  Good.  Any other initial issues that

3    we should talk about?

4            MS. TANGEMAN:  Yes, Your Honor.  We alerted

5    defense counsel we had had the representative sample of 19

6    total images and the videos all together.  Last night we

7    went through and removed four of the longest videos.

8            THE COURT:  Good.

9            MS. TANGEMAN:  And we are replacing them with

10   shorter less graphic videos.  And then we're –– and we are

11   adding one image.  So we did that to try to reduce the

12   amount of time, and we have alerted defense counsel as to

13   which ones they are, and we understand he has no objection

14   to that.

15           THE COURT:  Do you know what she's talking about?

16           MR. WINEMAN:  Yes.

17           THE COURT:  That's okay.

18           MR. WINEMAN:  I have been given the opportunity

19   to view those over the lunch hour.

20           THE COURT:  Good enough.  Anything else?

21           MS. TANGEMAN:  No, I don't believe so.

22           THE COURT:  Reese, anything for you?

23           MR. WINEMAN:  Separation of witnesses.

24           THE COURT:  Yeah, absolutely.  Yeah.  I'll

25   leave –– there will be a separation of witnesses, but it's

 1    up to each side to make sure that witnesses don't come into

 2    court and -- okay, so just keep an eye out.

 3              The other thing that she knows, I have a

 4    thoroughly idiosyncratic custom, I turn to the witnesses

 5    once the witness is sworn, and I say please tell --

 6    introduce yourself to the ladies and gentlemen, and tell

 7    them who you are, what do you do.  And if they're law

 8    enforcement, well, you've been involved in the

 9    investigation of this case, is that correct, yes.  And do

10    you recognize the person that's been charged in this case,

11    yes.  Just point them out, let the record show -- okay.

12    And then basically I don't know why, I just think it's --

13    especially with lay witnesses, it's my -- I like to think

14    it's a little more comfortable to them that -- figure out

15    there is, you know, an ordinary person with the same kinds

16    of curiosity the jurors have, okay.

17              The other thing I will ask is that, if you

18    desire, you're welcome to -- I will say who's your next

19    witness, and what do we expect to hear.  In other words,

20    I'm going to be giving the charge because I think it's very

21    important that from the get go they understand what the

22    case is all about.

23              And -- and I trust that my changes to the diction

24    and syntax of some of the key charges is acceptable.  I

25    just found, as is so often the case, I'm sorry, apologize,

1    batters up in Sixth Circuit, but one of those -- they're
2    not as bad as some of the OJI stuff, but they're just not
3    as comprehensive.  They're written for lawyers with
4    doctorate degrees and linguistics.  I'm serious.  All this
5    about film, undeveloped film, some of that has nothing to
6    do with the case.  I've tried to put some modifying clauses
7    where they should have been and so forth.  And knowingly --
8    and the other thing, candidly, took out deliberately.  It
9    didn't fit the matter, but if you want them back in, that's
10   fine.  The less the better.  And same with the sequencing,
11   just to give them kind of a checklist.  That's why I --
12   okay, I can't think of anything else.  I will ask who's
13   your next witness, what do you expect to hear.  Then you
14   can say, ladies and gentlemen, you'll recall in opening
15   statement I indicated that I expected that you will hear X.
16   Well, witness so and so is here to talk about X and Y.
17   Just whole thing is to put everything in a frame for the
18   jurors so they understand where we're going, why we're
19   headed there.
20          So say -- and finally, one final thing, I prefer
21   the use of the term opinion evidence rather than expert
22   evidence.  Another idiocrasy.  You'll all fall in the habit
23   of calling them an expert, but that tends, I think, to give
24   them a bit more elevation than sometimes they deserve,
25   okay.  Good.

1           MR. SIMKO:  I just want to -- you do not want us

2    asking -- in State Court they would sometimes ask The Judge

3    to recognize the --

4           THE COURT:  No, no.

5           MR. SIMKO:  I just wanted to make sure.

6           THE COURT:  You might say, Judge, have I done

7    enough to qualify the expert.  And don't spend a whole -- I

8    don't want the whole curriculum vitae.  I mean, give some

9    background about their experience, you know, what's your

10   job, what do you do, how do you go about it, did you do it

11   in this case.  We don't need all that other fluff, okay.

12   It just is gilding the Lilly.  He's here to talk about

13   the -- you want to give them some sense of why he's here,

14   but Dr. Small -- you have a Noble Peace Prize or whatever,

15   but that was your work for something not related to this,

16   but, no, Matt, that's -- and quite candidly, I'll be very

17   honest with you, and this may -- I don't think this is this

18   case, but where there's -- I don't like the whole rigmarole

19   about the records kept in the ordinary course of business.

20   But, A, if there's no objection, B, if there is, I'm going

21   to say, counsel -- Tracy's probably heard me say do you

22   have any reason to think this isn't what it says it is.

23   That's all we're talking about.  Don't give me this stuff

24   that all got drilled into our heads in law school.  Jurors

25   haven't got a clue what it's all about, kept in the

1    ordinary course.  So just plain and simple, get it in

2    there, make it understandable.

3            If there's nothing else, we'll get the jurors in

4    if they're ready, and we'll go to work.  Thank you, folks.

5            One final thing, Reese, Tracey knows this, you

6    would be a practitioner to this, no speaking objections.

7            MR. WINEMAN:  No.

8            THE COURT:  Just the usual thing to try to

9    communicate to the witness -- you wouldn't do it anyway,

10   but just, objection, hearsay.  If I can't rule on it right

11   away -- I'll be very candid, sometimes the glory of

12   realtime is that I get to read the question that I missed

13   because my mind was somewhere else.  Put my shoes on and

14   come over to side bar, I do all that stuff at side bar

15   unless I can --

16           MR. WINEMAN:  Yeah.

17           THE COURT:  He's going to check to see if we can

18   toggle -- I don't want images on your screens unless

19   they're going to be played if that's okay with you.  If

20   it's not, I'll -- I'll, perhaps, get the monitor here and

21   you can come look at them there, but you know what they

22   are.  I don't want the jury to -- the gallery to see those.

23           MS. TANGEMAN:  We've already alerted Jen Ramone

24   not to show it to the gallery.  It's supposed to just show

25   up on the jurors' screens.

```
 1              THE COURT:  Deanna, I assume that the monitors
 2   will not display this stuff either on their screens or in
 3   the gallery?
 4              COURTROOM DEPUTY:  It will display unless --
 5              THE COURT:  Not -- I don't want the gallery --
 6              COURTROOM DEPUTY:  Not if we don't publish it,
 7   there's a --
 8              THE COURT:  But the jurors have to see it.
 9              COURTROOM DEPUTY:  Oh, you don't want it to
10   display?
11              MS. TANGEMAN:  On the big screens.
12              THE COURT:  I don't want the public to see that.
13              COURTROOM DEPUTY:  Let me ask Dave.  The system
14   isn't set up to separate the two.  The only thing we can do
15   is turn those two monitors off.
16              THE COURT:  Please do.
17              COURTROOM DEPUTY:  Do you want them off for the
18   whole trial?
19              THE COURT:  Yes.  Well -- yes, they're here, they
20   can see.  They don't need the monitors.  We used to have
21   trials without big 28 screen monitors.  None of these
22   people -- all too young to remember that except for this
23   other guy right here, right, Reese?
24              MR. WINEMAN:  That's correct.
25              THE COURT:  All this fancy stuff.  Yeah, please
```

1  turn them off.  I don't want that stuff to be seen by

2  anybody that doesn't have to look at it.

3          COURTROOM DEPUTY:  Okay.

4          THE COURT:  Okey dokey, folks.  That was it.

5  Let's get the jurors.  Let's go to work.

6                  (Side bar concluded.)

7          THE COURT:  Counsel, one more time.

8                  (A side bar conference was had on the

9                  record.)

10         THE COURT:  I would ask that maybe -- I don't

11 think -- as long as there's nobody on the defense side, if

12 you'll tilt the monitors, tilt the computers.  Don't do it

13 just for the showing, I don't want the public to see this

14 stuff for lots of reasons.  I don't think it's fair to the

15 victims at all to have it disseminated anymore than it is.

16 You've got monitors, obviously.

17         COURTROOM DEPUTY:  Judge, maybe when they're

18 going to display the sensitive evidence they can flip the

19 monitor down.

20         THE COURT:  I don't want the jurors to see that

21 they're doing that.

22         MR. SIMKO:  Is there power buttons?

23         THE COURT:  Deanna --

24         COURTROOM DEPUTY:  I'm right here, Judge.

25         THE COURT:  I'm actually going to go back and

```
 1    tell the jurors that I don't want them viewing it.  There's

 2    some very graphic images displayed as part of the trial,

 3    and they will be displayed on the monitors of the people

 4    participating in trial before the -- I do not want them

 5    looking at them.  I don't want to make a big fuss out of

 6    it.  I don't want them visibly looking away or responding

 7    any way whatsoever because that could affect the jurors.

 8    But -- and I would ask, why don't you guys also tilt

 9    your -- have -- have your monitors, to the extent you can,

10    and I'm going to -- I will --

11              MS. TANGEMAN:  I don't know that it will go on

12    this morning.  It may be this afternoon, just depending on

13    how, timing wise --

14              THE COURT:  I understand.

15              (Side bar concluded.)

16              THE COURT:  Before the jurors come in, I want to

17    say something to the ladies and gentlemen.  I don't know if

18    there are gentleman, I can't see, I have a vision issue, so

19    if I'm -- in any event, to the spectators, this trial will

20    include, I expect, the display of some pretty graphic, and

21    to speak candidly, gruesome images.  This case involves

22    charges of receipt of child pornography.  The defendant is

23    presumed innocent.  It's a very important presumption, draw

24    no impression of my -- my view of the case.  I have no view

25    of the case at all.  I don't really know what it's about.
```

1    I've tried cases like this before, and I do know that part

2    of the evidence of necessity is the government's

3    standpoint, depictions of a sampling of what, according to

4    the government, yet to be proven, is found in his -- in his

5    possession.  During the display of that, I've turned off

6    the public monitors.  It will probably put -- potentially

7    it's unavoidable that you might be able to catch glimpses

8    of that stuff at counsel table.  I would ask, without

9    visibly looking away, if possible, try to avoid looking at

10   that stuff.  I can assure you you will not want to, okay.

11          The other thing I want to tell you is to the

12   extent that any of that becomes apparent to you, or you

13   find any of the testimony -- that sort of thing, plus any

14   of the testimony shocking or -- or disheartening, please do

15   not display those kinds of emotions in front of the jury.

16   It's very important that all of us who are participating in

17   the trial do so in a way that does not affect the

18   impartiality of the jury.  I trust that you understand what

19   I'm saying.  But that's why you will not be permitted --

20   normally we have the spectator monitors on in a trial so

21   that the jurors -- anybody's -- anybody in the audience --

22   everybody has the right to a public trial, and that

23   includes seeing and hearing the evidence.  Of course we

24   didn't used to have monitors, you're probably all too young

25   to remember the day when we didn't have all this electronic

1    equipment, but certainly Mr. Wineman and I grew up in an

2    era when all this digital stuff wasn't even a dream for

3    better or worse.  But in any event, I think you all

4    understand what I'm saying.  I don't want you to be viewing

5    the stuff.  On the other hand, to the extent that you may

6    see it or become aware of it, I don't want you to be

7    responding to it.  Thank you.

8                    (Jury present in open court.)

9         THE COURT:  Ladies and gentlemen, my name is

10   James Carr.  I'm the United States District Judge who will

11   be presiding at this trial.  We -- we, being the lawyers

12   and I, fully expect that the case will be in your hands by

13   the close of business tomorrow, or at the latest by lunch

14   time on Thursday.  All of us will do what we can to have it

15   move along expeditiously, but as you can see, we're here a

16   half hour late because I was distracted with other things I

17   have to tend to and other things I have to take care of.

18   So I will tell you, as I tell every jury, and I've told

19   every jury for almost 40 years now, the one thing you will

20   remember of your experience as jurors is that neither

21   Judges nor lawyers can tell time very well, and I apologize

22   for that, as I have for almost 40 years now, because each

23   of you has taken on a difficult burden.  Many of you may be

24   apprehensive about whether you're up to it and so forth and

25   so on.  For most of you it may be your first time in court.

1    First time in -- in a courtroom such as this, United States

2    District Courtroom, where, of course, you come in this room

3    and everybody knows that you're brought in serious errands,

4    and in my view this is the way a courtroom should be.  It

5    should project the significance and -- and, in a way, be a

6    symbol of where we collectively are doing and what you are

7    doing as jurors.  And I want to say this at the outset, I

8    commend you for your willingness to serve.  And what you

9    are doing as jurors, you are providing the most important

10   service, the most important service any American citizen

11   can provide to his or her fellow citizens in the continued

12   welfare of our Republic as a nation under law than any

13   American citizen can provide to his fellow citizens and on

14   his or her own behalf except service in combat in the

15   military in terms of active combat.  That's how important

16   jury duty is.  Many -- perhaps you too have this myth about

17   the jury system that why do we have it, so forth and so on.

18   Well, I am convinced, as I am convinced of any proposition

19   that the rights of all of us, including myself, are safer

20   in your hands than they would be in the hands of a single

21   judge.  And -- and that's how important jury service is and

22   how -- how much I -- I respect you and commend you for your

23   willingness to serve.  It is a very important service.

24   Without it, we would have a different country.  We would

25   not have the country that we have.  That's how strongly I

1    feel about the jury right that we all enjoy.

2            The other thing I want to mention is that

3    Ms. Tangeman and Mr. Simko probably stated to you, which is

4    correct, that they represent the United States of America.

5    Well, who is -- who are the United States of America?  All

6    of us.  They are our lawyers.  They're lawyers on behalf of

7    the United States of America.  But what I want you to

8    understand, Mr. Wineman is every bit as much our lawyer as

9    the government's lawyers.  He represents the United States

10   Constitution and the laws of the United States, and his job

11   is to see to it that I permit you only to hear evidence and

12   see evidence that the law permits.  And otherwise the trial

13   is presented, as Ms. Tangeman and Mr. Simko also want it to

14   be presented, in accordance with the laws and the

15   Constitution of our wonderful country.  So I just want you

16   to understand, often people have a misconception about the

17   lawyers' roles.  I want you to understand their role is the

18   same, to see to it that the evidence that you see and hear

19   and on which you will make a decision as to whether the

20   government has met its burden beyond a reasonable doubt,

21   that you make a decision unanimously one way or the other,

22   that it is based only on evidence that the law permits you

23   to see.  That's my job.  I'm sort of the gate keeper.  None

24   of these lawyers is deliberately going to smuggle in

25   something that you shouldn't see or hear.  They know that

1    would be wrong.  And that would also be a derogation of

2    their oath as attorneys, the same oath I took to protect,

3    defend and uphold the Constitution and laws of the United

4    States.  That is part of the lawyers' oath.  And I just

5    want you to understand that.  That's what we are about.

6    That's why it's so serious.  That's why I commend you, and

7    that's what the lawyers and I will be doing.

8            I'm now going to ask Deanna to read to you some

9    initial instructions.  You have copies on your chairs.

10   She'll pass them out.  Please don't read ahead.  Just wait

11   until she gets started.  While she's passing them out, I

12   will tell you why she's reading them rather than I.  I have

13   a pretty serious vision impairment.  I can read screens,

14   but my span is very narrow and sometimes I'm -- if I were

15   to try to read them, I'd sound, A, like a first grader,

16   and, B, as though I had a couple pints of beer before I

17   showed up to work this morning.  It's just an impairment I

18   have.  I'm able to function with the screens, but it will

19   be a lot easier for you to follow the instructions and to

20   understand the instructions.  Follow them as she reads

21   them, to have her read them.  So that's why I do that.

22           Go ahead, Deanna, if you'll go ahead and read the

23   instructions.

24           COURTROOM DEPUTY:  Introduction.  These are

25   initial instructions to help you understand the dispute

1    between the parties, your duties as jurors, the evidence

2    you will hear and see, and the law applicable to the charge

3    in this case.  The instructions --

4              THE COURT:  Excuse me, are you able to hear,

5    ladies and gentlemen?

6              Okay.  If at any time during the course of the

7    trial -- couple of other things I should mention, I

8    apologize.  If at any time you cannot hear a lawyer, me or

9    a witness, being speak up.  I realize you may be somewhat

10   daunted to speak up in a courtroom, you must because it's

11   very important that you hear everything.

12             And the other thing, if at any time -- sometimes

13   I tend to keep going when I should take a break, I expect

14   we'll take breaks in about an hour, hour and 15 minutes,

15   same in the afternoon.  I expect to adjourn at 4:30 or so.

16   But if at any time any of you get uncomfortable or have to

17   take a break or whatever, again, raise your hand.  It's no

18   problem.  Don't hesitate to interrupt.

19             Now, Deanna, I'll try not to interrupt myself.

20   Go ahead.

21             COURTROOM DEPUTY:  The instructions can be

22   divided into two parts, general principles applicable to

23   all criminal trials and specific instructions about the

24   charge in this case and what the government must prove.

25             You have copies of the instructions to read as I

1   read the instructions orally.

2            Do not read ahead as you must listen carefully to

3   everything I say.  You can write on the instructions if you

4   wish.

5            Although it is my intent that these initial

6   instructions be complete, except with regard to some

7   additional instructions relating to your deliberations, the

8   final instructions that I give you may vary somewhat from

9   these instructions.  If so, those final instructions are to

10  control your deliberations.

11           Number two, Juror's Duties.  It is for you to

12  determine whether the government has proved its charge

13  against the defendant beyond a reasonable doubt.

14           You are to decide whether it has done so only on

15  the basis of the testimony -- the answers the witnesses

16  give in response to the questions asked of them -- you

17  heard in this courtroom, and the exhibits and stipulations

18  introduced during trial.

19           You must apply the instructions and the law as I

20  give them to you.  This is so, even if you personally

21  disagree with an instruction or legal doctrine.  Personal

22  beliefs can play no role whatsoever in your decisions.

23           The lawyers may discuss the law during their

24  opening statements and closing arguments.  If what they say

25  about the law differs from what I say, you must follow what

1    I say.  What I say about the law controls.

2          All the instructions are important, and you

3    should consider them together as a whole.

4          Perform these duties fairly.  Do not let any

5    bias, sympathy or prejudice that you may feel toward one

6    side or the other influence your decisions in any way.

7          Number three, Note Taking/Transcripts.  You are

8    welcome to make whatever use you wish of these materials.

9    You are not required to take notes, but for my many people,

10   including myself -- as I will be doing on my computer here

11   on the bench -- doing so helps the memory and recollection.

12         You may refer to your notes during deliberations.

13   But do not let the juror or jurors who -- but do not let

14   the juror or jurors who may appear to have taken the best

15   notes control your discussion or decision.  Each of you

16   must reach a determination based on your own understanding

17   of the evidence in light of the law that I have given you,

18   and, as well, on the understanding of the evidence and

19   views of your fellow jurors.

20         Transcripts will not be made -- will not be

21   available for your consideration during deliberations.

22   Your only chance to learn what the witnesses have to say

23   will be as they are on the stand.  So pay careful attention

24   to everything that happens during the presentation of

25   evidence.

1          Number four, Presumption of Innocence; Burden of

2   Proof; Reasonable Doubt.  The defendant has pled not guilty

3   to the crime charged in the indictment.  An indictment is

4   not evidence.  It is simply the formal notice to the

5   defendant of the charge against him.  The mere fact of an

6   indictment cannot create in your minds even the slightest

7   suspicion of guilt.

8          The government has the burden to prove the charge

9   against the defendant beyond a reasonable doubt.

10         The defendant has no burden, or obligation, to

11  prove anything at all.  He is presumed innocent.  This

12  presumption of innocence stays with him until and unless

13  you have unanimously found, solely on the basis of the

14  evidence and law, that the government has met its burden of

15  proving the defendant guilty beyond a reasonable doubt.

16         Proof beyond a reasonable doubt means proof that

17  is so convincing that you would not hesitate to rely and

18  act on it in making the most important decisions in your

19  own lives.

20         Proof beyond a reasonable doubt does not mean

21  proof to an absolute certainty or all possible doubt.

22  Possible doubts or doubts based only on speculation are not

23  reasonable doubts.  A reasonable doubt is a doubt based on

24  reason and common sense.  It may arise from the evidence,

25  the lack of evidence, or the nature of the evidence.

1           If the government fails to meet its burden of

2     proof, you must return a verdict of not guilty.  This is so

3     even if you think or feel that the defendant may be guilty.

4     If you only think or feel he may be guilty of a charge, the

5     government has not met its burden of proof.

6           If you are convinced that the government has

7     proved the defendant guilty beyond a reasonable doubt,

8     return a verdict of guilty.  Otherwise you must return a

9     verdict of not guilty.  If you find that the evidence in

10    this case -- in this case could reasonably support either

11    of two conclusions -- one of guilt, the other of

12    non-guilt -- you must return a verdict of not guilty.

13          Number five, Evidence; Objections.  You must make

14    your decision only on the evidence.

15          The evidence includes the testimony you hear from

16    the witnesses in court and exhibits the parties introduce

17    into evidence and which you will have with you in the jury

18    room.

19          Do not let anything else influence your decision

20    in any way.  Nothing else is evidence.

21          Sometimes the lawyers will object to questions,

22    answers, or exhibits because they believe the law does not

23    permit you to hear, see, or consider the particular

24    question, answer, or exhibit.

25          If a lawyer objects, do not hold that against the

1    lawyer or his or her client.  The lawyer is simply trying

2    to make sure that the law is followed and the trial is

3    fair.

4              If I sustain an objection, you must disregard the

5    question, answer, or exhibit entirely.  Do not wonder why

6    the objection was made, why I ruled as I did, or what you

7    might have learned had I not sustained the objection.

8              Likewise, do not speculate about what a witness

9    who was not called to testify might have said, or what else

10   a witness who did testify might have said, had he or she

11   been asked additional questions.

12             Something that you did not hear or see, were not

13   permitted by me to hear or see, or that I told you to

14   disregard is not evidence.

15             Lawyers' statements, objections and arguments are

16   not evidence.

17             The lawyers' questions are not evidence.  The

18   evidence is, rather, what the witnesses say in response to

19   the lawyer's questions.

20             Questions I ask of witnesses are not evidence.

21   The evidence is, rather, what the witnesses say in response

22   to my questions, as it is with regard to the lawyers'

23   questions.

24             My legal rulings are not evidence.  They are

25   simply rulings on the law that you must accept and follow.

1             Base your verdict only on the evidence as I have

2    defined it here and nothing else.

3             Number six, Direct and Circumstantial Evidence.

4    Evidence consists generally of two types, direct evidence

5    and circumstantial evidence.

6             You can consider each type of evidence.

7             Direct evidence is simply evidence -- like the

8    testimony of an eye witness -- which, if you believe it,

9    directly proves a fact.  A witness's statement that he saw

10   rain is direct evidence that it was raining, and you could

11   find that it was raining if you believed the witness's

12   statement.

13            Circumstantial evidence indirectly proves a fact.

14   If someone walked into the courtroom wearing a raincoat

15   covered with drops of water and carrying a wet umbrella,

16   that would be circumstantial evidence from which you could

17   conclude that it was raining.

18            It is for you to decide how much weight to give

19   the evidence.  The law makes no distinction between the

20   weight you should or can give to either one, nor is one any

21   better evidence than the other.

22            You are to consider all the evidence, both direct

23   and circumstantial, and give it whatever weight you believe

24   it deserves.

25            Number Seven, Opinion Testimony.  Ordinarily, a

1    witness cannot give his or her opinion; instead, a witness

2    can only testify about the facts within his or her personal

3    knowledge.

4           Under some circumstances, a witness who has

5    special knowledge, training, or experience beyond that

6    usually possessed by jurors can present opinion testimony.

7           You do not have to accept opinion testimony or

8    find it conclusive as to the particular subject matter.

9           In deciding what weight to give to opinion

10   testimony, consider how well qualified the witness was to

11   give the opinion and the basis on which he or she reached

12   that opinion.

13          In addition, apply the same considerations you

14   apply to the testimony of other witnesses in determining

15   how credible they are and how much weight to give their

16   testimony.

17          Number Eight, Credibility of Witnesses.  You

18   alone decide how credible or believable each witness is,

19   and how much weight to give the testimony of each -- of

20   each of the witnesses.  You can believe everything that a

21   witness said, or only part of it or none of it at all.  But

22   you must act reasonably and carefully in making these

23   decisions.

24          Some of the things you may consider in evaluating

25   the credibility and weight of a witness's testimony are:

1            Was the witness able to see and hear clearly, or

2    was the witness's ability to see and hear impaired.  Was

3    there anything that may have affected the witness's ability

4    to perceive or remember what he or she tells you.

5            How good the witness's memory seemed to be:  Was

6    the witness able to remember accurately what happened.

7            How did the witness act while testifying.  Did he

8    or she look like he or she was testifying truthfully.

9            Did the witness have any relationship to the

10    government or the defendant or anything or anyone, or

11    anything to gain or lose from the case, that might

12    influence his or her testimony.

13            Did the witness have any bias, prejudice, or

14    other reason for testifying that might cause the witness to

15    testify untruthfully.

16            Did the witness at any time -- whether during his

17    or her testimony or at some other time or times, say or do

18    something different from or inconsistent with his or her

19    testimony.

20            How believable was the witness's testimony in

21    light of all the other evidence, was the witness's

22    testimony supported or contradicted by other evidence you

23    found believable.  If contradicted, what was the reason for

24    the contradictions.

25            These are among the things you may consider in

1    deciding how believable each witness was.  You may also

2    consider other things that you think shed some light on the

3    witness's believability.

4           In deciding which witnesses to believe and how

5    much weight to give their evidence, use your common sense

6    and your everyday experience in dealing with other people.

7    Then decide what testimony you believe, and how much weight

8    you think it deserves.  If your -- if your experience tells

9    you that a certain -- that certain evidence reasonably

10   leads to a conclusion, you are free to reach that

11   conclusion.

12          Number Nine, Number of Witnesses.  Do not make

13   any decisions based on the only number of witnesses who

14   testified about a particular fact or circumstance.  What is

15   more important is how believable the witnesses are, and how

16   much weight you think their testimony deserves.

17          Number Ten, Questions by Jurors.  You may not ask

18   questions of the witnesses during trial.

19          The lawyers are responsible for the questions and

20   answers that you hear, just as they are responsible for

21   deciding which evidence they can choose to offer.  They are

22   familiar with the law and rules of evidence, and their

23   decisions as to which questions to ask and exhibits to

24   introduce are made in the context of that knowledge.

25          It is not part of your function or duties to

1    develop evidence, which is what you would be doing if you

2    could ask questions.  You are the triers of facts, not the

3    developers of the facts.

4          For this reason, you are not permitted to ask

5    questions during trial.

6          Number Eleven, Outside Sources.  You cannot try

7    to find out information from other sources, such as

8    dictionaries, books, news accounts, though there wont be

9    any of those, in all likelihood, from the internet, social

10   media or otherwise from anyone or anywhere else other than

11   the courtroom.

12         This is so for at least three reasons.

13         First, through the Rules of Evidence, the law

14   controls what jurors can learn.  This is so, so that, to

15   the maximum extent possible, what you learn is likely to be

16   reliable and accurate.

17         Second, the lawyers and the parties are entitled

18   to be aware of everything that you will be considering when

19   you deliberate on and reach your verdict.

20         If you could look for information outside the

21   courtroom, the lawyers and the defendant would have no way

22   of knowing what you might have learned.  They could not

23   respond to or comment on it.  They could not call your

24   attention to reasons for you to disregard such information.

25         Moreover, for you to learn and consider something

1    from outside the evidence, you would deprive the defendant

2    of his Constitutional right to confront the witnesses

3    against him.

4            Third, I would not be able to tell you what you

5    can and cannot consider, which is one of the -- which is

6    one of my most fundamental duties as a Judge.

7            You must follow my instructions as to what you

8    can and cannot consider.  Failure to do so would violate

9    your oath and deprive the parties of the fair trial to

10   which they are entitled.

11           Number Twelve, Court Rulings and Other Actions.

12   Nothing I say or do during the trial will be meant to

13   influence your decision in any way.

14           Do not interpret my rulings on the lawyers'

15   objections as any indication of how I think you should

16   decide the case.  I will base my rulings on the law and

17   Rules of Evidence, not on how I feel about the case.

18           Likewise, do not speculate on what I think the

19   outcome should be.

20           My views are not evidence, and, to the extent

21   that you think I have any view or opinion, you must

22   disregard those thoughts entirely.

23           We each have separate duties in a trial.

24           It is your duty -- and yours alone -- to decide

25   the facts and determine whether the government has proved

1    the defendant guilty beyond a reasonable doubt.

2         Thirteen, General Instructions Concluded.  This

3    completes the instructions as to your general duties.  I

4    will now instruct you on the elements of the crime that the

5    defendant -- of the crime that the defendant is accused of

6    committing.

7         The defendant is only on trial for the crime

8    charged in the indictment.

9         Your job is limited to deciding whether the

10   government has proven -- proven beyond a reasonable doubt

11   that the defendant is guilty of the crime charged in the

12   indictment.

13        Fourteen, Elements of the Offense -- Receipt and

14   Distribution of Child Pornography.  Defendant Karl J.

15   Rogers is charged with one count of receipt and

16   distribution of visual depictions of minors engaged in

17   sexually explicit conduct.

18        You can find the defendant guilty only if all

19   twelve of you are convinced beyond a reasonable doubt that

20   the defendant -- that -- beyond all reasonable doubt that

21   the government has proven the following elements.

22        One, the defendant knowingly received and

23   distributed a visual depiction;

24        Two, the production of the visual depiction

25   involved the use of a real minor engaging in sexually

1    explicit conduct;

2            Three, the visual depiction was of a minor

3    engaging in sexually explicit conduct;

4            Four, the defendant knew that, A, at least one of

5    the individuals in the visual depiction was a minor; and B,

6    the visual depiction was of such minor engaged in sexually

7    explicit conduct;

8            And five, the visual depiction was received and

9    distributed using a means or facility of interstate or

10   foreign commerce, including a computer.

11           MS. TANGEMAN:  Excuse me, Your Honor.  It's

12   actually receipt or distributed.  I believe it was stated

13   and.  To be clear, number one and number five, that should

14   be or.

15           THE COURT:  My error.  Please note the

16   correction, and the final instructions will, of course,

17   reflect it accurately.  Thank you, Ms. Tangeman.  I remind

18   you, these are but initial instructions to acquaint you

19   with the case.  So it sort of sets the framework legally

20   for you, with lawyers' opening statements, which are not

21   evidence, will do so with regard to what they think the

22   evidence will be, okay.  And the final instructions will be

23   the instructions that will guide your deliberations and

24   final verdict.

25           Thanks, Ms. Tangeman.  Appreciate that.

1          JUROR:  What was that objection?  What was the

2    one --

3          THE COURT:  Ms. Tangeman, if you'll simply give

4    him first word of the paragraph and the words itself, maybe

5    read the phrase.

6          MS. TANGEMAN:  Number one on Page 16 should read

7    the defendant knowingly received or distributed a visual

8    depiction, and it is written correctly.

9          And number five, the visual depiction was

10   received or distributed using a means or facility of

11   interstate or foreign commerce, including a computer.

12         THE COURT:  Thank you very much.

13         COURTROOM DEPUTY:  Fifteen, Definitions.  As used

14   in the applicable statute, the following terms have the

15   indicated meanings:

16         An act is done "knowingly" when it is done

17   voluntarily and intentionally and not because of accident,

18   mistake, or some other innocent reason.

19         To "receive" a visual depiction means to take

20   possession of it.  This includes the knowing acceptance of

21   a depiction -- of a depiction previously requested.

22   Receiving includes the downloading of a photograph or video

23   by means of the internet.

24         "Distribution" includes knowingly allowing

25   electronic access to a visual depiction stored on one's

1    computer, and then downloaded by another person and posting

2    the depiction on a website for public viewing.

3            "Visual depiction" includes any photograph,

4    image, film, video or picture, including undeveloped film

5    and videotape, and data stored on computer disk or by

6    electronic means which is capable of conversion into a

7    visual image, whether or not stored in permanent format.

8            "Means or facility of interstate commerce"

9    includes the internet or the telephone.

10           "Computer" means an electronic magnetic, optical,

11   electrochemical, or other high speed data processing device

12   performing logical, arithmetic, or storage functions, and

13   includes any data storage facility or communications

14   facility directly related to or operating in conjunction

15   with such device, but such term does not include an

16   automated typewriter or typesetter, or portable hand-held

17   calculator or other similar device.

18           "Minor" means any person under the age of 18

19   years.

20           "Sexually explicit conduct" means actual or

21   simulated:

22           Sexual intercourse, including genital to genital,

23   oral to genital, anal to genital, or oral to anal, whether

24   between persons of the same or opposite sex;

25           Bestiality;

1          Masturbation;

2          Sadistic or masochistic abuse; or.

3          Lascivious exhibition of the genital or public

4     area -- or pubic area, I'm sorry, of any person.

5          The government is not required to prove that the

6     defendant was involved in any way in the production of the

7     visual depictions.

8          The government is not required to prove that the

9     defendant knew that a means or facility of interstate

10    commerce had been or would be used when he received or

11    distributed the visual depictions.

12         Lascivious Exhibition - Defined.  As mentioned,

13    "sexually explicit conduct" may include "lascivious

14    exhibition of the genitals or pubic area of any person."

15         Not every exposure of the genitals or pubic area

16    constitutes lascivious exhibition.

17         Whether a picture or image of the genitals or

18    pubic area constitutes such a lascivious exhibition

19    requires that you consider of the overall content of the

20    material.

21         To determine whether a particular visual

22    depiction constitutes a lascivious exhibition, you may

23    consider the following factors:

24         One, whether the focal point of the picture or

25    image is on the child's genitals or pubic area;

1          Two, whether the setting of the picture or image

2     is sexually suggestive, that is, in a place or pose

3     generally associated with sexual activity;

4          Three, whether the child is depicted in an

5     unnatural pose or inappropriate attire, considering the age

6     of the child;

7          Four, whether the child is fully or partially

8     clothed or nude;

9          Five, whether the visual depiction suggests

10    sexual coyness or a willingness to engage in sexual

11    activity; and

12         Six, whether the visual depiction is intended or

13    designed to elicit a sexual response in the viewer.

14         This list is not exhaustive, and an image need

15    not satisfy any single factor to be deemed lascivious.

16    Instead, you must determine whether the visual depiction is

17    lascivious based on its overall content.  It is for you to

18    decide the weight or lack of weight to be given any of

19    these factors.

20         Seventeen, Unanimous Verdict.  Your verdict,

21    whether it is guilty or not guilty, must be unanimous.

22         To find the defendant guilty, every one of you

23    must agree that the government has overcome the presumption

24    of innocence with evidence that proves his guilt beyond a

25    reasonable doubt.

1              To find him not guilty, every one of you must

2    agree that the government has failed to convince you beyond

3    a reasonable doubt.

4              Either way, guilty or not guilty, your verdict

5    must be unanimous.

6              Unanimity Not Required – Means.  One more

7    important point about the requirement that your verdict

8    must be unanimous.

9              The indictment accuses the defendant of

10   committing the crime of receipt and distribution of child

11   pornography.

12             The government does not have to prove that the

13   defendant both received and distributed child pornography

14   for you to return a verdict of guilty -- a guilty verdict

15   on this charge.  Proof beyond a reasonable doubt of either

16   way is enough.

17             In order to return a guilty verdict, all twelve

18   of you must agree that at least one of these has been

19   proved; however, all of you need not agree that the same

20   one has been proved.

21             Nineteen, Stipulation as to the "Minor" Element.

22   As mentioned previously, the government must prove that

23   the -- that the pornographic images in this case depicted

24   real children under the age of 18 years.

25             The party -- the parties have stipulated that the

1   persons depicted in the images and videos are actual

2   persons under the age of 18 years of age when the images

3   and videos were created.

4           Therefore, the government need not offer any

5   other evidence as to the age of those persons.  For

6   purposes of your deliberations, that fact is established

7   beyond a reasonable doubt.

8           Twenty, Inferring Required Mental State.

9   Ordinarily, there is no way that a defendant's mental state

10  can be proved directly, because no one can read another

11  person's mind and tell what that person is thinking.

12          But a defendant's state of mind can be proved

13  indirectly from the surrounding circumstances.  This

14  includes things like what the defendant said, what the

15  defendant did, how the defendant acted, and any other facts

16  or circumstances in evidence that show what was in the

17  defendant's mind.

18          You may consider the natural and probable results

19  of any acts that the defendant knowingly did, and whether

20  it is reasonable to conclude that the defendant intended

21  those results.

22          This, of course, is all for you to decide.

23          21, On or About.  Finally, a word about the dates

24  mentioned in the indictment.

25          The indictment charges that the crime happened

1    from "on or about" October 7, 2017, to "on or about"

2    December 13, 2017.  The government does not have to prove

3    that the crime happened on those exact dates.  But the

4    government must prove that the crime happened reasonably

5    close to those dates.

6            THE COURT:  Okay, Deanna, if you'll retrieve the

7    instructions, please.

8            Okay.  At this point, either Ms. Tangeman or

9    Mr. Simko will present the opening statement for the

10   prosecution.  Then Mr. Wineman can either present an

11   opening statement now, or he can reserve that right until

12   the close of the government's case.  That's one of the

13   little customs that we follow in trials of this sort, in

14   criminal trials generally.

15           The one thing I want to emphasize, what the

16   lawyers say isn't evidence, okay.  This is not evidence.

17   Don't start making your mind up one way or the other or

18   speculating about how you and your fellow jurors might

19   decide the case.  You've got to keep an open mind

20   throughout the entire trial until you've heard all of the

21   evidence -- three things have happened, you've heard all

22   the evidence, you've gotten my final instructions, and you

23   retire to the -- to the jury room to begin your

24   deliberations.  Then and only then can you start talking

25   about the case amongst each other.  You can never talk

1   about it with anybody else until it's all over, then you

2   can talk to anybody you want or nobody at all.  It's

3   entirely up to you.  But until those three things happen,

4   keep an open mind.  And that's tough.  Just keep in mind,

5   especially those of you who are parents or maybe who once

6   were children and trying to convince your parents of the

7   notion, wait until you hear the other side, okay.  Don't

8   simply rush to judgment because you hear a portion of the

9   evidence.  And don't talk about the case amongst

10  yourselves.  That is so important, and it's something we

11  jury -- we lawyers often wonder whether jurors are truly

12  able to -- to follow that instruction.  But I hope you

13  understand why it's so important because a juror might say

14  something or cause you to think about something that would

15  just put that bit of prejudgment in your -- in your minds.

16  And that's not fair to the parties, to anybody, and

17  certainly not in accordance to your oath as jurors, or the

18  importance of the job you are doing here in the courtroom

19  this morning.  So keep in mind you're not about to hear

20  evidence.  It's just what the lawyers think the evidence

21  will show.  Sometimes the evidence doesn't show it, and

22  that's okay, something comes up unexpectedly, a witness may

23  not appear, testimony may come out some way, the lawyer may

24  have misspoken or whatever.  Do not hold that against the

25  lawyer because it doesn't matter.  It has nothing to do

1   with anything because it's not evidence.

2             Ms. Tangeman or Mr. Simko, you may present your

3   opening statement.

4             MR. SIMKO:  Thank you, Your Honor.

5             THE COURT:  And you can do so either at the

6   podium or whatever you'd like.

7             MR. SIMKO:  May it please The Court, defense

8   counsel, ladies and gentlemen of the jury, good morning.

9   In America we have and celebrate the freedom of speech and

10  expression.  Our First Amendment protects freedom of speech

11  and expression more extensively than most places in this

12  world, but that right is not absolute.  Our right in

13  freedom of speech and expression ends in what we say, do or

14  possess hurts others.  So whether you know it or not, in

15  America you have the right to adult pornography.  You can

16  download it, you can give it out, you can view it as much

17  as you want.  The police and FBI won't care.  They're not

18  going to know, and they're not going to come to your door

19  regarding it.

20            On the other hand, child pornography is a crime.

21  Child pornography is the exploitation of children.  Child

22  pornography is the rape of children, both literally and

23  figuratively.  The First Amendment does not protect your

24  right to child pornography, does not protect your right to

25  the rape and exploitation of children.  You cannot download

1    it, you cannot possess it, you cannot view it, you cannot

2    give it out.  To be clear, this case is not about adult

3    pornography.  This case is about the defendant's

4    downloading of child pornography.

5              So what happened in this case?  Crime, especially

6    child pornography, is an arms (phonetic) race.  Police are

7    constantly trying to find those who are trying to download

8    child pornography, and those downloading child pornography

9    are trying not to be found.  Child pornographers use dark

10   web networks like TOR and Freenet.  They encrypt their

11   searches, their computers in what we call containers within

12   their computers.  They digitally scrub their computers with

13   programs like BleachBit in case they are found.  But law

14   enforcement has tools, software programs that run on these

15   dark web networks, that alert them when somebody is trying

16   to download child pornography.  And that's what happened in

17   this case.

18             The FBI, using its law enforcement tool, learned

19   that someone was trying to download child pornography on

20   Freenet, a dark web network, in the fall of 2017.  That

21   tool also gave the IP address of the person who was

22   downloading the child pornography.  Freenet, the dark web

23   network, doesn't disguise IP addresses, and so we were able

24   to learn what that -- that IP address was.  IP addresses,

25   when initiated, are sort of like home addresses for

 1   internet activity.

 2           So pursuant to a subpoena, the internet service

 3   provider provided the IP address, we gave them a subpoena,

 4   and they told us which of their customers was using this

 5   particular IP address.  The internet service provider was

 6   Frontier Communications, and they told us that their

 7   customer, Karl Rogers, at -- I'm sorry, 4850 Bullhead Road

 8   in Willard, Ohio was that particular internet service

 9   provider user, the IP address user.

10           So on December 13th, 2017, and pursuant to a

11   lawful search warrant, the FBI, local police, and members

12   of the Internet Crimes Against Children Task Force, also

13   known as ICAC, you'll hear that again, searched the

14   defendant's residence and his electronics for the presence

15   of downloaded pornography.  What they found in his home and

16   on his electronics are why we are here today.

17           Among other things, the FBI found multiple

18   computers, external hard drives and multiple computer disks

19   in the defendant's residence, in his bedroom, in his closet

20   under lock and key in a safe.  A forensic exam by an ICAC

21   or Internet Crimes Against Children Task Force, a forensic

22   examiner examined those devices, and they found images and

23   videos of child pornography on his Dell laptop, on his

24   Silicon power hard drive, and on multiple computer disks,

25   all of which the defendant, as I said, had in his house

1    where he lived alone, in his bedroom, in his closet, in his

2    locked safe.

3            I will warn you that you're going to have to view

4    a representative sample of these images and videos found in

5    the defendant's child pornography collection.  We've chosen

6    19, but keep in mind that's not all that the defendant had.

7    He had thousands of images and videos of child pornography.

8    The representative 19 images and videos I'll warn you

9    include depictions of a man having vaginal sex with a young

10   girl, someone performing oral sex on an infant, and a young

11   girl's -- genital display of a young girl's genitalia.  The

12   Court has given you, and we'll give you again the

13   definition of child pornography, but I can assure you what

14   I just told you we will see all fit that definition.

15           But that's not all we have to prove that the

16   defendant downloaded this child pornography because the

17   defendant admitted it.  In an interview with the lead

18   investigator Ryan Anschutz, portions of which you will see,

19   the defendant admitted to downloading child pornography.

20   He admitted that he had been doing it for a long time.  And

21   he admitted that he had most recently done it just a few

22   days before the FBI had arrived.  He admitted to using the

23   tools -- the dark web networks TOR and Freenet, admitted to

24   using encrypted software and other programs to try to hide

25   his tracks.  Those admissions are also confirmed by the

1    forensic examination we did on his electronics.

2             Now, the government, as The Judge told you, has

3    to approve certain things in this case.  We have to prove,

4    first, that the defendant knowingly received or distributed

5    a visual depiction.  And as it's kind of already came up in

6    these initial instructions, although the title of the

7    charge is Received and Distributed the visual depictions,

8    the actual element is or, received or distributed a visual

9    depiction.  We don't have to prove both.  One or the other

10   would be sufficient.

11            Also, we have to prove that the defendant acted

12   knowingly.  You heard the definition of knowingly.  The

13   Judge will give you it again at the end of this case.  But

14   as it said, it's not an accidental act.  It's something

15   that's done intentionally.  And as I stated earlier, you

16   will hear the admissions from the defendant that he had

17   been doing this for a long time and had done it recently,

18   and that he was using dark web networks and the other tools

19   of the trade of child pornographers.  This was no accident,

20   and this was not a one-time thing.

21            Second, the production of the visual image

22   involved the use of a real minor.  You heard The Judge tell

23   you there is also a -- there's going to be a stipulation

24   that the individuals in these pornographic images are, in

25   fact, real minors.  Defendant has agreed to that for the

1    purposes of this trial.  The visual depictions were -- were

2    of a minor engaging in sexually explicit conduct.  You will

3    hear from a forensic examiner, Jason Howell, who went

4    through and had to view each and every one of these images

5    and videos.  He has training in how to identify these

6    items, and he was able to identify 1,947 videos that meet

7    the definition of child pornography, 3,732 images that meet

8    the definition of child pornography.  He'll tell you that's

9    what he found, but you will also have your own experience

10   because you're going to have to view this child

11   pornography.

12        Fourth, the defendant knew that at least one of

13   the individuals in such visual depiction was a minor, knew

14   that the visual depiction was of such minor engaged in

15   sexually explicit conduct.  Again, you're going to have a

16   stipulation that the individuals were, in fact, minors;

17   although, you'll be able as to see that.  You'll have

18   investigator Howell's testimony as to what he found on

19   these computers, and, again, you're going to have to view

20   some of this so you're going to have your own experience

21   with this child pornography.

22        And, fifth, that the such visual depictions were

23   received or distributed by means of a facility of

24   interstate or foreign commerce, which includes a computer.

25   In this case you're going to hear everything was done on a

1    computer.  What we found was done on a computer.  And

2    there's no evidence that the defendant himself was involved

3    in the actual creation of any of these things so he had to

4    download it.  It means internet and computer are sufficient

5    for that element.

6         So at the end of this trial, after you've heard

7    all the testimony, you've seen all the evidence, listen to

8    the defendant's own statements, we're going to get up and

9    ask you to return the only verdict that's consistent with

10   the evidence, and that is that the defendant is guilty as

11   charged in the indictment.  Thank you.

12        THE COURT:  Mr. Wineman, as I indicated or told

13   the jurors -- thank you, Mr. Simko -- you can present an

14   opening statement now, or you have the right, of course, to

15   reserve that if that's your preference.  Up to you and your

16   client.

17        MR. WINEMAN:  Your Honor, I'd prefer to give

18   opening --

19        THE COURT REPORTER:  I can't hear you.

20        MR. WINEMAN:  I'd prefer to give the opening

21   statement at the close of The State's (sic) case, Your

22   Honor.

23        THE COURT: That's fine.  Good.  That's fine.  No

24   problem.

25        You may call your first witness.  Who is it, and

1    what do you expect we're going to hear presumably?

2         Ladies and gentlemen, it's sort of an

3    idiosyncrasy on my part, and as I tell the lawyer in every

4    case, I do a couple things.  I asked -- I try to remember

5    to ask the lawyers who their next witness is and what do

6    they expect that you're going to hear so that you

7    understand where this testimony's going to fit in the

8    overall presentation of the evidence on behalf of the

9    client by the lawyer.  Once again, it's not evidence.  The

10   evidence is the answers that the witness gives to the

11   questions and anything otherwise that you see or hear in

12   the courtroom that I admit into evidence, the exhibits and

13   so forth.  That's it.  It's just what the witnesses tell

14   you and what you see in exhibits.  Nothing else is

15   evidence.

16        Okay, folks, go ahead.  Mr. Simko and

17   Ms. Tangeman, your first witness is who and --

18        MR. SIMKO:  Your Honor, the government would call

19   Special Agent Todd Krajeck.  He is the Resident Agent in

20   Charge of the FBI for the division that handled this search

21   warrant.  He's going to testify essentially as to the

22   outlines of the investigation, the execution of the

23   warrant, the search and some of the items found.

24        THE COURT:  Okay.

25              TODD KRAJECK,

1    was herein, called as if upon examination, was first duly

2    sworn, as hereinafter certified, and said as follows:

3                THE COURT:  Good morning.

4    A.          Good morning, Your Honor.

5                THE COURT:  You have to pull up to about this

6    distance from the microphone if you can.  If you'll just

7    scoot on up.

8                And please tell the ladies and gentlemen who you

9    are.

10   A.          Good morning, everyone.  My name's Todd Krajeck.

11   I'm the Supervisory Senior Resident Agent in the Cleveland

12   division of the FBI.  I supervise the Canton and the

13   Mansfield resident agencies, which are satellite offices

14   within the Cleveland division.  Been in this position for

15   three years, 11 months.  Next month will be four years.

16               And prior to that I served in the Pittsburgh

17   office, Washington D.C., counter-terrorism division,

18   counter terrorism team.  Prior to that, Boston office, and

19   started out in the Rochester, New York resident agency out

20   of Buffalo.  Been in the FBI over 14 years.

21               THE COURT:  And before that did you have any law

22   enforcement experience?

23   A.          No, Your Honor, I was in the Army.

24               THE COURT:  How long did you serve in the Army?

25   A.          About three-and-a-half years, Your Honor.

1            THE COURT:  Okay.  And then I assume you're a

2    college graduate.  Any -- any formal education after that?

3    A.        No, Your Honor.  College -- graduated from

4    college, enlisted in the Army, served with Second Ranking

5    battalion, Fort Lewis, Washington.

6            THE COURT:  Very well.  You may continue.  And do

7    remember, maybe move the mic just a bit so when you're

8    speaking to the jury they can -- they can be sure to hear

9    you.

10           Go ahead, Mr. Simko.

11           MR. SIMKO:  Thank you, Your Honor.

12                      DIRECT EXAMINATION

13   BY MR. SIMKO:

14   Q.        Special Agent, you said you are the resident --

15           THE COURT:  If I can interrupt already.  What's

16   so special about being a Special Agent except that's the

17   title?

18   A.        That's an excellent question, Your Honor.  So

19   every employee of the Federal Government can be considered

20   an agent of the government or acting as an agent of the

21   government.  FBI Special Agents carry with us power to

22   carry a firearm, execute arrests and search warrants,

23   which --

24           THE COURT:  Which is like -- that's what any

25   other law enforcement agent does, whether --

```
 1   A.         Exactly.

 2              THE COURT:  -- whether DEA or Lucas County

 3   Sheriff's or whatever.  My point simply is, and I like your

 4   first response that's a good question.

 5              Ladies and gentlemen, there truly is nothing

 6   special about a Special Agent.  It's just the term.  Like

 7   Your Honor to The Judge, Judge, or whatever.  It's

 8   something since The Bureau really got underway sometime in

 9   the 1920s, I just want you to understand that.  We all

10   refer to kind of Special Agents.  That's part of the title

11   like mine is Judge, and his is AUSA, Assistant Prosecutor

12   and so forth, and his is defense counsel.  So I just want

13   to make that clear.  Go ahead.

14   BY MR. SIMKO:

15   Q.         And what -- what are your duties as the

16   resident -- as the head of the agency?

17   A.         So I supervise over 20 employees in the two

18   offices made up of special agents, task force officers and

19   professional staff.  We cover about 4,600 square miles as

20   far as our territory, ten counties between the two offices,

21   just under a million in population amongst the ten

22   counties.  So I supervise all of the operations conducted

23   within our territory, and that includes opening and closing

24   investigations.  And all of the documents that are created

25   throughout the investigations come through me for approval.
```

1    Q.          Were you aware of the opening of the

2    investigation in this case?

3    A.          I was, yes.

4    Q.          And what was your general awareness of the

5    investigation?

6    A.          That TFO Ryan Anschutz submitted opening

7    documents, we call them E.C, electronic communication, laid

8    out the factual or articulable factual basis by which we

9    open the investigation.  And once I approved that, the

10   investigation was opened, and then -- and that kind of

11   let's Ryan continue with whatever investigative techniques

12   he deems necessary.

13   Q.          All right.  Were you aware that they were

14   executing a search warrant in this case?

15   A.          Yes, I was.

16   Q.          How did you become aware of that?

17   A.          Ryan and I had talked several times about

18   executing a search warrant.  We talked about the logistics

19   of it.  Typically we'll knock and announce our presence at

20   the residence to be searched, usually in the morning.  In

21   this case, based on social media research and background

22   investigation we did on Mr. Rogers, we decided it might be

23   safer for him and us to approach him at his place of work

24   as opposed to going to his residence.

25   Q.          Do you know why a search warrant was issued in

1    this case?

2    A.        Yes.  Basically Ryan laid out probable cause to a

3    Federal Magistrate that there could be evidence of a

4    federal crime at that location, at his residence.

5    Q.        That would include the downloading of child

6    pornography?

7    A.        Correct.  Yes.

8    Q.        And were you involved in the execution of the

9    search warrant in this case?

10   A.        I was, yes.

11   Q.        Okay.  And what was your role in executing the

12   search warrant?

13   A.        So I supervised the -- the overall search

14   operation, which includes the search itself, any

15   investigative activity that occurs at the residence or the

16   location that we're at to include interviewing, any

17   interviews that need to be done, and which is what I did,

18   but I also participated in the physical search itself for a

19   little bit.

20   Q.        All right.  Did the search team meet prior to

21   executing the search warranted?

22   A.        We did.  Initially we planned on meeting at the

23   Willard Police Department in downtown Willard.  They had a

24   power outage and very few windows, and it was December so

25   it was dark, so we relocated to a Huron County outpost, I

1    believe located on Prairie Street in New Haven, Ohio.  And

2    we briefed the operational plan there.

3    Q.        All right.  And did individuals receive the roles

4    at that time?

5    A.        Correct, yes.

6    Q.        What are some of the different roles in that?

7    A.        So in this particular search warrant we had a

8    surveillance team that was set up close to Mr. Roger's

9    house so we could follow him from his house to his place of

10   work, which was the -- I believe the CSX Willard rail yard

11   on Liberty Road in Willard.  And then we had another

12   surveillance team set up at the rail yard to approach

13   Mr. Rogers once he exited his vehicle in the parking lot.

14   Q.        All right.  So where did you guys -- after

15   leaving the meeting initially, where did you go?

16   A.        I went to the rail yard.

17   Q.        And did the -- your team encounter the defendant?

18   A.        Yes.  So we ran radio communications, and it was

19   called out on the radio that Mr. Rogers, or a vehicle we

20   believed to be driven by Mr. Rogers, was departing his

21   residence, followed it to the rail yard.  As he parked his

22   car, we had agents, task force officers, and Huron County

23   Sheriff officers with us, and approached him in the parking

24   lot as he was walking into the office -- towards the

25   office.

1    Q.        All right.  Is Mr. Rogers in the courtroom here

2    today?

3    A.        He is, yes.

4    Q.        Can you point to him and identify him for the

5    record?

6    A.        Gentleman in the blue shirt, black tie.

7              MR. SIMKO:  Okay.  I'll indicate that the witness

8    has identified the defendant.

9    BY MR. SIMKO:

10   Q.        So did -- was the defendant given the opportunity

11   to come back with the search team to his residence?

12   A.        Yes.  As is standard procedure for us, we

13   approached Mr. Rogers in the parking lot, made sure he

14   didn't have any weapons on him, told him the reason that we

15   were approaching him in the rail yard, and had a federal

16   search warrant for his residence.  Informed him that he was

17   not under arrest, and that if he wanted to, he was able

18   come back with us to the residence.  I believe we asked him

19   for the key so we didn't have to break his door, which he

20   provided.  And then he agreed to come back, got in the

21   Huron County Sheriff's Office marked police cruiser, and

22   then followed us back to his residence.

23   Q.        Okay.  Can you describe the defendant's residence

24   for the jury?

25   A.        Yes.  So it's a -- I would say a farm house in a

1    very rural area.  Sits, I would say, several hundred meters

2    off of the main road of Bullhead Drive, long straight

3    driveway.  It was very -- there was a pretty good size snow

4    storm that night, so it was dark by the time we got to the

5    residence, which would have been after 6:00 p.m.  So he had

6    just a fairly large single family residence farm house.

7    Q.        And can you -- and you said you were involved in

8    the search of the defendant's residence?

9    A.        Yes.  So when we first approached the residence,

10   again, Mr. Rogers gave us the key, we entered through the

11   kitchen door.  Again, standard procedure for us, we want to

12   make sure there's nobody else in the house, so agents and

13   task force officers went in first and cleared every single

14   room, basement of the residence.

15            Once that's done, then we'll call in our

16   professional staff, primarily our photographer to take

17   entry photos.  So basically we take photos of the

18   residence, just how it is when we first arrive so we can

19   show this is the condition the house was in when we first

20   get there.

21            Subsequent to that at the end of the search

22   operation we take photos of how we left the house, you

23   know, so people can't come back and say, oh, you trashed

24   the house, or you broke the door, or broke this, just so we

25   have a record of what it looked like before and after.

1   Q.        Can you give the jury a little bit of the layout

2   of the home?

3   A.        Sure.  So we entered in through I guess the door

4   east facing which went into the kitchen.  There's also a

5   door in the kitchen that went into the garage, which is how

6   you access the basement.  Beyond the kitchen was a dining

7   room, beyond that was a living room, and then there was

8   also a second floor with one master bedroom and then I

9   believe two other bedrooms.  I think there were a few

10  detached buildings on the property as well.

11  Q.        All right.  And you said you were involved in the

12  search team, is that right?

13  A.        Correct.  Briefly.  So I kind of floated between

14  the interview of Mr. Rogers and the actual physical

15  searching of the residence.

16  Q.        Okay.  And where did you primarily search when

17  you did search?

18  A.        The master bedroom on the second floor, and

19  primarily focused in the closet of that bedroom.

20  Q.        Okay.  I'm going to show you some pictures from

21  that day, okay.  All right.

22            THE COURT:  Mr. Simko, these are marked as

23  exhibits?

24            MR. SIMKO:  They are, Your Honor.

25            THE COURT:  You'll hear marked -- marked for the

1    record what's being shown so that if anybody wants to find

2    out what exhibit number, what Number 9 was, at this point,

3    unless they weren't admitted into evidence and at least

4    somebody would be able to find out what that is.

5          And the other thing, until these documents are

6    admitted into evidence, which I usually don't do until the

7    end of the case, keep in mind this may or may not be with

8    you in the jury room.  What matters is those things that

9    you see here in the courtroom, because the ones that are

10   evidence are the ones that will go back with you in the

11   jury room.  Just keep that in mind.  You view these, you

12   can take note of them if you want so that you can retrieve

13   them if they are evidence and you want to take a look at

14   Exhibit 9 or any other specific exhibit, you're welcome to

15   do so.  But they're not evidence yet.  I know that's a very

16   fine and perhaps incomprehensible distinction, but I just

17   want -- go ahead, Mr. Simko.

18          MR. SIMKO:  Thank you, Your Honor.

19   BY MR. SIMKO:

20   Q.      I'm showing you what's been marked as

21   Government's Exhibit 9.  Can you tell the jury what that

22   is?

23   A.      Yes, so that's the door that we used to enter the

24   residence that I referred to that goes into the kitchen.

25   Q.      Okay.  I'm going to show you what's now

 1    Government's Exhibit 10.  Can you tell the jury what that

 2    is?

 3    A.         That is the living room on the first floor of the

 4    residence just beyond the dining room.

 5    Q.         Okay.  Government's Exhibit 11?

 6    A.         That's the dining room.  So that was one of the

 7    entry photos of the dining room, how it was when we first

 8    entered the residence.

 9    Q.         And you say this is how it looked when you

10    entered the residence?

11    A.         Yes, once the search started we used that table

12    there as a collection point for the evidence.

13    Q.         But this is how it looked when you first got

14    there?

15    A.         Correct.

16    Q.         Government's Exhibit 12?

17    A.         That is the master bedroom.  And that is not how

18    it looked when we first arrived.  That was after the search

19    had started.

20    Q.         Okay.  But is that the general layout, the bed,

21    and then the closet there in the upper left-hand corner?

22    A.         Yes, the closet that I primarily searched is

23    right there on the left of the photo.

24    Q.         And the items you said on the bed are items you

25    guys had taken of the closet, is that right?

1    A.        Correct.

2    Q.        Government's Exhibit 13, what are we looking at

3    here?

4    A.        That's also the master bedroom.  You just -- just

5    from the other angle so you can see the bed in the lower

6    right-hand corner.  That's the door to enter the bedroom.

7    Q.        All right.  So Government's Exhibit 12 is looking

8    in one direction, and then Government's Exhibit 13 is just

9    looking in the other direction?

10   A.        Correct.

11   Q.        Essentially to give a panoramic of the room?

12   A.        Yes.

13   Q.        Okay.  Government's Exhibit 14.  Tell the jury

14   what that is.

15   A.        Yes, so that's the bedroom also.  That's

16   generally how it looked when we first arrived.  The bed was

17   a lot neater when we first got there.  I was just focusing

18   on the closet, master bedroom closet.

19   Q.        Okay.  Government's Exhibit 15?

20   A.        Again, that's just a little bit closer-up view of

21   the closet.  You can see at least two safes in there that

22   were open.  But they were not -- they were not open when we

23   arrived.  So that was after we had started searching.

24   Q.        Okay.  How were you able to open the safe?

25   A.        Mr. Rogers provided us with the combination.

1   Q.        And you're looking here, is that one of the

2   safes?

3   A.        Yes, it is.

4   Q.        All right.  And that primarily where you guys

5   focused your search?

6   A.        Yes.  I mean we searched the whole closet, but,

7   yes, that was one of the focuses of that particular area.

8   Q.        All right.  State's Exhibit 16 -- I'm sorry,

9   Government's Exhibit 16?

10  A.        Very close-up view of the second Sentry safe in

11  the closet which was viewed on the previous exhibit.

12  Q.        Government's Exhibit 17?

13  A.        That is a close-up view of how the safe looked

14  when we first opened it.  So you have computer laptop on

15  the top, Bank of America envelope underneath it, handgun on

16  the middle shelf, and then a couple of CDs on the bottom

17  shelf, another laptop.

18  Q.        I direct your attention to the laptop on the top.

19  What color is that?

20  A.        Red.

21  Q.        All right.  And is that -- did you collect that

22  item eventually?

23  A.        I did.

24  Q.        Government's Exhibit 18?

25  A.        So that's the same safe with several sets of keys

1    hanging on the inside of the safe.  The key with the

2    yellow -- yellow key chain -- yes, yellow key tag there we

3    were able to use that to open up another Sentry lockbox

4    that was also in the closet.

5    Q.        All right.  Government's Exhibit 19?

6    A.        That is the -- looks like the contents of the

7    safe, the Sentry safe.  So you can see the same red laptop

8    there, Dell laptop with the black HP laptop, Bank of

9    America envelope, some CDs, another box that was, I

10   believe, from the safe as well.

11   Q.        All right.  These are the contents of that large

12   Sentry safe?

13   A.        Correct.

14   Q.        Okay.  Government's Exhibit 20, what are we

15   looking at?

16   A.        I believe the Bank of America -- that was the

17   Bank of America envelope in the safe.  You can see there

18   there's some sort of card with Mr. Roger's name on it and

19   mail as well.

20   Q.        Is there, additionally, some disks there in the

21   bottom right-hand corner?

22   A.        Yes, yes.

23   Q.        All right.  I'll also point out this green and

24   black power hard drive.  Do you see that in the photograph?

25   A.        Yes.

1    Q.          And that was all in the -- at least taken from

2    some part of that closet?

3    A.          Closet, correct.

4    Q.          Okay.  Next Exhibit, 21?

5    A.          So those four floppy disks and a notebook that I

6    believe also came out of the closet.  I can't say for

7    certain if it was a safe or lockbox or exactly what item it

8    came out of.

9    Q.          Okay.  State's Exhibit -- I'm sorry, Government's

10   Exhibit 22?

11   A.          That is the Sentry lockbox I referred to earlier.

12   You can see there the same key with the yellow tag that

13   came out of the black Sentry safe and used to open up.

14   Q.          That one there, that was in the --

15   A.          Yes.

16   Q.          That was in the Sentry safe.  Also, I notice

17   there's two initials on the top.  Is that K.J?

18   A.          It appears so, yes.

19   Q.          And it's Karl J. Rogers' house; is that correct?

20   A.          Yes.

21   Q.          Next, Government's Exhibit 23?

22   A.          So that is the same lockbox, just opened up.

23   There's the several CDs, pair of female or girl's

24   underwear.  I can't tell for certain, we didn't seize it as

25   evidence.  And then at least one pornographic magazine

 1   underneath the CDs.

 2   Q.        Okay.  Government's Exhibit 24?

 3   A.        So that is a lockbox that was found underneath

 4   the bed with some sex toys and order form.  It was also

 5   locked and found underneath that.

 6   Q.        This was located underneath the bed?

 7   A.        Correct.

 8   Q.        And these items here, those are sex toys in this

 9   box?

10   A.        Yes, they're called fleshlights.

11   Q.        Okay.  And this order form, who is that -- who is

12   this order form for these fleshlights?

13   A.        So Karl J. Rogers at his residence in Willard.

14   Q.        Okay.  All right.  Government's Exhibit 25?

15   A.        Panasonic laptop that was found in the closet,

16   not in the safe, but in the closet in the bedroom.

17   Q.        Okay.  You stated earlier that you seized at

18   least one of these items; is that correct?

19   A.        Correct.

20   Q.        And what item was that?

21   A.        The red Dell laptop out of the black Sentry safe.

22   Q.        All right.

23             MR. SIMKO:  May I approach the witness, Your

24   Honor?

25             THE COURT:  Of course.

 1   BY MR. SIMKO:

 2   Q.       I'm going to show you what's been marked as

 3   Government's Exhibit 37.  Can you tell the jury what that

 4   is?

 5   A.       Yes, that's the Dell laptop found in Mr. Rogers'

 6   locked Sentry safe.

 7   Q.       All right.  And you collected this item?

 8   A.       I did.

 9   Q.       And does it appear to be in the same condition as

10   when you collected it?

11   A.       It does.

12   Q.       Do all the photos that you saw here today depict

13   accurately what you saw in the house there during your

14   search?

15   A.       Yes, they do.

16   Q.       All right.  Just one moment.

17            MR. SIMKO:  Nothing further, Your Honor.

18            THE COURT:  Okay.  Any cross-examination?

19            MR. WINEMAN:  Thank you.

20                       CROSS-EXAMINATION

21   BY MR. WINEMAN:

22   Q.       Agent, we looked at a lot of pictures.  Did you

23   actually take those pictures?

24   A.       I did not, no.

25   Q.       Somebody else that was there with you taking

1    those pictures, do you know who that was?

2    A.        O S.T, Operational Support Technician, April

3    Engle (phonetic), works out of my office in Canton, and

4    she's --

5            THE COURT:  What does O.S.T. stand for?

6    A.        Operational Support Technician.

7            THE COURT:  I apologize, Mr. Wineman.  Go ahead.

8    BY MR. WINEMAN:

9    Q.        Now, you indicated when you got to Karl's place

10   of employment at CSX that you had contact with him.  Where

11   was that contact?  Was that in the back of the sheriff's

12   cruiser?

13   A.        So at the rail yard, sir, I don't believe I had

14   direct contact with Mr. Rogers.  It was agents and TFOs and

15   the Huron County Sheriff's Officer that approached him.  I

16   kind of stood back supervising the whole encounter.  I may

17   have --

18   Q.        So they would have had conversations with him

19   about entry to the home then?

20   A.        Yes, sir.

21   Q.        And you didn't talk to him about that?

22   A.        I did not.

23   Q.        You did learn, though, that he agreed to provide

24   keys for entry; is that right?

25   A.        Yes, sir.

1    Q.        Okay.  Now, as far as the safe, when you were at

2    the residence, did you have conversations with him about

3    the safe that was depicted in -- I believe it was picture

4    18.  Did you talk to him about that?

5    A.        I don't believe I had direct conversation with

6    him about the safe.  If I remember correctly, I might have

7    written a note or texted either Ryan or Bryan, who were

8    interviewing Mr. Rogers.

9    Q.        Okay.  And they indicated to you, once again,

10   that he provided the combination for the safe?

11   A.        Correct.

12   Q.        Okay.  All right.  Now, you indicated also that

13   in Plaintiff's Exhibit 21 there were four floppy disks and

14   a notebook.  What was -- what was done with those items?

15   A.        I was not the one that collected those floppy

16   disks.

17   Q.        Okay.  And in, and I believe it was Exhibit 24,

18   you identified sex toys being in that particular picture?

19   A.        The lockbox.

20   Q.        In the lockbox?

21   A.        I don't have that exhibit in front of me, but

22   it's -- the one you're describing, yes, I just can't say

23   it's 24 off the top --

24   Q.        Now, possession of those is not illegal, is it?

25   A.        No, sir.

1   Q.          Okay.  And there were -- there was also some, I

2   think you identified them as underwear, panties; is that

3   correct?

4   A.          Yes, sir.

5   Q.          Do you know, was there any testing done on those?

6   A.          We did not seize those as evidence.

7   Q.          You did not seize those, okay.  Approximately how

8   many agents and other members of the task force went into

9   Karl's home that day, do you know?

10  A.          I don't have the list in front of me.  We have a

11  roster of who participated, it would be a guess.

12  Q.          That's all right.

13  A.          Probably close to ten I would say.

14  Q.          Okay.

15  A.          Maybe more as we had -- from ICAC and Huron

16  County Sheriff's Office, so ten or a little bit more.

17  Q.          Okay.  And you were supervising the operation at

18  that point --

19  A.          Yes.

20  Q.          -- is that right?  Now, when you went to the

21  meeting, I think you referred to it was an outpost in Huron

22  County Sheriff's Department?

23  A.          Yes.

24  Q.          Did you discuss who was going to be involved in

25  the execution of the search warrant?

1  A.        Yes, sir.

2  Q.        Okay.

3            MR. WINEMAN:  I have nothing further.

4            THE COURT:  Okay.  Any redirect?

5            MR. SIMKO:  Just briefly, Your Honor.

6                    REDIRECT EXAMINATION

7  BY MR. SIMKO:

8  Q.        Mr. Wineman asked you a couple of questions about

9  interviewing the defendant.  What -- what provisions were

10  made -- you said it was cold that day, it was snowing.

11  What provisions did you have in order to interview the

12  defendant?

13  A.        Yes, so ICAC, the Internet Crimes Against

14  Children members, they -- or Task Force, they brought a

15  very large box truck.  And on the back of that box truck

16  there's a digital exploitation station, and also on the

17  back of it is a heated interview room with a table, camera,

18  and so it was -- it was out of the elements, out of the

19  snow, very warm inside of that.

20  Q.        And you also indicated you were floating between

21  the -- sort of the interview and the search.  Would be able

22  to view that interview outside of the interview room in the

23  other half of the truck?

24  A.        Yes, in the digital exploitation area that's

25  where I spent between searching and viewing the --

1    Q.        Okay.

2              MR. SIMKO:  Nothing further.

3              THE COURT:  Any recross?

4              MR. WINEMAN:  Nothing based on that, Judge.

5              THE COURT:  Okay.  Agent, you can step down.

6    You're free to go, or you're welcome to stay.  It's

7    entirely up to you.  Thank you very much.

8              Why don't we take a break, and we'll resume about

9    11 or little before.  You can step outside if you want.

10   Don't talk about the case.  Keep an open mind.  The

11   geography of the courthouse is such that you may encounter

12   one or more of us that has something to do with the trial.

13   We don't say hello or have conversation.  You should

14   understand that's the way it should be.  Not that we want

15   to be rude or, you know, aren't familiar with the social

16   amenities, just indicate -- any of us can't in any way be

17   talking to or otherwise becoming engaged with any of the

18   jurors.  So thank you.  See you in about 15 minutes.

19                  (A brief recess was taken.)

20             THE COURT:  You may be seated.  Ladies and

21   gentlemen, I apologize for being ten minutes late, just a

22   few minutes before I planned to come down right at 11:00 I

23   got a call from somebody I know's been trying to reach me

24   in reference to somebody -- actual judicial position up in

25   Michigan.  I thought it was important that I take that

1   call.  That's what happened, and I apologize.

2            So, okay, call your next witness.  Who is it, and

3   what do you expect we're going to hear?

4            MR. SIMKO:  Your Honor, the government would call

5   Special Agent Michael Sirohman.  He's going to testify that

6   he's a member of the team that executed the search warrant

7   in this case.  He will identify a couple of items that were

8   seized at the scene.

9            THE COURT:  Okay.  Agent, come forward and be

10  sworn, please.

11                    MICHAEL SIROHMAN,

12  was herein, called as if upon examination, was first duly

13  sworn, as hereinafter certified, and said as follows:

14           THE COURT:  Good morning.  You've got so slide up

15  so you're about this distance, and obviously you can turn

16  your back on me.  I've got a couple of questions for you,

17  and it's what the jurors hear you say.  Please introduce

18  yourself to the ladies and gentlemen.  Tell them who you

19  are and what your job is.

20  A.       My name is Michael Sirohman.  I'm a Special Agent

21  with the FBI, and I work out of the Canton Resident Agency,

22  which is part of the Cleveland division.

23           THE COURT:  And what do you do there?  What's

24  your current bunch of assigned tasks, and how long have you

25  been doing it?

1    A.        I have been in the Canton office for nine years.

2              Before that I was in the Utica Resident Agency

3    out of Albany.  Primarily I investigate white collar

4    crimes.  However, being in a resident agency, we're of

5    about ten agents, professional support, so we -- we help

6    each other out quite a bit.  So we do a lot of different

7    violations and a lot of different types of investigations.

8              THE COURT:  How long have you worked for The

9    Bureau?

10   A.        Eighteen years.

11             THE COURT:  And before then did you have any law

12   enforcement experience?

13   A.        No.  Prior to the FBI, I was a Certified Public

14   Accountant for about four years.

15             THE COURT:  Okay.  I trust you find that useful

16   in your -- the white collar crime investigations?

17   A.        Definitely.  It seems like finances and tracking

18   money is a part of most investigations.

19   Q.        And in addition to passing that examination, did

20   you -- in whatever preparation for that, did you have any

21   post-college profession, you know, higher education of any

22   sort?

23   A.        No, just the Bachelors Degree, and then into the

24   accounting world.

25             THE COURT:  Okay.  Mr. Simko?

```
 1              MR. SIMKO:  Thank you, Your Honor.
 2                       DIRECT EXAMINATION
 3   BY MR. SIMKO:
 4   Q.        Special Agent, you said that you are --
 5              THE COURT:  Go ahead.  Everything okay, Deanna?
 6              COURTROOM DEPUTY:  He just needed a pen.
 7              THE COURT:  Okay.  Go ahead.
 8   BY MR. SIMKO:
 9   Q.        You said you're part -- what resident agency are
10   you a part of?
11   A.        Canton.
12   Q.        All right.  And does that include Willard, Ohio
13   as well?
14   A.        Yes.  Canton -- our squad is Canton Mansfield, so
15   Mansfield covers a certain amount of counties, and then
16   Canton will cover certain amount of territories or
17   counties.
18   Q.        And you said Special Agents will assist with
19   other investigators in investigations; is that correct?
20   A.        Yes.
21   Q.        Does that include executing search warrants?
22   A.        Definitely, yes.
23   Q.        Were you involved in the executing of the search
24   warrant in this case?
25   A.        Yes, I was.
```

1    Q.        What was your role as far as execution of the

2    search warrant?

3    A.        My role in this search warrant was the search

4    team leader.

5    Q.        And what is that, for the jury?

6    A.        The search team leader, we just -- I was just --

7    on this particular case I would oversee the personnel

8    involved in the search, answer any questions anyone had,

9    make sure evidence was collected and processed --

10   Q.        Did you --

11   A.        -- at the scene.

12   Q.        At the scene?  All right.  And so were you

13   actually involved in the search itself?

14   A.        Yes, I will also help out in the searches.

15   Q.        Okay.  So did you -- where did you go first upon

16   executing this warrant?

17   A.        We briefed -- we staged at an area in town.  It

18   was in a meeting hall of some sort I remember.  And then

19   once everybody was ready to go, we drove out to the home.

20   Q.        Okay.  And so did you actually enter the home and

21   conduct the search?

22   A.        Yes.

23   Q.        All right.  And where did your search in that

24   home primarily -- what were you primarily searching?

25   A.        So once we made entry, when you walk in there's a

1    kitchen area.  The home would have been cleared first to
2    make sure there's nothing in danger.  So once that's done,
3    photographs will be taken, call them entry photos to see
4    what the scene was like when we got there.  And then we
5    would set up -- somebody is assigned to the computer
6    program that we track everything we do during the search.
7    And then we would just search different -- the search team
8    would search different locations throughout the home.
9    Q.        All right.  And where did you primarily conduct
10   your search?
11   A.        I was in different locations.  I mean, after we
12   went through the kitchen, I recall the dining room.  There
13   was a laundry room area, the living room on the first
14   floor.  And then there was a set of stairs that went up to
15   a second floor.  And to the left was a main bedroom.  To
16   the right was another bedroom.  And then in between there
17   was what I would describe as a loft area.  It was an open
18   area, looked like it was being used for storage.
19   Q.        All right.  Did you search in the main bedroom?
20   A.        Yes.
21   Q.        Okay.  And did you search the closet in the main
22   bedroom?
23   A.        Yes.
24   Q.        All right.  I'm going to show you what's been
25   marked as Government's Exhibit 15.  Can you see?

1   A.        Yes.

2   Q.        Okay.  Is that the closet where you conducted

3   your search?

4   A.        Yes.

5   Q.        Okay.  And did you collect any items from that --

6   that closet search?

7   A.        Yes, we collected several items from the closet,

8   in the safes within the closet.

9   Q.        I'm going to show you Government's Exhibit 19.

10  What are those items?

11  A.        Those are digital devices that were in the black

12  Sentry safe that was in the closet, couple laptops, phones,

13  some disks.

14  Q.        All right.

15  A.        And some hard drives.

16  Q.        Did you collect any of these items?

17  A.        Yes.

18  Q.        All right.  Which items did you collect there?

19  A.        I would have collected the disks and the HP

20  laptop.

21  Q.        Okay.  And the disk, I'll circle -- those ones

22  right there?

23  A.        Yes.

24  Q.        Did you collect any other additional disks from

25  that closet?

1    A.        Yes, so also in the closet was a smaller safe,

2    almost like a fire box.  And the key to that was in that

3    black Sentry safe, and there were some disks in there as

4    well.

5    Q.        I'm going to show you what's been marked as

6    Government's Exhibit 22.  Is that the box you're talking

7    about?

8    A.        Yeah, that's the -- another Sentry safe, yes.

9    Q.        Okay.  And Government's Exhibit 23, is that the

10   contents of that -- that box?

11   A.        Yeah, those disks were seized as well.

12   Q.        And you collected those as well?

13   A.        Yes.

14   Q.        Okay.

15            MR. SIMKO:  May I approach the witness, Your

16   Honor -- Your Honor, may I approach the witness?

17            THE COURT:  Yes.  I'm sorry, I was making a note.

18   And you can do that without asking, that's fine.  I

19   appreciate that.  That's one of of those little quirks that

20   all lawyers have when they approach a witness and so forth.

21   Go ahead.

22   BY MR. SIMKO:

23   Q.        Hand you what's been marked as Government's

24   Exhibit 39.  Are those the disks that you collected from

25   the closet, and specifically that lockbox safe?

1    A.        Yes.

2    Q.        I'm showing you what's been marked as

3    Government's Exhibit 20.  Did you collect any items in this

4    photograph?

5    A.        Yes.  That would be the hard drive with the lime

6    green border on it.

7    Q.        All right.  Circle it here.  That one

8    (indicating)?

9    A.        Yes.

10   Q.        Okay.  Is that the Silicon power hard drive?

11   A.        Yes.

12   Q.        Okay.  And where was that located?

13   A.        It was in that Sentry -- the smaller Sentry safe.

14   Q.        The one we had just previously seen?

15   A.        Yes.

16   Q.        Okay.  I'm going to hand you what's been

17   previously marked as Government's Exhibit 38.  Can you tell

18   the jury what that is?

19   A.        That's the Silicon hard drive from that Sentry

20   safe.

21   Q.        All right.  From the defendant's residence?

22   A.        Yes.

23   Q.        All right.  Would you have provided all these

24   items to the search team, essentially, to be forensically

25   analyzed?

1   A.        Yes.  So what we would do is we would gather --

2   once we gather all the evidence, Randy Agular (phonetic),

3   who's -- he was running the computer program.  So we stage

4   it in the dining room as we collect it, and he keeps track

5   of all the evidence as we get it.  And then once the search

6   is complete, we create an inventory, and we match it up

7   with the items that were taken from residence.  And we

8   leave a copy of the inventory and search warrant with them.

9   Q.        And were these items in substantially the same

10  condition as when you collected them?

11  A.        Yes.

12            MR. SIMKO:  Nothing further, Your Honor.

13            THE COURT:  Okay.  Mr. Wineman?

14                      CROSS-EXAMINATION

15  BY MR. WINEMAN:

16  Q.        Did you testify, Agent, that the hard drive was

17  in the small safe?

18  A.        Yes, I did.  It was -- we emptied the safe

19  content, the different safe contents, and then took a

20  photograph of those contents.

21  Q.        And you personally observed it, you personally

22  saw it then?

23  A.        The hard drive, yes.

24  Q.        Okay.  And you also observed -- observed the

25  contents, I take it was a lockbox, Exhibit 23; is that

1   correct?

2   A.        If it was the cream colored one, the smaller one?

3   Q.        Yeah.

4   A.        Yes.

5   Q.        Okay.  And did that contain the panties, do you

6   remember that?

7   A.        I would have to take a look at the photo, but I

8   believe it did, yes.  I believe that Sentry safe did

9   contain that.

10  Q.        All right.  And you were actually supervising the

11  collection of the evidence; is that correct?

12  A.        Yes, that was the team -- I was the search team

13  leader, yes.

14  Q.        Okay.  And there was no -- you didn't take those

15  for any testing, did you?

16  A.        No, we did not.

17  Q.        Now, did you accompany the other agents to affect

18  the arrest of Karl that day to the CSX yard?

19  A.        No, I was not part of that team, no.

20  Q.        Okay.  And did you actually see him when they

21  brought him back?

22  A.        I believe Mr. Rogers was in the kitchen for a

23  short time, and then after that I don't remember seeing him

24  at all.

25  Q.        Okay.  And you weren't involved in any

1    interrogation of him?

2    A.        No, I was not.

3    Q.        Nothing further.  Thank you.  Thank you.

4    A.        You're welcome.  Thank you.

5              THE COURT:  Redirect?

6              MR. SIMKO:  No, Your Honor.  Thank you.

7              THE COURT:  Agent, you may step down.  You're

8    welcome to go or free to stay.  It's entirely up to you.

9    A.        Thank you, Your Honor.

10             THE COURT:  Your next witness, and what are we

11   likely to hear?

12             MR. SIMKO:  Your Honor, the next witness is Jason

13   Howell.  He is the ICAC forensic examiner who did the

14   forensic examination of the different --

15             THE COURT:  Perhaps we can land a break around

16   noon or whatever.  Deanna, I think that's when I have the

17   appointment, maybe check with Elizabeth.  So if you're not

18   completed or whatever, there'll be a certain break point.

19                           JASON HOWELL,

20   was herein, called as if upon examination, was first duly

21   sworn, as hereinafter certified, and said as follows:

22             THE COURT:  Good morning.

23   A.        Good morning, sir.

24             THE COURT:  Normally I tell people to move to the

25   microphone, but I don't think you need to.  You have a good

1    loud voice.  I'm going to ask you a few questions.  In any

2    event, introduce yourself to the jurors.  Tell them who you

3    are and what your current job and duties are.

4    A.        Hi.  My name's Jason Howell, H-O-W-E-L-L.  I'm a

5    Special Investigator with the Cuyahoga County Prosecutor's

6    Office.  I'm assigned to the Ohio Internet Crimes Against

7    Children Task Force.

8              THE COURT:  How long have you had that

9    assignment?

10   A.        Nine-and-a-half years, sir.

11             THE COURT:  Okay.  How long have you worked for

12   the Cuyahoga County Prosecutor's Office?

13   A.        Same time.

14             THE COURT:  Same time.  And are you an attorney?

15   A.        No.

16             THE COURT:  Okay.  But you have some sort of

17   other training; is that correct?

18   A.        Yes, I'm a Peace Officer in The State of Ohio.

19             THE COURT:  Okay.  Okie doke.  And aside from

20   attending The Academy and so forth, have you had any

21   post-college education?

22   A.        Yes, I have a Bachelors Degree in Information

23   Technology.

24             THE COURT:  Okay.  Go ahead.

25                        DIRECT EXAMINATION

```
 1   BY MR. SIMKO:

 2   Q.        All right.  Can you tell -- you have a CV; is

 3   that correct?

 4   A.        Yes.

 5   Q.        And you brought it with you here today?

 6   A.        Yes.

 7   Q.        All right.  Can we see Government's Exhibit

 8   Number 6.  Is that your CV?

 9   A.        Yes, it is.

10   Q.        Okay.  And can you tell the jury a little bit

11   about -- you said you have a Bachelor's Degree, you said --

12   and you said you're a Peace Officer.  What's your Peace

13   Officer background?

14   A.        Prior to joining the Cuyahoga County Prosecutor's

15   Office as an investigator, I was a patrolman for the

16   Village of Creston Police Department.

17   Q.        And you have your degree in IT?

18   A.        That is correct.

19   Q.        Do you also do training in the area of IT?

20   A.        My training is specialized in the area of digital

21   forensics.

22   Q.        So you do training in that area?

23   A.        Yes.

24   Q.        Okay.  Can you tell the jury a little bit about

25   some of that training?
```

1    A.        The trainings I get show me and teach different

2    tools and methods to examine digital media to look for

3    evidence in cases.  So digital media can be things like

4    smart phones, SD cards, the hard drive from a computer,

5    SQLSTATE cards.  Nowadays you have smart speakers, things

6    of that nature, anything you can retain or store data as

7    well.

8    Q.        Generally how much training do you do as part of

9    your digital forensic background?

10   A.        I attempt to do 40 hours a year at least.

11   Q.        Is that in addition to any other training that

12   goes with a Peace Officer?

13   A.        Yes.

14   Q.        Have you had specialized training in the area of

15   a, quote, unquote, Freenet?

16   A.        Yes, I have.

17   Q.        And have you testified before giving your opinion

18   in the area of digital forensics?

19   A.        Yes, I have.

20   Q.        Approximately how many times?

21   A.        Four or five times last year, and over ten years

22   20, 30 times so far.

23   Q.        All right.  You mentioned the Internet Crimes

24   Against Children Task Force or ICAC, what is ICAC?

25   A.        ICAC is a federally-funded task force.  It's run

1    through the Office of Juvenile Justice and Delinquency

2    Prevention.  There's 61 task forces nationwide comprised of

3    state and local agencies, and we provide training,

4    resources -- by resources I mean forensic support,

5    investigative support to local agencies to investigate

6    crimes of sexual exploitation via the internet against

7    children.

8    Q.        And what do you do specifically as a member of

9    the task force?

10   A.        Specifically my duties are primarily digital

11   forensics.  And then I also do peer-to-peer file sharing

12   investigations.

13   Q.        How many devices do you think you've examined as

14   a member of the ICAC task force in your career?

15   A.        Several thousand.

16   Q.        All right.  Investigator Howell, can you explain

17   to the jury, how does someone go about downloading child

18   pornography?

19   A.        Generally they're going to need an internet

20   connection is the most popular way to obtain child

21   pornography.  They would have to search out a means to get

22   it, peer-to-peer file sharing, Dark Web type allocations

23   Freenet, or the other also known as TOR.  And then they'll

24   have to use terms that would pull up this type of content,

25   you know, and then attempt to download it with the

1    software.  But the software they'll have to search for as

2    well, it's on there.

3    Q.        This might be a little bit too basic, but do you

4    need a computer to download child pornography?

5    A.        You would need an internet capable device, a

6    smart phone could be used, doesn't have to be a computer.

7    Q.        Okay.  And so where does one find child

8    pornography on the internet?

9    A.        Usually by peer-to-peer file sharing applications

10   is the most popular.  There are, and were, websites that

11   contained it.  Those are pretty hard to locate anymore.

12   They're policed pretty regularly.  Most search engines

13   filter out that type of content from search results, so,

14   like, you can't just Google it per se.

15   Q.        Would it be somewhat difficult maybe to find if

16   you weren't going for it on purpose?

17   A.        Yes.

18   Q.        Okay.  Adult pornography, is that easy to find on

19   the internet?

20   A.        Extremely.

21   Q.        When you say the word downloading, is downloading

22   the child pornography the same as receiving child

23   pornography?

24   A.        I would say yes.

25   Q.        And what is an IP address, and how is it used in

1   these investigations?

2   A.        IP addresses, I relate to those as, like, a phone

3   number for your computer.  It's what allows your computer

4   to talk to other computers on the internet.  IP stands for

5   Internet Protocol.  When you pay for internet service from

6   a provider like Spectrum, used to be called Time Warner,

7   sorry, or Verizon or Comcast, they're going to provide you

8   with an IP address to use to allow you access to the

9   internet.

10  Q.        And if you know that IP address, can we know the

11  person who's essentially using that internet connection?

12  A.        Right.  We can ask the people who actually own

13  the IP address who they leased it out to when we notice the

14  activity on it.

15  Q.        What is -- we've heard something called the dark

16  web.  What's the dark web?

17  A.        Dark web's kind of a general term.  I think it's

18  used to describe applications that aren't commonly used by

19  most internet users.  So some people equate them, like, VP

20  inserts or virtual private networks allows the user to hide

21  their IP address, or mask it by using a piece of

22  specialized software to basically use somebody else's IP

23  address or different IP address maybe somewhere else in the

24  world or in the U.S.  It looks like traffic -- that IP

25  address is not the actual one that you pay for for your

1   service provider.

2   Q.      People use the dark web for illegal activity?

3   A.      Very common.

4   Q.      Are you familiar with the dark web browsers TOR

5   and Freenet?

6   A.      Yes.

7   Q.      And how does one get TOR and Freenet internet

8   browsers or networks on their computer?

9   A.      They actually have to download software from the

10  project websites.  So Freenet and TOR both have their own

11  website.  And that -- a user can go to that website on

12  their computer and download the software that they will

13  need to access those networks.

14  Q.      All right.  Those networks aren't going to come

15  with the computer, is that right?

16  A.      No.

17  Q.      Okay.  How does someone use a program like

18  Freenet or TOR to download child porn?

19  A.      Once it's installed, they would have to run the

20  program to execute to execute a role that starts the

21  program to get it running on their computer.  Then once

22  that's going, they would access it through whatever

23  browser, join the web browser like Fire Fox or Chrome is

24  what's used with those.  And then it will open up -- it

25  will open up those web browsers in certain modes so they

1    can access the TOR network or the Freenet network once the

2    executable is run to allow the access.  And then they can

3    browse through there just like you would with the internet.

4    There's no services, like, there's no Google, per se, on

5    Freenet.  They have what's called index sites, which is a

6    list of all the websites available to the people viewing

7    Freenet, and they'd have to review that to look for the

8    content that they want.

9    Q.       Would you have to then sort of click on it and

10   download the child pornography?

11   A.       Yeah, they'd have to then navigate to that

12   pre-site or that website inside Freenet, and then the

13   content will be there, or there might be another link to

14   the content somewhere else that they would have to then go

15   to that place to view the content and/or download it.

16   Q.       All right.  So downloading child pornography, is

17   that a multi-step process?

18   A.       Yes.

19   Q.       You mentioned something earlier called Onion or

20   the Onion.  Can you tell the jury what that is in relation

21   to TOR?

22   A.       The Onion router is also called TOR.  It's the

23   name, they're synonomous.  And it's a little more

24   widely-known application for anonymous web browsing is how

25   they -- what the website basically says it is.  So it

1    allows you to enhance your privacy by people actually track

2    your IP address at home.  And during a TOR session, you can

3    brows to what they call .onion sites, which are websites

4    that you can only see when the TOR program is running on

5    your computer.  So you can't get to those sites unless you

6    have TOR installed on your computer and have it running.

7    Q.        All right.  And what is Frost, and how is it

8    relevant to Freenet?

9    A.        Frost is a message board similar to the message

10   boards you see in, like, Yahoo or AOL.  And you have to

11   have Freenet running for Frost to function.  It uses

12   Freenet to connect to the other users of Freenet so you can

13   trade messages, you can make posts, you can share things to

14   files.  So you can download files through Frost.

15   Q.        Okay.  Use that to download child pornography?

16   A.        That is a common activity on Frost, yes.

17   Q.        What is LiveMe?

18   A.        I'm sorry?

19   Q.        LiveMe?

20   A.        LiveMe is a website.  It's a streaming website

21   that you can broadcast yourself to people on the internet

22   with your web cam or your phone camera.  It's commonly run

23   on phones by kids.  They'll broadcast themselves doing

24   gymnastics or cup challenges like YouTube challenges.  The

25   ice challenge for awhile was on LiveMe.  And just let's

1    them basically broadcast to whoever wants to log in and

2    view it.  People want to watch, just go to the website,

3    they see a feed that's open, click it, and then they get

4    the video of the person who's broadcasting themselves to

5    the world.

6    Q.       And sometimes does that broadcast involve child

7    pornography?

8    A.       In my experience, yes.  You know, the people

9    viewing this feed will try and convince the children to do

10   things they shouldn't be doing.  And I have several cases

11   where that's asked for.

12   Q.       Is the -- whoever is using the LiveMe, are they

13   able to make suggestions to the person on the other end as

14   to what maybe they should do?

15   A.       Yes.  That's a chat feature, so the person

16   broadcasting will see chats coming in.  There's also the

17   ability to give gifts to the person broadcasting that they

18   can then either regive to someone else on LiveMe, or they

19   can even flip it for a monetary value or something like

20   that.

21   Q.       All right.  Moving to devices.  Let's say you're

22   given a device to examine, can you run the jury through how

23   you would conduct an examination of a computer or hard

24   drive in a case like this?

25   A.       So for a computer, I would actually remove the

1    storage device, be it a hard drive or SQLSTATE drive or

2    whatever type of storage media it uses.  And I would attach

3    that to a device called a writing blocker.  And that's a

4    physical piece of equipment that goes between my forensic

5    examination computer and the media that's removed from my

6    evidence.  And what that device does is it prevents my

7    examinations computer, its operating system, from making

8    any changes to the drive that came from the suspect's

9    computer so I don't damage the integrity of the evidence.

10   Once that connection's made and my examine computer has

11   seized the suspect's drive, I then make a copy of it or an

12   image I call it an image.  It's a bit-for-bit copy.  So I

13   read every piece of it and my -- the image is an exact

14   duplicate of my suspect evidence drive.

15            And then I take those image files, I store those

16   on my examination computer, and I use the tools, different

17   tools, forensic tools against the image file and not the

18   original evidence.  That way if the image were to get

19   damaged by one of the tools, it doesn't work properly, I

20   can reimage it and I won't compromise the integrity of the

21   evidence.

22   Q.       So it protects the initial piece of evidence,

23   correct?

24   A.       Correct.

25   Q.       And it allows you, if something goes wrong, to

1   essentially start over?

2   A.          To start over again, exactly.

3   Q.          What information can you get when you examine a

4   device?

5   A.          Depending on the tool, a lot.  I can get

6   information about the computer's operating system, be it

7   Windows or Macintosh, those are the real popular ones, user

8   account information, you know, that was created by the

9   people that wrote the software or by a user, and most

10  people use their name, but you can use anything to set up a

11  user account and operating system.  Their internet browsing

12  history, their files they've looked at recently, programs

13  they've installed, programs they've uninstalled, files

14  they've viewed, files they've deleted, you know, basically

15  that's just anything that's been in there.  The tools that

16  we use, this software, goes through and pulls all that back

17  out, puts them into a readable format for me to do analysis

18  on.

19  Q.          Okay.  And what programs or softwares you did

20  mention, if you did mention, do you use when you are

21  analyzing these devices?

22  A.          The most common ones I use are ones called

23  Griffeye Analyze.  Use that to review pictures and videos

24  and categorize them.  Then the other one is the Magnet

25  Internet Evidence Finder, or I.E.F., which I recently

1    upgraded to the newer version, which is called Axiom.

2    Q.        All right.  When you -- after you've gotten the

3    information, what information -- what can you get -- what

4    information can you get from a particular file?  Let's say

5    you're looking at a video, what information can you get

6    from that video?

7    A.        It varies by the type of file.  Most basic

8    information is creation date, when the file was created on

9    the piece of media I'm examining, last accessed or modified

10   dates are sometimes there, depending on the operating

11   system that it was pulled from.  Some pictures and videos

12   have what is called exif data, which is information added

13   to it by the device, the camera that recorded the video or

14   took the picture.  Sometimes it will put in the date that

15   it did it based on the date and time the user set on that

16   device, the make and model of the camera that took the

17   picture.  This is very common with today's smart phones.

18   They put the make and model of the phone, put in cell phone

19   there that took it, the date and time it was recorded.

20   Sometimes there's GPS information like location data, where

21   physically on the planet it was taken.

22          If the video's been edited or photo's been edited

23   the software that's been edited, sometimes will leave a

24   stamp in there saying, you know, Photo Shop was used to

25   create this.  Or there's thousands of picture editing

1    tools.  They all like to leave their name in there, kind of

2    a promotion I guess.  Or at least if you go to edit again

3    or put it to another tool or picture editing software, it

4    can say, oh, you edited it with this software, I can't edit

5    it, or I can do this additional stuff.

6    Q.        How do you tell if a device has child pornography

7    on it?

8    A.        I'd have to review the pictures and videos that

9    are recovered from it.

10   Q.        So you have to download -- or you actually view

11   all of those images and videos, is that right?

12   A.        Yes.

13   Q.        Okay.  And how do you tell if something's child

14   pornography?

15   A.        I use a categorization method that I was --

16            THE COURT:  What kind of method?

17   A.        Categorization.  That I was trained on when I

18   took the training for the Griffeye Analyze program.  And

19   it's based on the U.S. Code for child pornography.

20   Q.        So you're aware of the definitions of what is

21   child pornography and what qualifies as illegal child

22   pornography; is that correct?

23   A.        That's correct.

24   Q.        So you're making an examination, do you complete

25   any reports when you're done?

1    A.        Yes, I do.

2    Q.        All right.  And what reports do you usually make?

3    A.        A make a report from each tool that I use.  So

4    there would be a report from my Griffeye tool, and another

5    report from my I.E.F. tool.  And then I do an overall

6    summary narrative that I generate myself, just a Word

7    document.

8    Q.        All right.  And in an investigation, who do you

9    end up giving those reports to?

10   A.        They're given back to the case agent.

11   Q.        And what do you do with the child pornography

12   that you're able to identify on those devices?

13   A.        That's also given to the case agent on an

14   encrypted drive.

15   Q.        Were you involved in the investigation of this

16   case?

17   A.        Yes, I was.

18   Q.        And what was your role?

19   A.        During the search warrant I did what's called an

20   ossium (phonetic) triage.  The ICAC has a mobile

21   investigations vehicle that I drive regularly that allows

22   us to triage digital evidence during a search warrant to

23   look for evidence of child pornography to see if it needs

24   to be seized, or if there's no evidence it can be left

25   behind, so we're not taking things that we don't need to

 1   take from a home.  And there's also an interviewer in the

 2   vehicle that the agents or investigators can utilize to

 3   talk to the witnesses, suspects, whoever they need to talk

 4   to.

 5   Q.        Can you give the jury kind of a rough estimate

 6   about the size of this vehicle?

 7   A.        It kind of looks like an RV.  It's a large truck,

 8   it's about 26 feet long, 12 feet tall, couple doors on it

 9   and windows, like a big ambulance slash RV hybrid.

10   Q.        Okay.  You said -- why do you do the triage on

11   the scene?

12   A.        The triage we do to find evidence that we should

13   be seizing during the search warrant.  Prior to that we

14   used to take all the computers and phones and cameras and

15   memory cards that were in the home.  And then we'd have to

16   go -- go through all of it in the lab and try and return

17   things back that had nothing on them.  The triage let's us

18   do that now on scene.  Today's world everybody's so

19   connected, everybody's got a smart phone, some people don't

20   have a home phone anymore, so to not take their phone if we

21   don't need to, you know, seems to be a better option

22   because we have no way to contact the person if we have

23   their only means of communications in our evidence room.

24   Q.        It's a convenience factor for the people you're

25   searching; is that right?

1    A.         Kind of.

2    Q.         All right.  And did you examine devices while on

3    scene in this case?

4    A.         Yes, I did.

5    Q.         All right.  And did you take any devices with you

6    when you left the scene to do further examination?

7    A.         When I left the scene, devices were taken by the

8    case agent and later brought to my lab by the agent for

9    further examination.

10   Q.         All right.  So you did examine devices later on;

11   is that right?

12   A.         Correct.

13   Q.         Can you walk through the jury -- you gave the

14   general description, how you specifically did that in this

15   case?

16   A.         In this case, as I described before, the storage

17   media would have been removed from a computer, attached to

18   a write blocker and examined.  If it wasn't in a computer,

19   then, like USB flash drives and stuff can be found loose,

20   then they will be hooked to the write blocker directly,

21   write blockers for the USB, and then those images are

22   examined just as I described earlier.

23   Q.         Okay.  And did you make a compilation of the

24   relevant data on the devices that you examined in this

25   case?

1    A.        Yes.

2    Q.        Did you also write a report summarizing your

3    findings?

4    A.        Yes, I did.

5    Q.        All right.  I'm going to hand you what's been

6    marked as Government's Exhibit 4.  Is that the summary of

7    your forensic examination in this case?

8    A.        Yes, it is.

9    Q.        All right.  I'm going to show you on your screen

10   Government's Exhibit 3.  Can you tell the jury what that

11   is?

12   A.        That is the report that I generate at the end of

13   an exam.  It contains my summary, which is Exhibit 4, and

14   then the reports from the tools that I used to do the

15   examination.

16   Q.        Okay.  And -- so we can click on these and see

17   portions of your examination; is that correct?

18   A.        That's correct.

19   Q.        All right.  Can we click on item -- what is item

20   23?

21   A.        Item 23 was a Silicon powered branded external

22   hard drive.

23   Q.        All right.  I'll show you Government's Exhibit

24   38.  Is that the hard drive that you examined?

25   A.        Yes, it is.

```
 1   Q.        All right.  And is this sort of information here
 2   part of what you were able to uncover as far as your
 3   examination's concerned?
 4   A.        Yes, it is.
 5   Q.        All right.  Can we go to the first encryption --
 6   all right.  Are these items that you found on this
 7   particular hard drive?
 8   A.        Yes, they are.
 9   Q.        All right.  And can you tell the jury what is
10   item, we have on here as record one and record three, and
11   what are those items?
12   A.        Both of these are executable programs that you
13   would need to start an application.  The top one will start
14   a program called Freenet Tray.  And what that does is when
15   Freenet's running, it kind of runs in the background.  It's
16   not always up on your screen.  But down by the clock in a
17   Window's based system there's a little rabbit, that's the
18   tray icon, and this is part of that.  So you would use this
19   to start a Freenet application.
20   Q.        So there's evidence of Freenet on this hard
21   drive?
22   A.        Yes.
23   Q.        And then what's item -- record three, the second
24   listed there?
25   A.        Record three is TOR.exe.  And this is the program
```

1    that you run to access the TOR network.

2    Q.        Item 25, what is item 25?

3    A.        Item 25 is a Dell laptop.

4    Q.        All right.  I'm going to show you what's been

5    marked as Government's Exhibit 37.  Is that the laptop you

6    examined?

7    A.        Yes, it is.

8    Q.        And what we're looking at on the screen is the

9    examination of that device; is that correct?

10   A.        That is correct.

11   Q.        Okay.  And can we first put that log on there.

12   All right.  Installed programs, what is this?

13   A.        So these are applications or programs that are

14   currently installed in the Dell laptop's Windows operating

15   system.

16   Q.        All right.  And I'll go down first to record 21

17   there called Eraser, what is Eraser?

18   A.        Eraser is a program that will erase your, like,

19   internet browsing history, file access history, and things

20   that are commonly recorded by the Windows operating system

21   web browsers.  It's a privacy tool, enhances your privacy

22   by erasing records of what you were doing on your computer.

23   Q.        And that was installed on this computer?

24   A.        Yes, it was.

25   Q.        All right.  Record number 37 entitled BleachBit,

1   what's a BleachBit?

2   A.        It's a competing product for the Eraser program,

3   another privacy tool.  It's also able to wipe free space on

4   the computer's hard drive.  So when you delete a file in

5   the Window's operating system, it's not always gone.  It's

6   kind of like evicting somebody out of apartment.  You just

7   kind of threw them out but all their stuff is still there.

8   So BleachBit is kind of like the cleaning crew that comes

9   in, takes all their stuff out and makes the apartment

10  pristine so somebody else can move it.

11  Q.        So would that hamper someone like you from

12  finding files on the computer?

13  A.        Yes.

14  Q.        Record number 44 just Freenet.  What is that

15  installed programs?

16  A.        That's the Freenet application, so you would need

17  that to access Freenet.

18  Q.        And that was installed on the defendant's

19  computer?

20  A.        It's actually installed on a -- not on the

21  computer's internal hard drive, it was run from another

22  drive.

23  Q.        Okay.  Record number 64, TrueCrypt?

24  A.        TrueCrypt is an encryption program.  So it allows

25  you to create what we call an encrypted container.  It's

```
 1   like a big file that you'd store files in, kind of like a
 2   filing cabinet that then you can lock.
 3   Q.        All right.  And did the -- it's installed in
 4   defendant's computer; is that correct?
 5   A.        That is correct.
 6   Q.        And did he have -- was there anything in the
 7   TrueCrypt relevant to your case here?
 8   A.        There are encrypted containers on the computer.
 9   Q.        All right.  Were you able to open all of them?
10   A.        Not all of them.
11   Q.        Some of them?
12   A.        Yes.
13   Q.        How were you able to open some of them?
14   A.        The suspect provided the password to me.
15   Q.        So the defendant actually provided you the
16   encryption code; is that correct?
17   A.        Yes.
18   Q.        So on the left here we have something called
19   ShimCache.  What is ShimCache?
20   A.        ShimCache is an operating system generated by
21   links, our file pass.  The Microsoft Windows operating
22   system records a lot of different information as you use
23   your computer to make use of your computer easier.  So if
24   you run a program regularly, it's always at the top of that
25   most recently used programs.  If you open a file a lot, you
```

1    will see that, you know, you can find it faster, it will

2    show up at the top of a list of files that were just

3    opened.  Convenience factors like that use things like the

4    ShimCache and link files and other things that Windows

5    records to make that happen.

6    Q.        Okay.  So here record number 95, TOR.exe, what

7    relevance would that have as far as this investigation's

8    concerned?

9    A.        It's showing that the executable TOR.exe program

10   itself was run on the computer, so somebody accessed TOR

11   with this computer.

12   Q.        Do you see the last update, date and time there?

13   A.        Yes.

14   Q.        And what date is that?

15   A.        December the 11th, 2017.

16   Q.        All right.  The warrant was executed on this case

17   two days later; is that correct?

18   A.        That's correct.

19   Q.        All right.  Something called Vidalia, record

20   number 112.  What is Vidalia, and why would that be

21   relevant to this case?

22   A.        It's part of the TOR application, being the onion

23   router.  They use an onion theme for all their stuff.  The

24   .onion file Vidalia is a type of onion, so that's an

25   application used to get the TOR network running.

1  Q.       So it's connected to TOR; is that right?

2  A.       Yes.

3  Q.       Okay.  Record number 229, Freenet Launcher,

4  what's relevant in that -- what's the relevance of that?

5  A.       Like TOR, Freenet has several smaller

6  applications that have to run in order to use the Freenet

7  system, and that launcher is one of them.

8  Q.       And then lastly here in your ShimCache record,

9  number 332, uTorrent, is that also associated with TOR?

10  A.       UTorrent is a peer-to-peer file sharing program.

11  It uses the BitTorrent peer-to-peer file sharing network.

12  Q.       Okay.  All right.  Record number 94, so what's a

13  USB device?

14  A.       USB device, this is recorded by the Windows

15  operating system any time you plug a device into the

16  computer via the USB port on your computer.  So this is

17  listing storage devices, things that would have memory,

18  ability to store files that were attached to this computer.

19  Q.       And item 94, the Silicon power hard drive, do you

20  see that there?

21  A.       Yes.

22  Q.       Okay.  And that would be consistent with the

23  Silicon power hard drive that you examined; that's correct?

24  A.       Yes.

25  Q.       Being plugged into the defendant's Dell laptop

1   computer at some point; is that correct?

2   A.          That's correct.

3   Q.          And actually we have a date there, last

4   connected.  What's the date there?

5   A.          December the 10th, 2017.

6   Q.          So three days prior to us executing the search

7   warrant; is that correct?

8   A.          Yes.

9   Q.          Lastly can we go to the prefetch?  What are

10  prefetch files?

11  A.          Prefetch files are generated by the Window's

12  operating system to help start programs faster.  So

13  programs you run more often, they keep a -- the prefetch

14  files updated regularly so that when you click the program,

15  a little icon will make the program start.  It starts up

16  quicker.

17  Q.          Okay.  So here we have eraser is the first

18  record, or the record 116.  That was last run on

19  December 10th, 2017; that's correct?

20  A.          Yes.

21  Q.          And we have BleachBit, that erasing program that

22  you mentioned, record number 182, and that was last run on

23  December 11, 2017; is that correct?

24  A.          Yes.

25  Q.          Okay.  TrueCrypt exe, record number 317, last run

1    on December 11th, 2017; is that correct?

2    A.        Correct.

3    Q.        All right.

4              THE COURT:  It's a few minutes before noon, so

5    when you reach a breaking point in the next five minutes or

6    so, ten minutes --

7              MR. SIMKO:  We can probably break after this

8    last -- one last question, Your Honor.

9    BY MR. SIMKO:

10   Q.        And there was just item 388, TrueCrypt, last run

11   on December 10th, 2017; is that correct?

12   A.        Yes.

13   Q.        So all these dates are just days prior to us

14   executing this warrant; is that correct?

15   A.        That is correct.

16   Q.        Okay.

17             MR. SIMKO:  I'm going to move off of this area

18   for now so if you want to take a break now --

19             THE COURT:  Okay, good.  Ladies and gentlemen,

20   we'll take our noon-time recess.  Counsel, why don't you

21   just approach for one second.

22                  (A side bar conference was had on the

23                   record.)

24             THE COURT:  Can I give them an hour and 15

25   minutes -- or you're on track, on time?  Okay.  Good.

1    Great.

2             MR. WINEMAN:  I'm going to be looking at the

3    evidence so.

4             THE COURT:  Okay.

5                  (Side bar concluded.)

6             THE COURT:  Ladies and gentlemen, we seem to be

7    moving right along, so let's plan to resume at about 1:15,

8    and, again, keep an open mind.  Don't talk to anybody who's

9    having anything to do with the case.  Don't talk amongst

10   yourselves about the case.  Just keep an open mind, and

11   we'll -- we generally -- I generally try to adjourn around

12   4:30, give or take.  That's sort of flexible.  I don't like

13   to interrupt something right in the middle of things, but

14   just for your own planning in terms of getting home and so

15   forth.  So thank you very much.  And we'll see you about

16   1:15.

17                  (A brief recess was taken for lunch.)

18             THE COURT:  Is there anybody in the spectator

19   section?  I can't see.

20             MS. TANGEMAN:  Just those with our office.

21             THE COURT:  Okay.  I just want to remind you,

22   I've asked counsel to sort of unobtrusively angle the

23   computers away from the -- from your view.  Maybe if you

24   could actually slide over, if you can slide over -- I don't

25   want you -- candidly, it's an invasion of the victim's

1    privacy, again, and I'm sure that they wouldn't -- they

2    don't want anybody to see this stuff.  They understand

3    that, those who have responded to the victim impact request

4    understand that it has to occur at trial.  But if you'll

5    please just slide over, those of you -- slide over by the

6    wall.  The other thing is we're not able to suppress the

7    audio, and there will be some audio.

8            COURTROOM DEPUTY:  Judge, they're going to mute

9    it at the computer so there won't be audio for that.

10           THE COURT:  Audio anywhere?

11           COURTROOM DEPUTY:  Correct.

12           THE COURT:  Great.  Wonderful.  Okay, let's get

13   the jury and go to work.  Thank you very much.

14               (Jury present in open court.)

15           THE COURT:  You may be seated.  You may resume,

16   and you understand you remain under oath.

17   A.        Thank you, Your Honor.

18           THE COURT:  Mr. Simko, you may proceed.

19           MR. SIMKO:  Thank you, Your Honor.

20   BY MR. SIMKO:

21   Q.        I just want to actually go over a few things.  If

22   we could put that last exhibit, this is State's Exhibit --

23   I'm sorry, Government's Exhibit 3, the forensic

24   examination.  And in this, there's one thing that I didn't

25   ask you about, and that was item 209.  We heard about

1    BleachBit, Eraser, TrueCrypt exe, but 209 is TOR.exe, what

2    is TOR again?

3    A.        TOR.exe is used to access the TOR network or the

4    Onion router network.

5    Q.        And the date on that one, again, December 11,

6    2017, two days prior to executing our warrant; is that

7    correct?

8    A.        Yes, it is.

9    Q.        There's also another question that was asked

10   earlier on in my examination, and that was the defendant

11   had provided a password, or the encryption code for some of

12   his items, but you weren't able -- you weren't able to get

13   into all of the items; is that correct?

14   A.        That's correct.

15   Q.        And why was that?

16   A.        The password provided did not unlock all the

17   containers found on the computer.  I have a piece of

18   software called Passware that I used to attempt to unlock

19   encrypted containers.  It basically just tried passwords

20   against the encryption tool to see if it unlocks it.  And I

21   let it run for several days, and it was unable to guess the

22   correct password.

23   Q.        You can run it to the end of time, essentially,

24   it may unlock one password, just trying one after the

25   other?

1   A.        That's right.

2   Q.        Sometimes it just doesn't work?

3   A.        Correct.

4   Q.        All right.  I next want to go to the Griffeye

5   exam file list.  What is that?

6   A.        This is a list of the picture and video files

7   that I categorized in this case using the Griffeye Analyze

8   program.

9   Q.        So all the items and videos you were able -- the

10  child pornography, you were able to essentially put into

11  something looking like a spreadsheet here; is that correct?

12  A.        That's correct.

13  Q.        I want to go over these columns because it's

14  going to be evidence.  The jury will know what they are.

15            Starting with the top there, image ID number.

16  Can you just tell us, you know, where we get those numbers

17  and what that means?

18  A.        That number is generated by the Griffeye program

19  while it's doing its processing.  So that's generated by

20  the software itself and how it keeps reference of each file

21  that it finds.

22  Q.        So file number essentially for the --

23  A.        Yes, it's assigned by the software.

24  Q.        There's a thumbnail and a word that says link

25  that looks like you can open something.  What is that?

1   A.        That is a link to the actual picture or video.

2   If this is a full copy and you click that, it will play the

3   categorized file.

4   Q.        So you'd be able to view it either as an image or

5   video; is that correct?

6   A.        That's correct.

7   Q.        This is a clean copy; is that correct?

8   A.        Correct.

9   Q.        And so you -- if someone here was to click on

10  that, it won't actually open a piece of child pornography;

11  is that correct?

12  A.        That is correct.

13  Q.        Binary copies?

14  A.        Binary copy would mean that it's found on two

15  different files, but they share the same hash value.  A

16  hash value is a fingerprint for a digital file, it's unique

17  to the file itself.  So if the same file with the same hash

18  value is located in the case, it would be more than one

19  copy, it would be, like, two, three, four binary copies

20  means that their hash values matched.  So it's the same

21  actual picture or video possibly in different locations.

22  Q.        Okay.  So if it's the same video or image was on

23  the Dell laptop or the Silicon hard drive, one each there,

24  we would be able to know that there are two copies that

25  exist, is that right?

1    A.        That is correct.

2    Q.        And here you just have a one, so, essentially,

3    there's one item listed, is that right?

4    A.        Yes.

5    Q.        Category.  What is category?

6    A.        So category is part of that categorization method

7    that I use.  There are three primary, there's child abuse

8    material, which is the child pornography itself.  It's the

9    sexually explicit material.  Then there is child

10   exploitive, slash, age difficult, which would be material

11   that's not exactly child pornography, but it's sexually

12   exploitive of a child.  That could just be a nude child, or

13   a child in provocative clothing like lingerie that we'd see

14   on an adult.  And then this -- the age difficult would be

15   people are subjects that aren't easily identified as

16   children, so they could be 14, they could be 18.  They've

17   entered puberty and adolescence, so it's difficult to

18   determine age just by looking at the picture going, oh,

19   yeah, that's a child.  And then the last is a CGI, slash,

20   animation child exploitive.  So this is computer-generated

21   graphics.  That's what the CGI stands for, or animation.

22   It could be hand-drawn pictures that are exploitive of

23   children of a sexual nature.  So hand-drawn pictures of

24   nude children or computer-generated animations of children

25   involved in sex acts with adults or other children.

1   Q.          Okay.  And so -- there are those three

2   categories.  All three of those categories are going to be

3   represented somewhere in this document; is that correct?

4   A.          That is correct.

5   Q.          Okay.  Md5?

6   A.          That is a hash value.  Md5 is one type.  There

7   are several.  It basically -- file here was passed through

8   a big mathematical algorithm, and this value is what was

9   generated as the file passed through the algorithm.  Again,

10  it's like a fingerprint for a digital file.  So if I were

11  to take this top one, picture, and I were to change just

12  one little pixel, and I would say it's red and flip it to

13  green or white, that hash value will change because it's no

14  longer the same file, I've altered it in some way.

15  Q.          Okay.  Exif?

16  A.          That's that additional information that I was

17  speaking of, like, the program that made the filing or

18  maybe altered the file, the camera that took the camera or

19  video, GPS information.  So if you see something here that

20  says exif, that means there's additional information

21  attached to the file about it.

22  Q.          So we have exif serial number, that would be some

23  of the information attached to that; is that right?

24  A.          That would be a unique serial number generated

25  and then put in the exif data, correct.

1    Q.        Series?

2    A.        Series is used through the National Center for

3    Missing and Exploited Children.  They keep a repository of

4    known victims of sexual abuse whose images and videos who

5    have been abused and distributed through peer-to-peer file

6    sharing or the internet in general.  So if I have

7    information on the series, it would be there.

8    Q.        Tags?

9    A.        That's additional information about the file that

10   I can put in there myself during my review of the images.

11   Q.        Comment and bookmarks?

12   A.        Comment, same thing.  I can write a comment in

13   about the file.  Bookmarks, I usually use bookmarks to

14   categorize files together if necessary.

15   Q.        All right.  Source ID?

16   A.        That's the evidence ID number that I use.  It's

17   referenced in my analysis report, my summary, under

18   submitted items that has an item number.  So the item

19   number here is 17.  If I reference my report, it would tell

20   me that it came from one of the 11 CD or DVD optical disks

21   that were submitted for examination.

22   Q.        Okay.  So this particular -- what item it came

23   from or what particular disk or computer; is that correct?

24   A.        Correct.

25   Q.        And we'll get to more about which items these

1    items correspond to.  The file path?

2    A.         That is the location on the digital media that I

3    had examined.  That's where the file is in its structure,

4    folder structure.

5    Q.         Okay.  And looking at this file path, it ends

6    with the word anal.  Did you find, when you examined the

7    defendant's devices, that he had some of his child

8    pornography categorized into different folders?

9    A.         Yes.

10   Q.         And one of those might have been anal, next one's

11   vaginal, but those would be some of the categories that he

12   would use?

13   A.         Yes.

14   Q.         File name?

15   A.         That is actually the name of the file itself.

16   Q.         That's what you would see if you were actually

17   just looking at it on the computer?

18   A.         If you were looking at the -- this, yeah, in the

19   anal folder, you would see a file titled 10-73.

20   Q.         Okay.  And kind of going down, you see one there

21   called Bart and Lisa Alone.  That's a cartoon reference,

22   but essentially that's what you would see when you tried to

23   open the file, is that right?

24   A.         Correct, that is the name of the file.

25   Q.         Created date?

1    A.        That would be the date that it was created on the

2    media that was examined.

3    Q.        Okay.  And here we have some pretty old dates.

4    First one, in fact, is back to 1980, and what -- why such

5    an old date?

6    A.        This was burned to a CD and DVD, sometimes CD,

7    DVD dates are not reliable.

8    Q.        All right.  Same thing with last write time,

9    that's a 1970 date?

10   A.        Yes, optical media like CDs and DVD, they're only

11   written to once, so this would be a last write time.  So

12   these 1970 for that and last accessed, because, again, it's

13   a reopening media.  The computer can't record when it last

14   accessed the file on that media, so the Griffeye Program

15   put this 1-1-1970 date in to fill in the blank.

16   Q.        Okay.  And we'll see some dates that are more

17   current, but these older dates have to do with because

18   these were disks instead of a computer, is that right?

19   A.        That's correct.

20   Q.        Okay.  Same, last accessed, old dates, same

21   reason here?

22   A.        Yes.

23   Q.        And then deleted, what does that column mean?

24   A.        The software detected that the file has actually

25   been deleted by the user.

```
 1   Q.        And checked or unchecked?

 2   A.        So if it says checked, that means it is a deleted

 3   file, unchecked is not a deleted file, it is an active

 4   file.

 5   Q.        All right.  Overwritten?

 6   A.        It goes with the deleted.  The software has

 7   identified that the file is deleted.  If it was

 8   overwritten, meaning something wrote over the space it was

 9   occupying and only part the file may remain, you will see a

10   checked row there if it detects it was an overwritten file

11   or partially overwritten file.

12   Q.        So your earlier analogy, people renting or moving

13   apartments, if it's overwritten somebody new moved in

14   essentially?

15   A.        Correct.

16   Q.        Unallocated?

17   A.        That's where deleted files reside in the file

18   system.  So when you use space on the storage media, it's

19   allocated for your file.  It's rented, the apartment's in

20   use.  When you delete a file, the apartment's no longer in

21   use, it's not unallocated.  So if you evict somebody, their

22   stuff is in that unallocated part, but nobody's in it.

23   Q.        Longitude and latitude?

24   A.        That is GPS coordinates.

25   Q.        So if we had this particular item, if we had that
```

1    information, it would put it here; is that right?

2    A.        Yes.  So, again, like smart phones will put in,

3    you know, geographic location where you took a picture.  So

4    if I were to go out and take a picture here, my phone would

5    record my GPS location and be able to tell me I took the

6    picture in Toledo in front of the U.S. Courthouse.

7    Q.        Okay.  And then we have some blank columns here,

8    but just so the jury understands what they are, make exif,

9    model exif, software exif?

10   A.        So make is, like, the make of the camera or the

11   person who made the device, Canon, Samsung, Panasonic, who

12   manufactured it.  Model would be where the model number

13   would be.  So if it's a Cannon Sure Shot Digital Camera, it

14   would say Sure Shot.  Software like Photo Shop, if it's

15   names on files and edits, if it was given a title by the

16   software or any access data, that would be reside in there.

17   Could be the original title of the file, so someone could

18   rename the file later, but the original being in that

19   column.  Also some cameras put the date that they take the

20   photo in the exif data.  That would be the created date

21   there, under created date exif.  Image unique ID is usually

22   used by camera added software.  It's added so it can track

23   how often something's been edited.  It's like copyrighted.

24   Q.        Comment exif?

25   A.        It's kind of a catchall.  If you look here, some

1    software put its version in there.  Instead of the software

2    column it will go in the comment.  This exif is standard

3    used across different formats of pictures.  And like

4    everything, computers, it's always updated.  The standard

5    is always changed to revise.  Older software might not use

6    the newer standard with all these newer columns in it, so

7    sometimes this will show up under comment if it's the older

8    version of exif.

9    Q.        City exif?

10   A.        It will put that from the GPS.  Like smart phones

11   will put Toledo in there.

12   Q.        Key word imagines?

13   A.        That's my software.  There's a list of key words

14   that can be indicative of child pornography or titles that

15   help child pornography.  If there's a match or just

16   pornography in general is actually what I look at.  If I

17   see a match, it can help me filter through the files to

18   help me locate the child pornography faster.

19   Q.        So you can locate every one that says vag if you

20   wanted to?

21   A.        Correct.

22   Q.        Social media identifier and then camera

23   forensics?

24   A.        The social media identifier, the Griffeye analyze

25   software will read the file, and if there is any

1    information from social media like Facebook, Flicker,

2    Hinder, it will put a flag in there saying that this

3    picture was associated with Facebook, and it will give me

4    the Facebook ID or post that it's associated with if the

5    information is still in the image.  Camera forensics is

6    a -- it's a piece of software or a separate piece of

7    software, or separate database, that the camera, if there's

8    exif information like make, model and camera serial number,

9    it will tell you if that make, model and camera has been

10   seen sharing pictures on the internet elsewhere.

11   Q.        Okay.  So as we said here earlier, this is sort

12   of the master list of all of the child pornography that you

13   were able to identify; is that correct?

14   A.        Yes.

15   Q.        All right.  And you said you classified them,

16   that's correct?

17   A.        Yes.

18   Q.        Three classifications.  So how many files did you

19   locate on the defendant's computer that consisted of child

20   pornography?

21   A.        There were 3,732 unique images or pictures, and

22   1,947 unique videos.

23   Q.        I'm going to show you what's been marked as

24   Government's Exhibit 5.  Tell the jury what that is.

25   A.        This is the report that goes along with the file

1    that's created by the Griffeye Program.

2    Q.        Okay.  Does that kind of break out each device

3    and the pornography on it?

4    A.        Yes, it does.

5    Q.        So can you tell the jury -- well, there we had

6    these numbers earlier, 17 -- we had these numbers earlier

7    like 17-1 or 17-9 that was on the computer.  Are those

8    identified in this report?

9    A.        The source ID is in the Griffeye report, but does

10   not identify what the source is.  That has to be referenced

11   out of my overall investigative analysis report.

12   Q.        Okay.  So -- well, can you tell us what, then,

13   based on those two reports, what is source 17?

14   A.        Source 17 is 11 miscellaneous CD, DVD disks.

15   Q.        And then have you them marked as 17-1, 17-2?

16   A.        That's correct.

17   Q.        Seventeen applies to the disks, and then the dash

18   applies to whatever disk; is that right?

19   A.        Right.  The disks were labeled with a dash and

20   number when they were imaged.

21   Q.        Show you what's been marked as Government's

22   Exhibit 39.  Are these the disks that correspond to those

23   numbers?

24   A.        Yes, they are.

25   Q.        All right.  So how many images did you find that

1    met the definition of child abuse material or sexually

2    explicit material?

3    A.        On all the media in the case, 3,732 unique,

4    meaning that eliminates all the binary copies.

5    Q.        So could have been multiple copies, but this is,

6    like, one particular image of one --

7    A.        Correct.

8    Q.        Okay.  And did those include -- and I'll go over

9    the definitions of sexually explicit conduct here, sexual

10   intercourse or oral sex involving minors?

11   A.        Yes, it does.

12   Q.        Does it include bestiality including minors?

13   A.        Yes, it does.

14   Q.        Does it include masturbation involving minors?

15   A.        Yes.

16   Q.        Sadistic or masochistic abuse involving minors?

17   A.        Yes.

18   Q.        And lascivious exhibition of genitals or pubic

19   area involving minors?

20   A.        Yes.

21   Q.        I'll ask you now then, videos, how many videos

22   did you say met the definition of child abuse material?

23   A.        1,947 unique videos.

24   Q.        Did those include sexual intercourse or oral sex

25   involving minors?

 1   A.      Yes.

 2   Q.      Bestiality involving minors?

 3   A.      Yes.

 4   Q.      Masturbation involving minors?

 5   A.      Yes.

 6   Q.      Sadistic or masochistic abuse involving minors?

 7   A.      Yes.

 8   Q.      And lascivious exhibition of genitals or pubic

 9   area involving minors?

10   A.      Yes.

11   Q.      All right.  Were you able then to refine those

12   thousands of videos and images and just allow us to view

13   essentially what was created or downloaded in the period of

14   October 7th through December 13?

15   A.      Yes, I was able to generate a list of just the

16   child abuse material within that date.

17   Q.      All right.  Do you see Government's Exhibit 7 on

18   your screen there?

19   A.      Yes, I can.

20   Q.      What is Government's Exhibit 7?

21   A.      This is the spreadsheet that I generated that

22   contains the files within the date range specified.

23   Q.      Okay.  And how many of those in total, if we were

24   to count them, have child abuse material?

25   A.      I don't remember off the top of my head.  I

1    believe the spreadsheet was just child abuse material.

2    Q.        If I told you it was 116 videos and images, would

3    that sound about appropriate for this spreadsheet?

4    A.        Yes, it does, I'm sorry.

5    Q.        I'm going to show you four in particular -- well,

6    we heard item 17, and then we had dashes.  Again, remind

7    the jury what is item 25?

8    A.        Item 25 is the Dell laptop.

9    Q.        And you identified that earlier the -- that red

10   Dell laptop?

11   A.        That is correct.

12   Q.        I want to bring to your attention four particular

13   files.  These will be more relevant later, but can you tell

14   us about this one particular image, or this one particular

15   image?

16   A.        So this file is a picture being that it's a .jpg

17   extension.  It was located in the -- in an encrypted

18   container on the Dell laptop.  That's why it says

19   abdecrypted.  And it was in a folder titled

20   Insertions-orgasm, and a sub folder titled Orgasm, and then

21   inside there, another sub folder titled Nueva Carpeta, and

22   the file itself is titled Erection.

23   Q.        All right.  And is there a -- we looked earlier,

24   there was a created date when it came to the disks that was

25   sort of a long time in the past.  Is there a created date

1  of relevance in this file?

2  A.          Yes, the created date for this file is

3  December 11, 2017.

4  Q.          All right.  And this comes from the computer, so

5  there would be a date associated with it as opposed to a

6  disk, is that right?

7  A.          Yes.

8  Q.          All right.  Can you similarly tell us about this

9  particular entry?

10  A.          This entry is a video file.  Again, it's from the

11  abdecrypted container.  It's in a sub folder titled UNV,

12  and in there is a sub folder titled TS.  And the file name

13  for the file is just the underscore character.

14  Q.          And then is there a create date on this one?

15  A.          Yeah, the create date for this file is

16  November 25, 2017.

17  Q.          The create date corresponds to download date?

18  A.          Corresponds that the date that the file appeared

19  on the media, yes.

20  Q.          If he had downloaded it, that would be the date,

21  is that right?

22  A.          Very well could be, yes.

23  Q.          Okay.  Before we go on to the next one, you

24  mentioned encrypted container, can you tell the jury, we

25  didn't discuss it earlier, what is a container, or

1   encrypted container?

2   A.        So an encrypted container is, again, it's like a

3   filing cabinet, and it just let's you store files in it.

4   But when it's locked, it just looks like a file on the

5   computer unless you have the password to unlock it in the

6   program, in this case TrueCrypt.  So to access the files in

7   the container, you have to start the TrueCrypt program and

8   then unlock the container, which then looks like you

9   plugged in almost like a flash drive in the computer.  It

10  looks like a different drive to Windows once TrueCrypt has

11  unlocked the container.

12  Q.        All right.  Can you tell us about this entry in

13  this spreadsheet?

14  A.        Yes.  This is another video file located in the

15  Dell laptop abdecrypted container.  Let's see, the file

16  path, it is in a file folder titled UNV, and then a sub

17  folder titled PTV, and another sub folder titled PTS, and

18  the file is entitled LiveMe 76962.

19  Q.        All right.  And I know we had discussed this

20  earlier, but what is LiveMe?

21  A.        LiveMe is a broadcast, video broadcasting website

22  or application that you can broadcast a video of yourself

23  doing things to the internet.

24  Q.        That would include children exhibiting themselves

25  in pornographic fashion; is that correct?

1   A.        That is correct.

2   Q.        And the created date on this one?

3   A.        October 22, 2017.

4   Q.        And then the last file to bring to your

5   attention, can you tell us about this last one?

6   A.        This last file also from the abdecrypted

7   container from the Dell laptop, it's in a folder titled

8   UNV, sub folder titled TV.  The file is named Tongue.  It

9   is a video file, and it has a tag of infant toddler, which

10  means the subject of the video appears to be young enough

11  to be, like, between one and four years old.

12  Q.        Okay.

13  A.        Very small child.

14  Q.        And the create date on this one?

15  A.        October 13th, 2017.

16  Q.        So all four of these -- well, these three videos

17  and this one image were created between October 7th, 2017,

18  and December 13th, 2017 on the defendant's computer; is

19  that correct?

20  A.        Yes.

21  Q.        All right.  And these four particular involve

22  child abuse material or sexually explicit material, is that

23  right?

24  A.        That is correct.

25  Q.        And although they're not -- there's just four,

1   there are 116 in this time range; is that correct?

2   A.        Yes.

3   Q.        Just one moment.  Just a couple last questions

4   here.  There were items -- or indicated as item 25 AB and

5   item 25 AD, can you -- why is there AB and AD?

6   A.        There were multiple encrypted containers on the

7   Dell laptop.  They were titled AB, AC, AD.  I don't know

8   why the user titled them that way.  I located child

9   pornography in container AB and in container AD.  I was

10  able to open both of those.

11  Q.        Okay.  And then also question I may not have

12  asked earlier, and you had mentioned, what is a

13  peer-to-peer -- what does peer-to-peer mean?

14  A.        Peer-to-peer file sharing is in reference to the

15  way to trade files through the internet between two peer

16  computers.  What that means, you're not downloading from a

17  server.  Like if you buy a song from the Google Play Store

18  or from iTunes, you get that music file from the iTunes

19  circ or the Google circ.  In peer-to-peer file sharing,

20  it's me sharing songs directly with you or another user of

21  the internet sharing a file with the other user.  There's

22  no servers involved.  So it's just one peer sharing files

23  with another peer.

24  Q.        All right.  And is -- well, for instance, is

25  Freenet a peer-to-peer network?

1  A.        It is a type of one, yes.

2  Q.        All right.  Nothing further.  Thank you.

3            THE COURT:  Mr. Wineman?

4            MR. WINEMAN:  Thank you.

5                      CROSS-EXAMINATION

6  BY MR. WINEMAN:

7  Q.        Were you familiar with the affidavit for the

8  search warrant that was used to search the premises?

9  A.        I was -- assisted on the search warrant.  I was

10  aware of it.  I'm not familiar with it verbatim.

11  Q.        Okay.  Do you know if you recovered any files

12  that were identified in the affidavit for the search

13  warrant?

14  A.        I do not believe so.

15  Q.        Okay.  Now, the images that were recovered, were

16  they from October through December of 2017?

17  A.        Some of the images and videos recovered were from

18  that date range.

19  Q.        Okay.  And once you received these videos and --

20  as a result of the search warrant that was executed, what

21  did you do with them?

22  A.        I received digital media that was seized --

23  Q.        Yeah.

24  A.        -- and then my software was used to recover

25  pictures and videos from that media, and then reviewed

1   those pictures and videos, and I categorized them as child

2   pornography or not child pornography files.

3   Q.        Okay.  Did you submit them to the National Center

4   for Missing and Exploited Children?

5   A.        Yes, as part of my work product, I do submit the

6   files recovered.

7   Q.        Okay.  I'm going to show you a couple exhibits

8   that we obtained in discovery and ask if this is

9   correspondence you received back from the people at The

10  National Center --

11           THE COURT:  Is this marked -- been marked as an

12  exhibit and otherwise identified for the record?

13           MR. WINEMAN:  It's marked as Exhibits A, B and C,

14  Your Honor, Defendant's.

15           THE COURT:  Okay.

16           MR. WINEMAN:  May I approach the witness?

17           THE COURT:  Of course.

18           MR. WINEMAN:  Thank you.

19           THE COURT:  You don't need to ask, but you have

20  standing.

21  BY MR. WINEMAN:

22  Q.        These were addressed to you, and can you tell us

23  what that is exactly?

24  A.        These three reports are initial hash value

25  comparison reports.  These were done by me using a piece of

1    software that I got from The National Center for Missing

2    and Exploited Children.  The way these work is the hash

3    values I referenced earlier, like the fingerprints for the

4    files, I upload those hash values to The National Center

5    through that program they provided me, and then they

6    compare those hash values against their database of hash

7    values, they contain and maintain a large database of hash

8    values.  They maintain a large database of hash values for

9    images and videos of child sexual abuse material.

10            And then when that comparison's done, the system

11   then sends me these PDF files, and they tell me that -- how

12   many of the hash values I submitted are an identified

13   child, which would be a child that they have information on

14   as a known victim, recognized hash value.  That is a hash

15   value that they have seen before or a file they have seen

16   before through submissions, but have not identified the

17   child or the victim.

18            And then unrecognized hash values are hash values

19   that are not in their system in any way, they've never seen

20   them before.

21   Q.        Okay.  If you refer to Page 1 at the bottom of --

22   I think it's all three of them, A, B and C, there's a

23   paragraph at the bottom of the page that starts law

24   enforcement officials, please be advised.  Are you familiar

25   with that?

1   A.        Yes.

2   Q.        Okay.  And would you read that paragraph for me,

3   please?

4   A.        Sure.  (Reading:) Law enforcement officials,

5   please be advised this report is being provided solely for

6   informational purposes pursuant to the National Center for

7   Missing and Exploited Children's NCMEC congressional

8   authorization admission.  Under no circumstances shall this

9   report be used as evidence of criminal wrong doing.  Please

10  treat all information contained in this report as law

11  enforcement sensitive information and do not share any

12  contents of this report with persons unrelated to the

13  criminal investigation or result -- or I'm sorry, or any

14  resulting criminal prosecution.  Be advised that NCMEC adds

15  information to the child recognition and information

16  system, CRIS, on a daily basis, and while infrequent, the

17  information contained in the system may change.  This may

18  account for possible dispirit -- dispirit search results

19  between the LESP and CRIS.  For the most accurate

20  information, please submit corresponding images, slash,

21  videos to NCMEC for comprehensive review.

22  Q.        Now, what you submitted originally, did you

23  resubmit that to them?

24  A.        Yes.

25  Q.        Okay.  So this is not the most recent report?

1   A.          This is done by me through the LESP client that

2   they refer to in the paragraph.

3   Q.          Right.

4   A.          Once this work was done, I then took the actual

5   images and videos, placed them on an encrypted hard drive

6   and submitted that to NCMEC Child Recognition

7   Identification System, or CRIS, for the full compare --

8   comprehensive review.

9   Q.          And did you receive a report back after that

10  second submission?

11  A.          Yes.

12  Q.          Okay.  Do you have that with you?

13  A.          I would have forwarded it on to the case agent

14  and possibly the prosecutors.  I don't always read them

15  all.  It takes them sometimes several months to get it back

16  to me, and my work product is completed at that time.

17  Q.          Okay.

18              MR. WINEMAN:  Nothing further of the witness.

19  Thank you.

20              THE COURT:  Any redirect?

21                        REDIRECT EXAMINATION

22  BY MR. SIMKO:

23  Q.          Just a few questions off of defense's counsel's

24  line of questioning.  First, I heard you say that you

25  encrypted your hard drive sending it to NCMEC, is that

1   right?

2   A.        Yes.

3   Q.        Why did you do that?

4   A.        In case the driver gets lost.  These are

5   submitted through the U.S. Postal Service.  Unfortunately

6   mail gets lost.  I didn't want people to have access to

7   child pornography files that I was submitting.

8   Q.        Based on his exhibits, these are actually

9   identified -- so you submit an image or video, and they

10  tell you, yeah, we've seen that before; is that right?

11  A.        Yes.  The CRIS review they will actually look at

12  the picture or video, along with its hash value, to verify

13  that the -- the victim in the video is someone that they

14  have identified in the past.

15  Q.        So identified children, on State's Exhibit A --

16  I'm sorry, Defendant's Exhibit A, 348 identified victims by

17  NCMEC based on the images and videos you submitted; is that

18  right?

19  A.        Exhibit A was submission of video files only, and

20  based on their hash values, NCMEC was stating in this

21  initial comparison 348 of the files that were submitted

22  appeared to have matched 348 hits in their system as

23  identified children, yes.

24  Q.        So real people?

25  A.        Yes.

1    Q.       All right.  Defense Exhibit B, what was that

2    submission?

3    A.       This was part of the images, the system, the hash

4    value.  I can only submit a certain number of values at a

5    time, so since there were so many in this case, I had to

6    break them in two.

7    Q.       And here they identified 1,036 children; is that

8    correct?

9    A.       They identified 1,036 hash values.  There could

10   be 20 images of the same child.  They don't tell me any of

11   that.  They're just saying of the hash values submitted,

12   1,036 matched hash values in their system of having

13   identified victim related to that file.

14   Q.       Okay.  So someone -- yes, so per image they have

15   actually identified 1,036 kid -- whether they appear

16   multiple times, corresponding to real people essentially?

17   A.       Yes.

18   Q.       Okay.  Same thing with Defendant's Exhibit C,

19   they have identified children as 974; is that right?

20   A.       Yes, 974 of the hash values submitted correlate

21   back to an identified child.

22   Q.       A real person?

23   A.       Yes.

24   Q.       Thank you.

25            THE COURT:  Any recross?

```
 1              MR. WINEMAN:  I have nothing further.

 2              THE COURT:  Okay.  Officer, you may step down.

 3    You're free to go, or you're welcome to stay.

 4              And your next witness, and what are we likely to

 5    hear?

 6              MS. TANGEMAN:  Your Honor, the government would

 7    call the case agent, Detective Ryan Anschutz.

 8              THE COURT:  Okay.

 9                   RYAN ANSCHUTZ,

10    was herein, called as if upon examination, was first duly

11    sworn, as hereinafter certified, and said as follows:

12              THE COURT:  You may be seated, sir.

13              MS. TANGEMAN:  May be about 45 minutes.

14              THE COURT:  Then why don't we plan to take our

15    mid-afternoon recess then.

16              Good afternoon.

17    A.        Good afternoon.

18              THE COURT:  Angle yourself and the microphone so

19    you're facing the jury, and speak directly in the

20    microphone.

21              Please tell the ladies and gentlemen who you are.

22    A.        Detective Ryan Anschutz.

23              THE COURT:  With what department or police

24    force --

25    A.        Mansfield Division of Police.
```

1              THE COURT:  Pardon?

2    A.        Mansfield Division of Police.

3              THE COURT:  How long have you been employed by

4    the Mansfield Police?

5    A.        Approximately 12 years.

6              THE COURT:  Any prior law enforcement experience

7    or is that it?

8    A.        Yes.

9              THE COURT:  Okay.  Where, and with whom?

10   A.        Part time with Edon Police Department, near

11   Dayton, full-time before Mansfield P.D, with Wright State

12   University Police Department, and in the middle of my time

13   with Mansfield Division of Police I was a Sargeant with

14   Butler Police Department while being laid off from

15   employment.

16             THE COURT:  And how long have you been a

17   detective?

18   A.        Approximately three years.

19             THE COURT:  Okay.  And what are your current

20   duties and assignments?  Just, generally, what do you do,

21   basically?

22   A.        I'm currently assigned full time to the Federal

23   Bureau of Investigation Child Exploitation Task Force out

24   of the Cleveland Division.  I operate mainly out of the

25   Mansfield operations -- investigate --

```
1              THE COURT:  How long have you been affiliated

2   with the FBI?

3   A.         Approximately three years.

4              THE COURT:  And what do you do with and for them

5   in terms of your -- what's your role, if you have a

6   specified sort of role, or what did you do with regard to

7   this case?

8   A.         Yes, I handle and investigate crimes involving

9   child -- various different child exploitation crimes

10  involving crimes over the internet and live victims.

11             THE COURT:  Okay.  Have you had any specialized

12  training for what you do?

13  A.         Yes.

14             THE COURT:  And where and when did you have that?

15  A.         2006 the Ohio Peace Officer's Training Academy.

16  I have a Bachelors Degree in Criminal Justice, part of a

17  Masters Degree in Homeland Security Administration, and a

18  graduate certificate from the University of Louisville in

19  Cyber Security.

20             THE COURT:  Okay.  Thank you.

21             Ms. Tangeman?

22             MS. TANGEMAN:  Thank you.

23                       DIRECT EXAMINATION

24  BY MS. TANGEMAN:

25  Q.         So all together, how long have you been in law
```

1  enforcement combining all of that?

2  A.        Approximately 13 years.

3  Q.        Now, you mentioned some of your background.  Did

4  you also take any digital forensic courses with any either

5  local police agency or Federal law enforcement agency?

6  A.        Yes, I have.

7  Q.        Tell us about those.

8  A.        I've been through BCET (phonetic), which is basic

9  computer evidence technician through United States Secret

10  Service at the National Computer Forensic Institute in

11  Birmingham, Alabama; along with, I'm a CART DExT certified,

12  which is a search find and extract evidence technician

13  through the FBI.  That was a two-week course in Quantico,

14  Virginia.

15  Q.        Were you the lead investigator in this case as

16  well?

17  A.        Yes.

18  Q.        Now, direct your attention to October 18th of

19  2017.  Did you get a lead regarding someone seeking out and

20  receiving child pornography on the internet, and

21  specifically the Freenet dark web network?

22  A.        Yes, I did.

23  Q.        And so the jury understands, what does someone

24  need to seek out and receive child pornography if they're

25  not producing that child pornography themselves?

1    A.          They need a device to access it, whether it be a

2    computer or mobile phone, an internet connection, and then

3    the places to go find the content that they're looking for.

4    Q.          And are there several networks for applications

5    that you've become aware of in the course of your

6    investigation of sexual exploitation against children on

7    the internet that are known to have child pornography, and

8    known to attract child pornographers?

9    A.          Yes.

10   Q.          Tell us about some of those.

11   A.          Some of those applications and programs include

12   BitTorrent, TOR, Freenet, eMule, Frost.

13   Q.          Frost being the message board for Freenet?

14   A.          Yes.

15   Q.          And is Freenet sometimes referred to as a

16   peer-to-peer program?

17   A.          Yes.

18   Q.          And we heard about that peer-to-peer programs,

19   meaning you can file share with another peer; is that

20   correct?

21   A.          Correct.

22   Q.          And how does TOR, TOR, how does TOR differ from

23   something like Freenet?

24   A.          TOR, the biggest difference is with the IP

25   address with TOR.  TOR intentionally hops IP addresses from

1   the home IP address around the world on several different

2   IP addresses.  So it attempts to mask the originating IP

3   address.  Freenet does not mask your IP address.  I mean,

4   it's out in the open when you're requesting those files.

5   Q.        And I'm not sure if we heard this before, but is

6   child pornography something that you can just type in and

7   find on Google?

8   A.        No.

9   Q.        And that's because Google polices its platform

10  and removes that kind of content; is that correct?

11  A.        That's correct.

12  Q.        And are networks, dark web networks like Freenet

13  and TOR and BitTorrent, are they publicly available?

14  A.        Yes.

15  Q.        And do they cost anything to download and use?

16  A.        No, they do not.

17  Q.        But fair to say they're called the dark web

18  because they're not readily available; is that right?

19  A.        Correct.

20  Q.        Now, what does someone have to do to find child

21  pornography on networks like Freenet, TOR or BitTorrent?

22  A.        They can utilize various different search terms

23  in the, like, indexing sites to locate that information.

24  Q.        And --

25            THE COURT:  I couldn't quite hear your answer.  A

1    little louder, please.

2    A.          Different types of search terms in the various

3    different websites that you go to search for.

4    Q.          So once they get to those networks, the child

5    pornography doesn't just come at them on the screen,

6    correct?

7    A.          Correct.

8    Q.          So they would have to use terms consistent with

9    child pornography?

10   A.          Yes, that's correct.

11   Q.          And based on your training and experience working

12   on internet crimes against children, what are some common

13   search terms for child pornography?

14   A.          Common search terms include PTHC, hussie fan, and

15   then like isolating like an age, whether it be like 8 and

16   then YO to indicate 8 years old, 3 YO, Ray Gold is another

17   common term.

18   Q.          When you say PTHC, tell what the stands for.

19   A.          Preteen hard core.

20   Q.          And that would be -- in your experience, would

21   that be a term that child pornographers would be familiar

22   with?

23   A.          Yes.

24   Q.          But that's -- is that the exhaustive list of

25   search terms?

1   A.        No.

2   Q.        And when you download something off of the

3   internet, be it Freenet or TOR or BitTorrent, is that the

4   same thing as receiving that item, that file?

5   A.        Yes.

6   Q.        Now, when a user wants to download child

7   pornography to one's device, what would they have to do?

8   A.        They would have to have a folder, or to save it,

9   they click on the link to save that file and a -- and they

10  have to select the location in which they want to save that

11  file to.

12  Q.        So typically they might want to, say, name it and

13  save it in a particular place on their computer?

14  A.        Yes.

15  Q.        Have you found, in your training and experience,

16  that it's common for child pornographers to have different

17  folders for different kinds of sex acts?

18  A.        Yes.

19  Q.        And can that child pornography be saved on

20  external storage devices, for example, computer disks?

21  A.        Yes.

22  Q.        Can it also be saved on things like the hard

23  drive we saw, the Silicon powered hard drive?

24  A.        Yes.

25  Q.        And that hard drive, is that something then that

1    would connect to a computer?

2    A.        Yes.

3    Q.        What is the -- what are some of the reasons why

4    someone might use, say, that Silicon power hard drive?

5    A.        Ease of use, portability.  You can take it

6    practically anywhere.  And concealment, you can also hide

7    it since it's a small form factor.

8    Q.        And is there a certain amount of memory that a

9    computer has, or storage space?

10   A.        Yes.

11   Q.        And once that is exceeded, would someone wanting

12   to save something else have to go to an external storage

13   media device?

14   A.        Yes.

15   Q.        Now, is law enforcement able to monitor some of

16   these dark web networks for illegal content like child

17   pornography?

18   A.        Yes.

19   Q.        And these task force that we heard about

20   including ICAC, are those devoted to sort of policing these

21   dark networks?

22   A.        Yes.

23   Q.        How are some of these programs able to do that?

24   A.        They use -- you've heard us talk about the hash

25   values, the md5 hash values, fingerprints to individual

1    files.  There's a huge database of known child pornography

2    files that the software uses to search out for individuals

3    that are requesting and downloading those files with those

4    exact hash values.

5    Q.          And over the course of time, and I mean decades,

6    have law enforcement in the National Center for Missing and

7    Exploited Children been sort of creating sort of mass

8    directories, if you will, of known child pornography hash

9    values?

10   A.          Yes.

11   Q.          And are those shared with other law enforcement?

12   A.          Yes.

13   Q.          And does the National Center for Missing and

14   Exploited Children sort of maintain that large database?

15   A.          Yes, they do.

16   Q.          And what kind of law enforcement tools, and we

17   say tools, are used to on these networks to locate child

18   pornography and prosecute these cases, what are we talking

19   about?

20   A.          We're talking about, you know, like Freenet in

21   particular was a tool developed that is a law enforcement

22   only tool.  And same thing with, like, the BitTorrent

23   application.  We have law enforcement tools based on the

24   open source -- source code for those programs that have

25   been designed then and purposed for law enforcement use.

1    Q.        And they're basically just software for those

2    particular web networks; is that correct?

3    A.        That's correct.

4    Q.        Have you received training in those law

5    enforcement tools or software programs that law enforcement

6    uses on some of these dark websites like TOR or Freenet?

7    A.        Yes.

8    Q.        And does ICAC also use those same law enforcement

9    tools or software?

10   A.        Yes.

11   Q.        Now, on what network was child pornography

12   initially detected in this case that sort of kick started

13   this investigation?

14   A.        On Freenet.

15   Q.        And when, approximately, was that child

16   pornography activity occurring, if you know?

17   A.        October 7th of 2017.

18   Q.        And how many different files of child pornography

19   had been requested by the user on Freenet that law

20   enforcement detected using this Freenet law enforcement

21   tool?

22   A.        Three files of interest.

23   Q.        And were they all subsequently requested then

24   from the same IP address?

25   A.        Yes, they were.

1   Q.        Now, what did you do with that investigative

2   lead?

3   A.        With that investigative lead I took the manifest

4   key to the files that were being requested.  I then put

5   them into my law enforcement software and downloaded them

6   to verify that they were indeed files of child pornography

7   that were being requested from that IP address.

8   Q.        Is that standard procedure?

9   A.        Yes, it is.

10  Q.        So you verified that those files are, in fact,

11  child pornography before you go further; is that correct?

12  A.        Yes.

13  Q.        Even though the hash values may suggest that they

14  already are child pornography?

15  A.        Correct.

16  Q.        And did you make efforts then to identify the IP

17  address or address to the internet activity that was

18  requesting these three files on Freenet?

19  A.        Yes, I did.

20  Q.        And tell us about that.

21  A.        I issued an administrative subpoena to Frontier

22  Communications for the IP address that was on the lead.

23  Q.        Do you recall by heart what that IP address is?

24  A.        I do not.

25  Q.        Would looking at your report help you refresh

1    your memory?

2    A.        Yes.

3    Q.        I'd ask you to pull up Exhibit 36.  And if you

4    could zoom in on -- and is the IP address listed in the

5    body of that report?

6    A.        Yes, it is.

7    Q.        And tell us what the IP address was that was

8    requesting all three of these child pornography files.

9    A.        IP address is 50.51.125.183.

10   Q.        Is that the typical way that an IP address is

11   signified; in other words, numeric values that are

12   separated by periods?

13   A.        Yes.

14   Q.        And did you determine who the internet service

15   provider was with respect to this particular IP address?

16   A.        Yes, I did.

17   Q.        And who was that?

18   A.        Frontier Communications.

19   Q.        Did you later obtain the subscriber information

20   for that IP address from Frontier?

21   A.        I did.

22   Q.        Pursuant to subpoena?

23   A.        I did.

24   Q.        And who was the IP address 50.51.125.183

25   subscribed to during the time frame of the child

1    pornography files in question?

2    A.         The subscriber information came back to a Karl

3    Rogers, 4850 Bullhead Road, Willard Ohio.

4    Q.         Is that the defendant's residence?

5    A.         Yes, it is.

6    Q.         Same residence that was then later searched?

7    A.         Yes, it is.

8    Q.         And did you run a check or do anything

9    investigative wise to follow up on that information?

10   A.         Yes.

11   Q.         And tell us about that.

12   A.         Did open source checks on the internet for that

13   address and checks through the BMV.

14   Q.         And when you say open source, what do you mean?

15   A.         Google, social media, other publicly available

16   websites.

17   Q.         And what, if anything, did you determine?

18   A.         That Karl Rogers was the resident at 4850

19   Bullhead Road.

20   Q.         Did you find anyone else associated with living

21   at that residence?

22   A.         No.

23   Q.         Now, was any surveillance done at that location

24   as well?

25   A.         Yes.

1    Q.        Tell us about that.

2    A.        Multiple times surveillance was conducted and

3    observed.  Vehicles registered to Mr. Rogers in the

4    driveway.  We observed the geographical layout of being

5    outside of town and set off the roadway quite a bit.

6    Q.        And directing your attention to December 13th,

7    2017, did you search the defendant's residence or

8    participate in any way in the execution of the search

9    warrant in which electronics were seized from his residence

10   pursuant to the search warrant?

11   A.        Yes, I did.

12   Q.        And do you recall if electronics were located at

13   the defendant's residence?

14   A.        Yes, I do.

15   Q.        Were those electronics forensically examined both

16   on site and then later in the weeks and months that

17   followed?

18   A.        Yes, they were.

19   Q.        Who did those forensic examinations?

20   A.        Investigator Howell with ICAC.

21   Q.        Now, I'd like to pull up exhibit -- Government's

22   17.  Showing you what's been marked as Government's Exhibit

23   17, we heard that the safe that we're looking at contained

24   this laptop, did you -- you observed this item underneath

25   it?

1   A.        Yes.

2   Q.        And can you tell the jurors what that is?

3   A.        A fleshlight.

4   Q.        And what is a fleshlight?

5   A.        Flesh light is a sex toy that simulates male

6   penis to vaginal intercourse.

7   Q.        And that was located in the locked safe with the

8   Dell laptop that was later found to contain child

9   pornography?

10  A.        Yes.

11  Q.        With disks in the safe that were later found to

12  contain child pornography?

13  A.        Yes.

14  Q.        Could you pull up Government's Exhibit 23.

15            MS. TANGEMAN:  Clearing this out, Deanna, which

16  corner?

17            COURTROOM DEPUTY:  I got it.

18            MS. TANGEMAN:  Thank you.

19  BY MS. TANGEMAN:

20  Q.        Showing you Government's Exhibit 23, the lockbox

21  that was also located in the defendant's closet.  Can you

22  tell us -- we heard about some underwear that had been

23  found in this lockbox.  For the record, are some of these

24  disks also among the disks that contain child pornography?

25  A.        Yes.

```
 1   Q.         And pursuant to preparation for trial, did you

 2   attempt to Google and find out more information about this

 3   particular kind of Fruit of The Loom underwear?

 4   A.         Yes, I did.

 5   Q.         Tell us what you found out.

 6   A.         They returned to girl's, children's underwear.

 7   Q.         We also see, could you clear that out for me,

 8   please.  We also see an item right here underneath.  And

 9   I'd ask -- could you turn -- can you tell us what that

10   object is under the disks?

11   A.         That is a inserted sleeve for a fleshlight.

12   Q.         And for the record, are we seeing the word, and

13   I'm going to quote this, not words I would typically use,

14   the words pussy and masturbator on there?

15   A.         Yes.

16   Q.         We also see an image of sort of a woman holding

17   her legs up?

18   A.         Yes.

19   Q.         And that was under the children's underwear; is

20   that correct?

21   A.         Yes.

22   Q.         Now, was the defendant also interviewed that

23   particular day of December 13th, 2017?

24   A.         Yes, he was.

25   Q.         Tell the jurors where he was interviewed.
```

1   A.          He was interviewed in the rear of the ICAC van,

2   or the box truck, the interview room that they have -- that

3   they brought on scene for us.

4   Q.          And who else was present in that interview room?

5   A.          Task Force Officer Bryan Allen.

6   Q.          And Bryan is spelled B-R-Y-A-N; is that correct?

7   A.          Correct.

8   Q.          Allen spelled A-L-L-E-N?

9   A.          Yes.

10  Q.          And was it the two of you conducting this

11  interview of the defendant?

12  A.          Yes, it was.

13  Q.          And for the record, do you see the defendant

14  sitting in court here today?

15  A.          Yes, I do.

16  Q.          Can you please point to him and describe what

17  he's wearing?

18  A.          He's sitting at the defense table with a blue

19  shirt and black tie.

20              MS. TANGEMAN:  Noting the defendant for the

21  record.

22              THE COURT:  It does.

23              MS. TANGEMAN:  Thank you.

24  BY MS. TANGEMAN:

25  Q.          Now we're going to be showing the interview, but

1   just so the jurors can understand a broad overview, did the

2   defendant admit to downloading child pornography?

3   A.       Yes, he did.

4   Q.       And did he admit to using specifically Freenet

5   and TOR?

6   A.       Yes, he did.

7   Q.       Detective, showing you what's been previously

8   marked as Government's Exhibit 29, can you tell us what

9   that is, please?

10  A.       That is -- it's a video of the interview with

11  Karl Rogers with the case number and date of the interview

12  in its entirety.

13  Q.       And also can we pull up --

14           THE COURT:  I'm sorry, Ms. Tangeman.  Your back

15  was turned.

16           MS. TANGEMAN:  Pulling up Government's Exhibit

17  31, and just so we can identify, is this the transcript

18  that corresponds to the interview in its entirety?

19  A.       Yes, it is.

20  Q.       And have you reviewed both before coming in here

21  in court?

22  A.       Yes, I have.

23  Q.       And are they fair and accurate depictions, no

24  additions, deletions and the like?

25  A.       That's correct.

1   Q.        Now, for evidentiary purposes, have we chosen

2   portions of that interview to play for the jury here today?

3   A.        Yes.

4             MS. TANGEMAN:  And, Your Honor, I would like to

5   begin playing those portions, if The Court would like to

6   take the afternoon recess now, that's fine, or I will

7   start.

8             THE COURT:  How long -- how long will it last?

9             MS. TANGEMAN:  I'm not sure.  It's certainly

10  shorter, I don't know if I --

11            THE COURT:  Agent, do you recall offhand about --

12  do you recall how long this interview lasted?

13            MS. TANGEMAN:  This is portions of it, so it's

14  not the whole interview.

15            THE COURT:  Why don't we keep going, it's a

16  little early.

17  BY MS. TANGEMAN:

18  Q.        And just before we start it --

19            THE COURT:  Is that okay with you guys?  We

20  can -- if you guy want to -- who would like to break now?

21  Show of hands.  Who would like to wait maybe 15, 20

22  minutes, and I think it was two to nothing that raised

23  their hands so far as I can tell.  So that's fine.  I mean,

24  also, just remind you, sometimes I tend to not be as

25  attentive as I should.  And if at any time any one of you

1    would like to take a break or whatever just, you know, just

2    let me know.  We can move -- the break times aren't

3    immutable, carved in stone.  But we'll -- let's see how far

4    we get.

5              MS. TANGEMAN:  Thank you.

6    BY MS. TANGEMAN:

7    Q.        And this, for the record, would be Government's

8    Exhibit 28.

9                   (Video playing in open court.)

10   BY MS. TANGEMAN:

11   Q.        And Detective, he mentions Periscope and LiveMe.

12   Are you familiar with those programs?

13   A.        Yes, I am.

14   Q.        And can you tell us what Periscope is?

15   A.        Periscope was actually an older program at the

16   time produced by Twitter to do live streaming, live videos

17   over the web.

18   Q.        And LiveMe, tell us about that.

19   A.        Similar application.  It's its own stand alone

20   website where it is live streaming of, you know, any user

21   that wants to, you know, put their stuff out there live,

22   whether they're doing gymnastics or anything.

23   Q.        And have those sites also been known to contain

24   child pornography on them?

25   A.        Yes.

1   Q.        And, in fact, did we hear testimony specifically

2   about some child pornography from LiveMe?

3   A.        Yes.

4   Q.        And are one of those files going to be among the

5   representative sample of child pornography that this jury

6   will see?

7   A.        Yes, it is.

8             MS. TANGEMAN:  You may continue.

9             (Video playing in open court.)

10  BY MS. TANGEMAN:

11  Q.        Detective, the defendant mentioned that there

12  would be a lot of 10 years and younger victims among his

13  collection.  Was that what you found to be the case?

14  A.        Yes.

15  Q.        Did you or any other investigator ever mention

16  the word Freenet prior to the time the defendant started

17  mentioning it?

18  A.        No.

19  Q.        Did you ever list that specific name of the

20  network in any search warrant document?

21  A.        No.

22  Q.        And why didn't you list the name of it in the

23  search warrant document?

24  A.        To protect the integrity of that network so that

25  name is just not put out there.

1   Q.          And does Freenet advise on its website that it

2   does not guarantee anonymity?

3   A.          Correct.

4   Q.          Does it do it more than once?

5   A.          Yes.

6   Q.          And was the defendant living alone at the time?

7   A.          Yes.

8   Q.          Did you find any evidence that he was producing

9   child pornography?

10  A.          No.

11  Q.          And although you -- strike that.

12              Did you actually find the three files that he

13  tried to download, download from Freenet during the

14  undercover investigation?

15  A.          I'm sorry, can you repeat that?

16  Q.          Did you find those three files of child

17  pornography that were initially part of what your law

18  enforcement tool was picking up that he was trying to

19  download from Freenet?

20  A.          No, we did not find those.

21  Q.          What did you find, though, that linked to those

22  undercover downloads?

23  A.          Similar file names like ESP and then a number

24  after it.  It was in the parent folder of the same file

25  path.  There was, like, 800, 900 files with similar names,

1   ESP or ONV with a whole bunch of numbers after it.  843,

2   it's kind of arbitrary, but, like, the same ONV and ESP

3   were located during the forensic as well.

4   Q.       And we saw some evidence with Investigator Howell

5   about the, you know, files that we can see from evidence of

6   Freenet, Frost and TOR, was that consistent with your

7   review of the collection as well in the forensics in this

8   case?

9   A.       Yes, it was.

10  Q.       So there was evidence of the same series, if you

11  will, of child pornography, but not the specific file that

12  he was trying to download during the undercover

13  investigation?

14  A.       That's correct.

15  Q.       Is there some reason why we might not find those

16  three files that were part of the undercover tool picking

17  it up on October 7th, 2017?

18  A.       He might not have gotten the full file from

19  Freenet.  It might not have fully downloaded to his -- that

20  file might not have fully downloaded to his computer at

21  that time.  We saw the request that he was making it

22  download that file.

23  Q.       And could a -- a cleaner like BleachBit or

24  TrueCrypt also erase those files?

25  A.       Absolutely, yes.

1  Q.       And fair to say, just so the jury's clear, we're

2  not here for those three investigative files of child

3  pornography, are we?

4  A.       No.

5           MS. TANGEMAN:  If you'd like to take your break

6  here, Your Honor, we may, or I can continue?

7           THE COURT:  That would be fine.  What time is it,

8  quarter to 3?  We'll resume in about 15 minutes in any

9  event.

10          Okay, don't talk about the case.  Keep an open

11 mind.  And don't have anything to do with any of us that

12 have something to do with the case.  Thank you.

13                  (Whereupon the jury was excused for a

14                   break.)

15          THE COURT:  Obviously don't talk to anybody else

16 who may be a witness in the case about testimony.

17          Okay.  We have a separation of witnesses.  I

18 neglected -- let me ask you this, are you going to be

19 showing any portions of the interview, Reese?

20          MR. WINEMAN:  No, not --

21          THE COURT:  Pardon?

22          MR. WINEMAN:  Not any additional portions.

23          THE COURT:  Okay.  I neglected to tell them not

24 to speculate about whatever may not -- what may have been

25 talked about, and I'll try to remember to do that.  And I

1    appreciate the questions you asked about things he didn't

2    do.  Would it be appropriate to simply close that circle by

3    asking whether the investigation disclosed any indication

4    of any kind whatsoever of any sort of predatory conduct or

5    not?  That would be up to Mr. Wineman.  Why don't you talk

6    about that.

7              MS. TANGEMAN:  Your Honor --

8              THE COURT:  Tracey, I really do, I think it's

9    thoroughly appropriate to, you know, just sort of keep the

10   focus.

11             MS. TANGEMAN:  We were not planning on doing it

12   for that reason.  We were concerned about it having a

13   prejudice sort of effect.

14             THE COURT:  It's up to you.  Why don't you and

15   Reese talk about it.  I just -- just occurred to me, it's

16   not a big deal, okay.  And, again, I think it was

17   appropriate that you at least touched upon those two

18   subjects, those additional subjects just to keep that off

19   the -- but I will try to remember, and if I don't why don't

20   you approach and remind me.  I think it's a standard

21   instruction, just not to speculate about what else isn't

22   there because it's not evidence.  All right.  See you guys

23   in about ten minutes.

24             (A brief recess was taken.)

25             THE COURT:  Again, I'm sorry for the delay.  Have

1   a seat.  I just want to let you know that it looks as we

2   might be adjourning right around 4:00, little earlier this

3   afternoon.  We seem to be pretty much on schedule, which is

4   good.  Okay, you may proceed.

5           And, agent, you understand you remain under oath.

6   BY MS. TANGEMAN:

7   Q.      Now, in preparation for trial did you make a copy

8   of all of the child pornography that the defendant had on

9   his electronics in this case?

10  A.      Yes, I did.

11  Q.      Show you what's been previously marked as

12  Government's Exhibit 2.  Can you remove that from the

13  envelope, please.  Tell us what that is.

14  A.      It is a hard drive containing all of the files

15  from the forensic --

16  Q.      All of the child pornography files?

17  A.      Yes, all the child pornography files.

18  Q.      And this is just for appellate purposes; is that

19  correct?

20  A.      Yes.

21  Q.      For trial did you also make a representative

22  sample of child pornography for the jurors to view?

23  A.      Yes, I did.

24  Q.      And to be clear, that's not all of the child

25  pornography, it's just a representative sample of the

1   total; is that correct?

2   A.        That's correct.

3             THE COURT:  Let me interrupt if I may, okay.  The

4   matter that I neglected to tell the jury, as I mentioned to

5   counsel during the break.

6             Ladies and gentlemen, again, and previously with

7   regard to that interview, you are seeing excerpts,

8   according to the government, and in the case to come,

9   excerpts of the images and so forth.  But I simply want you

10  to -- I want to instruct you, don't speculate what you

11  didn't hear in the interview and what you're not seeing as

12  evidence.  That's being introduced for you to consider in

13  your deliberations.  In other words, whatever reasons there

14  were, whatever any of that might contain, it is not

15  evidence because you don't see it.

16            Okay.  Apologize, Ms. Tangeman.

17            MS. TANGEMAN:  No problem.

18  BY MS. TANGEMAN:

19  Q.        And does some of the child pornography and the

20  representative example include child pornography the

21  defendant received in the time frame of October 7th and

22  December 13th, 2017?

23  A.        Yes.

24  Q.        Now, I'd like to pull up Exhibit 7, please.  Also

25  in preparation for trial, did Officer Howell create an

1    Excel spreadsheet that he shared with us with respect to

2    all of the child pornography files from the time range in

3    question, October 7th to December 13th, 2017?

4    A.        Yes, he did.

5    Q.        And is that reflected on Government's Exhibit 7

6    with respect to at least the first 116 entries?

7    A.        Yes.

8    Q.        Now, for the record I'd like to zoom in on the

9    first page, about ten lines down where it says the file

10   name is erection.  And for the record, this is what kind of

11   file?

12   A.        It is an image.

13   Q.        And is that often connoted as a jpg, or J-P-G

14   after the word?

15   A.        That's correct.

16   Q.        And this date then falls within the time frame in

17   question, this being received on December 11, 2017?

18   A.        That's correct.

19   Q.        Is that going to be one of the files that is

20   among the representative sample?

21   A.        Yes.

22   Q.        And I'd like to go down just a few lines from the

23   bottom under video mp4, just three up from the bottom.  And

24   Detective, is this also another file of child pornography?

25   A.        Yes, it is.

1    Q.        What kind of file is this?

2    A.        It is a video file in the mp4 format.

3    Q.        And is mp4 also a common moniker to signifying

4    something is a video file?

5    A.        Yes, it is.

6    Q.        And what date did the defendant receive this?

7    A.        November 25th, 2017.

8    Q.        And is this also going to be among the

9    representative sample of child pornography that the jury

10   will see in a minute?

11   A.        Yes, it will be.

12   Q.        And I'd like to go about six pages in.  And

13   that's the page.  And about six down from the top.  Now,

14   this is -- the file name is LiveMe76962.avi, what kind of

15   file is this?

16   A.        This is a video file.

17   Q.        And is AVI, again, significant sort of

18   representation that we are going to be seeing a video file?

19   A.        That's correct.

20   Q.        And what date did the defendant receive this?

21   A.        October 22nd, 2017.

22   Q.        Is this also among the representative sample of

23   child pornography that the jury will see in just a minute?

24   A.        Yes, it is.

25   Q.        And then going down six lines from that to the

1    file labeled tongue.  The one at the bottom there of the

2    two, Detective, tongue AVI, again, AVI connoting that it's

3    a video; is that correct?

4    A.        That's correct.

5    Q.        What date was that received on?

6    A.        October 13th, 2017.

7    Q.        And is that also a file that will be shown among

8    the representative sample of child pornography?

9    A.        Yes, it is.

10   Q.        And would it be fair to say that all of those

11   items that we just identified on Exhibit 7 came off of the

12   defendant's Dell laptop?

13   A.        Yes.

14   Q.        Your Honor, at this time I'd like to play the

15   representative sample?

16   A.        You may.

17   Q.        Government's Exhibit 1, please.  So the record is

18   clear, Detective, what is the jury seeing here?

19   A.        Seeing a prepubescent female and an adult male

20   penis ejaculating on to the genitalia of a prepubescent

21   female.

22   Q.        And when we say prepubescent, does that mean

23   under 12?

24   A.        Yes.

25   Q.        And for the record is this a video?

1    A.        Yes.

2    Q.        The next video, please.

3              (Video playing in open court.)

4    Q.        Detective, tell us what we're seeing in this

5    second video.

6    A.        Observing two prepubescent females laying on a

7    pink blanket exposing their genitalia, the prepubescent

8    female on the left was touching her genitalia with her

9    hands.

10   Q.        Would that constitute the lascivious display of

11   their vaginas?

12   A.        Yes.

13   Q.        Third video, please.

14             (Video playing in open court.)

15   Q.        Detective, what are we seeing in this video?

16   A.        A prepubescent female being vaginally penetrated

17   with an adult male penis.

18   Q.        For the record, can you note what is in the

19   child's mouth?

20   A.        It is a pacifier.

21   Q.        At the end of it, it says coming soon?

22   A.        Yes.

23   Q.        And that was built into the video; is that

24   correct?

25   A.        Yes.

1    Q.       And next video.

2             (Video playing in open court.)

3    Q.       What are we seeing here, Detective?

4    A.       Observing a prepubescent female oral to genital

5    intercourse with an adult male.

6    Q.       And the next video?

7             (Video playing in open court.)

8    Q.       What are we seeing here?

9    A.       Observing a prepubescent female, infant toddler

10   with an adult male engaging in oral to genital intercourse

11   with the infant toddler female.

12   Q.       Again, there appears to be a pacifier in the

13   mouth of the toddler; is that correct?

14   A.       That's correct.

15   Q.       Does it appear that the toddler is trying to push

16   the adult away?

17   A.       Yes.

18   Q.       Next video.

19            (Video playing in open court.)

20   Q.       What are we seeing in this video, Detective?

21   A.       Observing a prepubescent female engaging in

22   digital to genital masturbation.

23   Q.       And the next video.

24            (Video playing in open court.)

25   A.       A prepubescent female toddler laying on a bed

 1   being held down by an adult male while he ejaculates into

 2   her mouth.

 3   Q.        Now switching to the representative sample of

 4   images.  This image, what are we seeing here?

 5   A.        Exposed prepubescents genitalia, female.

 6   Q.        Next image, what are we seeing here?

 7   A.        Prepubescent female exposing her genitalia.

 8   Q.        Specifically her vagina?

 9   A.        Yes.

10   Q.        What are we seeing in the third one?

11   A.        Prepubescent female genitalia being penetrated

12   with male genitalia.

13   Q.        Next image?

14   A.        Prepubescent female exposing her genitalia, her

15   vagina in particular.

16   Q.        Next image, what are we seeing here?

17   A.        Prepubescents female exposing her genitalia while

18   being digitally penetrated with what appears to be an adult

19   finger.

20   Q.        Next image, what are we seeing here?

21   A.        Prepubescent baby being bent over face down on

22   a -- what appears to be a bed with genitalia exposed with

23   an adult hand.

24   Q.        It's a female; is that correct?

25   A.        Yes.

1    Q.         Next image?

2    A.         Prepubescent female sitting on what appears to be

3    a couch with her legs spread to expose her genitalia, her

4    vagina in particular.

5    Q.         Next image, what are we seeing here?

6    A.         A prepubescent toddler with her mouth open with

7    an adult male penis touching her tongue in her mouth.

8    Q.         What are we seeing here?

9    A.         A prepubescent female with her legs pulled back

10   in the air on the -- laying backwards on the ground with an

11   object penetrating her anus with her genitalia also

12   exposed.

13   Q.         What are we seeing her?

14   A.         A prepubescent female laying on a bed with an

15   adult male penis next to or touching the genitalia of the

16   prepubescent female.

17   Q.         Does it appear that she's crying?

18   A.         Yes.

19   Q.         Next, what are we seeing here?

20   A.         Prepubescent female genitalia exposed being

21   digitally penetrated with what appears to be an adult

22   finger.

23   Q.         Last one, what are we seeing here?

24   A.         Prepubescent female genitalia.

25   Q.         Okay.  Was all -- were all of those videos and

1    images, totaling 19 in all, representative of the

2    collection of child pornography that defendant had on his

3    devices that we heard was over 3,000 images and over 1,000

4    videos?

5    A.        Yes.

6    Q.        And were the electronics containing the child

7    pornography, the Dell laptop, the Silicon hard drive, and

8    the numerous -- 11 total computer disks?

9    A.        Yes.

10            MS. TANGEMAN:  Your Honor, I'd like to read a

11   stipulation at this time.

12            THE COURT:  Okay.

13            MS. TANGEMAN:  This is a stipulation entered into

14   by both parties in the case.  Reads (Reading:) It is

15   stipulated and agreed by and between the parties, the

16   plaintiff, United States of America, by and through its

17   counsel, Justin E. Herdman, United States Attorney, and

18   Tracey Ballard Tangeman and Matthew D. Simko, Assistant

19   United States attorneys, and defendant, Karl Rogers, with

20   the advice and consent of Reese Wineman, attorney for the

21   defendant, that the following facts are true and deemed

22   proved:

23            One, the minors depicted in the visual

24   depictions, images, and videos in Government's Exhibit 1

25   are real children.

1          I have nothing further.

2          THE COURT:  Cross-examination?

3          MR. WINEMAN:  Yes, Your Honor.  Thank you.

4          THE COURT:  Sorry, Mr. Wineman, go ahead.

5          MR. WINEMAN:  Thank you.

6                    CROSS-EXAMINATION

7    BY MR. WINEMAN:

8    Q.        Detective, during your training, were you given

9    training in enhanced interrogation techniques?

10   A.        I'm not sure what you mean.

11   Q.        I'm not talking about water boarding or anything

12   like that, but as part of the training --

13         THE COURT:  Mr. Wineman, may I suggest you mean

14   ineffective rather than enhanced?  It's your question, your

15   witness.

16         MR. WINEMAN:  No, no I'm --

17         THE COURT:  Go ahead.

18   BY MR. WINEMAN:

19   Q.        No.  Were you given any specific training, either

20   through the Mansfield P.D. or the FBI on interrogation

21   techniques, did you have any courses in that?

22   A.        Yes.

23   Q.        Okay.  And where was that?

24   A.        It was through undercover investigations through

25   ICAC.

1   Q.        Okay.  All right.  And when you were questioning

2   Karl -- first of all, did you question him at his

3   employment place first?

4   A.        Not that I recall.

5   Q.        Okay.  So it was only at the home?

6   A.        Yes.

7   Q.        All right.  And I notice in some of the script

8   that there's somebody named Allen that's identified, but

9   nobody else was questioning him, were they?

10  A.        It was -- yeah, just myself and Detective Bryan

11  Allen.

12  Q.        Oh, okay.  So there were two of you questioning

13  him at that time?  All right.  Did he, during that

14  interrogation period, indicate that he wished to speak to

15  an attorney?

16            MS. TANGEMAN:  Your Honor, I'd like to object and

17  approach.

18            THE COURT:  Okay.  I'm going to sustain the

19  objection.  Jury will disregard that question.

20            MR. WINEMAN:  I'll withdraw that.

21  BY MR. WINEMAN:

22  Q.        About how many people -- how many officers do you

23  recall being at the scene that day?

24            THE COURT:  At the scene being out at the house?

25            MR. WINEMAN:  At the house, Your Honor.  I

1    apologize.

2              THE COURT:  No problem.

3    A.        I would guess maybe between 10 and 15.

4    Q.        Okay.  And the different departments, the FBI was

5    represented, obviously, Huron County Sheriff's Department,

6    and what other agencies were there?

7    A.        The FBI, the Huron County Sheriff's Office, BCI

8    had an agent, and Ohio ICAC also had an agent --

9    Q.        Okay.

10   A.        -- or their forensic team.

11   Q.        Now, prior to you obtaining this search warrant

12   and you preparing the affidavit for this search warrant,

13   where did you get your initial source or identification of

14   the IP number for Karl?

15   A.        From my law enforcement tool.

16   Q.        Okay.  And what was that?

17   A.        It's the Freenet law enforcement tool.

18   Q.        Freenet law enforcement tool, okay.  You may have

19   testified to this, but -- or the previous witness may have,

20   but were the files that you identified, or that affidavit

21   in the search warrant ever located?

22   A.        No.

23   Q.        Okay.  And that would have been the lead -- the

24   original lead that you got identifying Karl as a receiver

25   of child pornography; is that right?

1  A.       Correct.

2  Q.       Okay.

3           MR. WINEMAN:  Nothing further, Your Honor.

4           THE COURT:  Okay.

5                     REDIRECT EXAMINATION

6  BY MS. TANGEMAN:

7  Q.       Just so we're clear, is it normal to have members

8  of ICAC present for the execution of a search warrant?

9  A.       Yes.

10 Q.       A search warrant for child pornography?

11 A.       Yes, absolutely.

12 Q.       Is there anything unusual about the number of

13 people you had out at the scene?

14 A.       No.

15 Q.       And for the record, that was the scene being the

16 defendant's residence at 4850 Bullhead Road in Willard,

17 Ohio?

18 A.       That's correct.

19 Q.       Is that in the Northern District of Ohio Western

20 Division?

21 A.       Yes, it is.

22          MS. TANGEMAN:  I have nothing further.

23          THE COURT:  Okay.  Any recross?

24          MR. WINEMAN:  No.  No further cross.

25          THE COURT:  Detective, you may step down.  You're

```
 1    free to go or welcome to stay.  Entirely up to you.  Thank

 2    you for attending.

 3              MS. TANGEMAN:  Your Honor, our next witness is

 4    James Pauken with Frontier Communications to testify

 5    concerning the IP subscriber records.

 6                        JAMES PAUKEN,

 7    was herein, called as if upon examination, was first duly

 8    sworn, as hereinafter certified, and said as follows:

 9              THE COURT:  Good afternoon.

10    A.        Good afternoon.

11              THE COURT:  You can address the jury rather than

12    me for my few questions.  You have to get closer so the

13    microphone will pick up what you're saying.

14              Please tell the ladies and gentlemen who you are.

15    A.        My name is James Pauken, and I'm the security

16    operations that -- the manager of security operations for

17    Frontier Communications.

18              THE COURT:  For?  You have to speak up a little

19    louder even with the microphone.  You have to speak

20    directly into the microphone.  It's a little difficult.

21    This courtroom was built in 1934, and in the intervening

22    how many years that is, I guess 84 or whatever, 85 we still

23    haven't fixed the acoustics, okay.  It's very difficult to

24    hear.

25              And you mentioned your position.  How long have
```

1    you worked for -- for that company?

2    A.        I have been with Frontier, it will be three years

3    in May.

4            THE COURT:  What are your assigned duties,

5    particularly in reference to whatever it was with regard to

6    whatever you did in this case?

7    A.        So I primarily handle investigations.

8            THE COURT:  What sort of investigations?

9    A.        It can range from issues with customer service

10   issues, cable theft, vehicle break ins, just about

11   anything.

12           THE COURT:  Okay.

13           MS. TANGEMAN:  Thank you, Your Honor.

14           THE COURT:  Tracey, go ahead.  Ms. Tangeman,

15   apologize.

16                     DIRECT EXAMINATION

17   BY MS. TANGEMAN:

18   Q.        And what services does Frontier Communications

19   provide to its customers?

20   A.        Yeah, so Frontier is a telecom provider, so we

21   provide internet, telephone and video services.

22   Q.        And where is it based out of?

23   A.        Connecticut.

24   Q.        Does it service certain areas in the Northern

25   District of Ohio?

1  A.        It does.

2  Q.        And is Willard one of of those locations?

3  A.        It is.

4  Q.        Now, when someone signs up for internet service

5  through Frontier, do you all generate a document that sort

6  of documents who that customer is?

7  A.        We do.

8  Q.        Tell us about that.

9  A.        Yeah, so basically it's what we refer to as a

10 subscriber report, which basically states customer's name

11 and address.

12 Q.        And is it Frontier Communications itself that

13 assigns an IP address to a customer?

14 A.        That's correct.

15 Q.        And that IP address, it's fair to say it's a

16 series of numbers separated by periods?

17 A.        That's correct.

18 Q.        What does that correspond to, what is an IP

19 address?

20 A.        IP address just stands for internet protocol

21 address, and, as you were stating, it's a numeric label

22 associated with, you know, a device on the internet

23 network.

24 Q.        So it's the internet activity for that particular

25 location?

1    A.         That's correct.

2    Q.         Does each location, say residence in this case,

3    have its own unique IP address?

4    A.         It does.

5    Q.         So once an IP address is assigned, for example to

6    this defendant, no other individual then has that IP

7    address; is that correct?

8    A.         That's correct.

9    Q.         At least during the time that he is with your

10   company?

11   A.         That is correct.

12   Q.         Now, I'd like to pull up Government's Exhibit 8,

13   please.  And go to the second page, please.

14             Is this the Frontier Communications record that

15   was provided to the FBI pursuant to a U.S. Department of

16   Justice subpoena?

17   A.         It is.

18   Q.         And can you tell us what the date at the top is

19   there, in the body of it?

20   A.         Looks like it's October 20th of 2017.

21   Q.         And is this that subscriber log that you were

22   just referencing?

23   A.         Yeah, the subscriber report.

24   Q.         And is this made and kept in the regular course

25   of business of Frontier?

1   A.        It is.

2   Q.        Now, tell us who is the IP address in question

3   50.51.125.183, who is that subscribed to?

4   A.        Karl Rogers.

5   Q.        And in here it's Karl with a C.  Would that be

6   something that the defendant provided, or would that be

7   something that was typed in by a Frontier --

8   A.        It could be something that the defendant

9   provided.  It could also be a mistake on our customer

10  service representative who took down the information.

11  Q.        And what address is this IP address subscribed

12  to?

13  A.        It would be 4850 Bullhead Road in Willard, Ohio.

14  Q.        And the length of service?

15  A.        It started on July 23rd, 2015 to present date.

16  Q.        That being then the 2017 date at the top?

17  A.        Correct, the October 20th of 2017.

18  Q.        And it also notes the kind of internet service,

19  and that's what kind?

20  A.        Residential internet.

21  Q.        And are you also given the session times, if you

22  will, that they're interested in finding that subscriber

23  information for, also on the second page of Government's

24  Exhibit 8?

25  A.        Yes, that is listed as well.

1    Q.        One moment, please.

2              MS. TANGEMAN:  I have nothing further.

3              THE COURT:  Okay.  Cross-examination?

4              MR. WINEMAN:  Yes.

5                        CROSS-EXAMINATION

6    BY MR. WINEMAN:

7    Q.        Did your company identify anything illegal prior

8    to the involvement of law enforcement in this case?

9    A.        Not that I'm aware of.

10   Q.        And that would be part of your position to

11   determine that or to investigate that; is that right?

12   A.        That is not part of my position specifically.

13   Q.        Okay.  So you wouldn't do investigations

14   involving child pornography, you'd refer them to law

15   enforcement?

16   A.        Yeah, if I was identified -- if something like

17   that was identified to me, that is something we would

18   notify law enforcement of right away.

19             MR. WINEMAN:  Nothing further.  Thank you.

20             THE COURT:  Okay.  Any redirect?

21             MS. TANGEMAN:  No, Your Honor.  Thank you.

22             THE COURT:  Sir, you may step down.  You're free

23   to go, or you're welcome to stay.  As I say, free to go,

24   and thank you very much for attending.

25             Your next witness, and --

```
 1                    MS. TANGEMAN:  Your Honor, may we approach?

 2                    THE COURT:  Sure.

 3                         (A side bar conference was had on the

 4                         record.)

 5                    MS. TANGEMAN:  I think we were going to try to

 6      accommodate Reese's witness who's here and take them out of

 7      order.  We were going to try to accommodate your witness

 8      who couldn't --

 9                    MR. WINEMAN:  He couldn't make it.

10                    MS. TANGEMAN:  He had to leave already?

11                    MR. WINEMAN:  No.

12                    MS. TANGEMAN:  You don't have anybody else here?

13                    THE COURT:  Set to go, got somebody else?

14                    MS. TANGEMAN:  We are finished for the day.

15                    THE COURT:  That's fine.

16                    MS. TANGEMAN:  And we are ahead of schedule.

17                    COURTROOM DEPUTY:  Just so that FYI, tomorrow

18      some of the jurors would like a little bit longer lunch

19      because it's Ash Wednesday and they'd like the opportunity

20      to go to church.

21                    THE COURT:  That's great because I've got a lunch

22      date.

23                    MR. WINEMAN:  One of our witnesses couldn't make

24      it.

25                    THE COURT:  I'll tell them about St. Francis up
```

1    the street.

2              (Side bar conference concluded.)

3              THE COURT:  Ladies and gentlemen, we're actually

4    done for the day, which is unusual for court proceedings

5    and judges and lawyers.  I'm pleased that we're ending a

6    little early, especially because we've had you wait upward

7    of maybe all together 45 minutes during the day.

8              I believe that the attorneys still expect to

9    complete the presentation of evidence tomorrow.  We'll

10   simply wait and see.  Case may actually be in your hands

11   before you go home tomorrow evening, or certainly sometime

12   on Thursday.

13             Just an FYI, just for your own time table, I

14   understand some of you would like to have a somewhat longer

15   lunch yesterday -- or tomorrow.  Why don't we plan to

16   adjourn -- for those of you who want the additional time

17   because it's Ash Wednesday, St. Francis Church, I'm not

18   sure you can see it from the building, but the security

19   people can tell you how to get there, you basically take a

20   right out the door, take a right down the First Street,

21   take a left, and then a right on the Main Street, you can't

22   miss it.  I think it's actually -- it's a very pretty

23   church.  I think it's probably the oldest still standing

24   church here in Toledo.  I think it's one of the early

25   Catholic parishes built probably around 1850 or 1860.  So

1   there's also an Ash service available, I believe at noon,

2   at St. Patricks, which is church a little bit further from

3   downtown for those of you who would prefer to go there,

4   that's fine.

5           Why don't we plan about a quarter of 12:00 until

6   maybe 1:30.  And obviously if services run a little late or

7   whatever, that's fine, we'll wait for you.

8           Okay, when you go home tonight, probably one of

9   the more difficult parts of jury service you're likely to

10  experience when you're together with whom you're going to

11  be together tonight, because they no doubt know that you

12  are here on this errand today and a little bit longer.  And

13  they're going to want to know how was it, what's it like,

14  what's the case about, what's The Judge about, what are the

15  lawyers like.  The only thing you can say is I can't talk

16  about the case.  The Judge has made that very clear.  Or

17  you can say The Judge has made it very clear I can't talk

18  about the case.  Once it's over, I can talk about it.

19  Okay.  That's the easiest way to -- to avoid that problem.

20  And I mean even talk about me or the lawyers or anything to

21  do with the case, just say I've made -- The Judge has made

22  real clear to you, and my instructions tried to explain the

23  reason for that, simply I emphasize so much that you can

24  only consider the evidence that you hear from the witnesses

25  and that which you have with you back in the jury room.

1    Nothing else is evidence.  You can't speculate about

2    anything.  You can't wonder why certain questions may or

3    may not have been asked, why certain issues weren't raised.

4    None of that's evidence.  And the real problem is why I'm

5    so emphatic about not talking about the case among

6    yourselves, or particularly so, equally, at least equal

7    importance anybody outside the courtroom.  That kind of

8    conversation -- the likelihood that somebody might say

9    something that would affect your verdict individually and,

10   through you, affect the ultimate outcome of this case.

11   It's just too much of a risk, and it's not worth it.  So

12   don't do it.

13        Okay.  Have a safe trip home, and we'll see you

14   tomorrow.  We'll be ready to go by 9:00.  If you are all

15   here before then, that's great.  If not, we'll wait until

16   you show up.  Hope you can get here by 9:00.  Drive safely.

17   Thank you.

18        (Jury excused.)

19        THE COURT:  I gather we have -- I gather we have

20   nothing to talk about this evening?

21        MS. TANGEMAN:  No, Your Honor.  I just say that

22   we should be prepared to close tomorrow.  Defense

23   witnesses, any character witnesses, should be here in the

24   morning.  There is a possibility that we may not call any

25   additional witnesses, so I just wanted to alert The Court

1    and counsel.

2            THE COURT:  Counsel, if that's the case, I mean,

3    if we're done by the noon-time break, I'd very much like to

4    give final instructions and have you argue tomorrow, so I'd

5    ask that you be ready to do so.

6            Reese, is that okay with you?

7            MR. WINEMAN:  Yeah, Your Honor.  We'll be ready

8    to go forward.

9            THE COURT:  My thought would be, I mean depending

10   when it is you're done with witnesses, if we're done with

11   witnesses at 10:00, I will probably at least give the

12   charge.  I don't like to break it up, but it's not as

13   though it's overnight.  I certainly would not, I don't

14   think anyway, unless it's okay with you, if there were time

15   for the government to give its argument, you say, fine,

16   just as soon have the time, noon hour, to put your thoughts

17   together.  You could give your argument in the afternoon,

18   okay.  We can just see where we are.

19           MS. TANGEMAN:  Okay.

20           MR. WINEMAN:  Fine.

21           THE COURT:  I would like to use the most

22   expeditious use of the time possible, but I don't want to

23   jam either of you guys up.

24           MS. TANGEMAN:  Thank you, Your Honor.

25           MR. WINEMAN:  Thank you.  See you guys in the

1    morning.

2          THE COURT:  No need to be here too early unless

3    there's something to talk about.  I'll be here 8:00 or

4    whatever, so 8:15.  If you need me, just wander on up and

5    let me know.  See you in morning.  Have a good evening.

6                         - - -

7              C E R T I F I C A T E

8

9          I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11

12   s:/Angela D. Nixon              December 14, 2020

13   --------------------------              -----------

14   Angela D. Nixon, RMR, CRR       Date

15

16

17

18

19

20

21

22

23

24

25

1                        **I N D E X**

2     WITNESS                            PAGE      LINE

3     Todd Krajeck
      Direct Examination by Mr. Simko              52    12
4     Cross-Examination by Mr. Wineman             67    20
      ReDirect Examination by Mr. Simko            71    6

5

6     Michael Sirohman
      Direct Examination by Mr. Simko              75    2
7     Cross-Examination by Mr. Wineman             81    14

8     Jason Howell
      Direct Examination by Mr. Simko              85    1
9     Cross-Examination by Mr. Wineman            132    5
      ReDirect Examination by Mr. Simko           137    21
10

11    Ryan Anschutz
      Direct Examination by Ms. Tangeman    141    23
12    Cross-Examination by Mr. Wineman             175    6
      ReDirect Examination by Ms. Tangeman  178    5
13

14    James Pauken
      Direct Examination by Ms. Tangeman    180    16
15    Cross-Examination by Mr. Simko               184    5

16

17

18

19

20

21

22

23

24

25