1            UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF OHIO
2                 WESTERN DIVISION

3   UNITED STATES OF AMERICA,      Docket No. 3:18CR26

4            Plaintiffs,           Toledo, Ohio

5            v.                    March 6, 2019

6   KARL J. ROGERS,

7            Defendant.

8   ------------------------------

9            TRANSCRIPT OF JURY TRIAL, VOLUME 2
            BEFORE THE HONORABLE JAMES G. CARR
10               UNITED STATES DISTRICT JUDGE

11

12  APPEARANCES:

13  For the Plaintiffs:  Tracey Ballard Tangeman
                         Matthew D. Simko
14                       Office of the U.S. Attorney
                         Four SeaGate, Suite 308
15                       Toledo, Ohio 43604
                         (419) 242-5675

16

17  For the Defendant:
                         Reese M. Wineman
18                       6 West Main Street
                         Norwalk, Ohio 44857
19                       (419) 668-6840

20

21  Court Reporter:      Angela D. Nixon, RMR, CRR
                         1716 Spielbusch Avenue
22                       Toledo, Ohio 43624
                         (419) 260-5259

23

24  Proceedings recorded by mechanical stenography, transcript

25  produced by notereading.

1                THE COURT:  As I'll explain to the jurors, I'm

2      sorry to keep you all waiting.  I've been here since 8:00

3      this morning, but first Wednesday of every month when I'm

4      back I have probation orientation.  I simply forgot about

5      that yesterday.

6                A couple matters, the record will show that the

7      sound had been muted on the materials that were admitted as

8      exhibits yesterday.  And, also, where are we?  What's the

9      time table?  Can we get to the jury today you think, Tracy?

10     What's the -- Matt, what's the situation?

11               MS. TANGEMAN:  Yes, absolutely it will go to the

12     jury today.  The government is prepared rest subject to the

13     admission of our exhibits.

14               THE COURT:  Okay.  Reese, what's your game plan?

15               MR. WINEMAN:  Your Honor, we will be presenting

16     three witnesses.

17               THE COURT:  Okay.

18               MR. WINEMAN:  They will be Dylan McLaughlin,

19     Michael Rogers and Karl Rogers.

20               THE COURT:  I'll have them spell their names when

21     they're on the stand.

22               MR. WINEMAN:  Pardon me?

23               THE COURT:  I'll have them spell their names on

24     the stand.

25               MR. WINEMAN:  Pardon me?

```
 1                    THE COURT:  Done by maybe 10:30 or so?
 2                    MR. WINEMAN:  They're here now.
 3                    THE COURT:  No, I meant will their testimony take
 4       an hour, hour -- what I propose to do is read the jury
 5       instructions, adjourn noon-time recess and maybe start at
 6       1:30 or so.
 7                    MR. WINEMAN:  Well, the defendant will probably
 8       be testifying also.
 9                    THE COURT:  Pardon?
10                    MR. WINEMAN:  The defendant will probably be
11       testifying also.
12                    THE COURT:  Oh, okay.  I'd like to get the
13       instructions read this morning if we can.  That takes about
14       40 minutes or so.
15                    MR. WINEMAN:  Sure.
16                    THE COURT:  Let's go to work.  Okay.  Thanks.
17       And I am sorry.  I'll tell you it's probably one of the
18       most important things I think I do is to welcome --
19       honestly welcome the folks coming out of federal prison
20       back and let them know we look ahead, we don't look back.
21       And got -- I've been doing that for several years now.  If
22       it works for one of those folks, then it's worth the
23       effort.  And just -- remarkable thing is ex-felons, federal
24       felons sometimes with hideous records are getting jobs.
25       The jobs are out there.  All set?
```

```
 1                    (Jury present in open court.)

 2          THE COURT:  Good morning.  You may be seated.

 3          Ladies and gentlemen, I'm very sorry.  When I

 4   said we'd start at 9:00, I forgot that the first Wednesday

 5   of every month I have what I call probation orientation.

 6   It's a monthly session with people whom we've sentenced at

 7   some point in criminal cases, often very serious criminal

 8   cases, who have -- are now coming out of prison, and

 9   they're beginning their term of -- when they're under our

10   court supervision, and I do this every Wednesday, and I

11   simply -- it slipped my mind, and I apologize.  I trust you

12   can understand it's an important part of my job, and try to

13   get those folks off to a good start now that they're back

14   home and go about the rest of their lives.

15          Okay, Ms. Tangeman, Mr. Simko, ready to proceed?

16          MS. TANGEMAN:  We are, Your Honor.

17          THE COURT:  Okay.  And so what's next?

18          MS. TANGEMAN:  Your Honor, subject to the

19   admission of the government's evidence, the government

20   would rest.

21          THE COURT:  Okay.  And we'll deal with that at

22   the conclusion of the case, as is my practice.

23          Mr. Wineman, it's your case -- case is with you.

24   You may proceed.

25          MR. WINEMAN:  Yes, Your Honor.  We would like to
```

1   offer Defense Exhibits A, B and C.

2           THE COURT:  Okay.  We will deal with that after

3   the -- at the conclusion of the case.

4           MR. WINEMAN:  Fine.

5           THE COURT:  Before the case goes back to the

6   jury.

7           MR. WINEMAN:  I'd like to call Dylan McLaughlin

8   to the stand.

9           THE COURT:  Okay.

10          MS. TANGEMAN:  Your Honor, may we approach

11  briefly?

12          THE COURT:  Sure.  Deanna, why don't you swear

13  the witness.

14               (A side bar conference was had on the

15               record.)

16          THE COURT:  What's the --

17          MS. TANGEMAN:  Just wanted to note two things,

18  just wanted to note two things.  The defense has the

19  opportunity to make a Rule 29 Motion, and also a -- if they

20  would like to do their opening now.

21          THE COURT:  Yeah, that's right.

22          MR. WINEMAN:  Yeah, I'd.

23          THE COURT:  Did you want to file -- for the

24  record file a Rule 29 Motion?

25          MR. WINEMAN:  Yeah, Rule 29 Motion.

1           THE COURT:  That will be denied for the record.

2   I think that's important to preserve the record for rights

3   on appeal.  And do you want to make a brief opening?

4   What's your --

5           MR. WINEMAN:  No, I think --

6           MS. TANGEMAN:  You'll waive it?

7           THE COURT:  That's fine.  Or if you just want to

8   say, look, we have this number of witnesses and I'm calling

9   my first witness right now, why don't you do that.  Thanks.

10              (Side bar concluded.)

11                   DYLAN MCLAUGHLIN,

12   was herein, called as if upon examination, was first duly

13   sworn, as hereinafter certified, and said as follows:

14           THE COURT:  Mr. Wineman?

15           MR. WINEMAN:  Yes, Your Honor.

16           Ladies and gentlemen, we've got three witnesses

17   we're going to call in addition to the defendant.  I'd like

18   to have you recall the magistrate indicated that you need

19   to wait until all the evidence is in before you make a

20   determination, and I'm sure all you'll all do that.

21           Mr. McLaughlin's going to be our first witness,

22   and basically, he's known Karl for several years.  They

23   were in the Marine Corp. together.  And we anticipate he's

24   going to testify that since he's known him that he has

25   never observed any type of behavior which would indicate to

1    him that Karl suffered from the addiction.  It's been

2    pretty much demonstrated through the evidence that the

3    government has presented to you.

4            And the other two witnesses, one is Karl's

5    father, and the other is his brother, who's known him

6    obviously his whole life, that is his brother's' whole

7    life.  They're going to testify to similar observations

8    they've made through the years.  Thank you.

9            THE COURT:  Okay.  And good morning, sir.

10   A.      Good morning.

11           THE COURT:  If you could please move so you're

12   about this distance from the microphone, otherwise the

13   folks will have difficulty hearing you.

14           Please tell the jurors who you are.

15   A.      My name is Dylan Graham McLaughlin.

16           THE COURT:  I'm sorry, go ahead.  I interrupted

17   you.  Finish up.

18   A.      I served with Karl in the United States Marine

19   Corp. from 2010 to 2014, those are my years of service.  We

20   were in the same company on Camp Pendleton in California.

21           THE COURT:  And were you deployed?

22   A.      I was deployed, Your Honor.  I was --

23           THE COURT:  Pardon me?

24   A.      I was deployed, yes, I was.

25           THE COURT:  Where were you deployed?

1    A.        I was sent to Afghanistan RC Southwest Camp

2    Leatherneck in southern Afghan late 2012, early 2013.

3            THE COURT:  Well, it's neither here nor there,

4    but my father served in the Marine Corp. in World War II,

5    very proud of his service.  Senator Glenn, who I suspect

6    everyone knows is a Marine Corp. Colonel, one of our first

7    astronauts, one of the Senators who sponsored me for this

8    position.  He came to my hearing.  I went up to him and

9    said, Senator, I'm so pleased and honored that you've come

10   for my confirmation hearing.  Senator, I'd very much like

11   for you to meet my father, who, like yourself, is an

12   ex-Marine, I noticed the smile.  His smile that patented

13   the million watt smile turned graciously cold.  I thought,

14   oh, my God, I'm at the end of the race, but I'm flat on the

15   tracks chewing cinders (phonetic), what happened.  He

16   starts to smile again, I'm sure ignorant people like myself

17   needed the instruction he gave me.  Young man, there is no

18   such thing as an ex-Marine.  I'd be proud to meet your

19   father who like myself, is a former Marine.  So thank you

20   for your service.

21   A.        Thank you, Your Honor.

22           THE COURT:  And go ahead.  I'll just jump ahead.

23   Mr. Wineman, why don't you go ahead and find out what he

24   has to tell us about the defendant.

25           MR. WINEMAN:  Yes, Your Honor.

```
 1                     DIRECT EXAMINATION

 2   BY MR. WINEMAN:

 3   Q.        Dylan, you met Karl when?

 4   A.        I met Karl on Camp Pendleton.  He was actually in

 5   29 Palms when I checked into the unit, so I didn't meet him

 6   until I had been with ammunition company for a month or

 7   two.

 8   Q.        Okay.  And you've kept in touch with him since

 9   he's gotten out of the Marine Corp., and you've gotten out

10   of the Marine Corp. I take it; is that right?

11   A.        Yes, sir.

12   Q.        I won't call you an ex-Marine.

13             Now, during the period of time that you were in

14   contact with him during the Marine Corp., did he ever

15   disclose to you any evidence of addiction to child

16   pornography?

17   A.        No, sir.

18   Q.        Okay.  And you've kept in contact since you've

19   last served with him, is that right?

20   A.        Yes.

21   Q.        And at any point did he ever talk to you about

22   issues with -- with being addicted child pornography?

23   A.        No, that's -- nothing remotely like that.  No,

24   never.

25   Q.        Okay.
```

```
 1              MR. WINEMAN:  Nothing further, Your Honor.
 2              THE COURT:  Okay.  Ms. Tangeman, Mr. Simko, your
 3    witness.
 4                        CROSS-EXAMINATION
 5    BY MR. SIMKO:
 6    Q.        Mr. McLaughlin, my name is Matt Simko.  I'm with
 7    the United States Attorney's Office.  Let me also say thank
 8    you for your service.
 9    A.        Thank you.
10    Q.        You indicated that you served with the defendant
11    until 2014?
12    A.        Yes, sir.
13    Q.        All right.  And then -- do you live here in the
14    area?
15    A.        I do not, sir.  I live in Virginia.
16    Q.        Okay.  And do you visit often?
17    A.        No, sir.  It's only been maybe every
18    year-and-a-half or two years I've been able to see him.
19    Q.        Okay.  And have you ever been to his house?
20    A.        I have.
21    Q.        His bedroom?
22    A.        I have.
23    Q.        Have you looked around in there at different
24    things?
25    A.        I have.
```

1    Q.        You have?  What did you look for?

2    A.        Well, I'm not sure what you mean what did I look

3    for.  It was just kind of as friends checking out each

4    other's living spaces.

5    Q.        Okay.  You check out his -- the closet near his

6    bedroom?

7    A.        I don't recall looking at that, no.

8    Q.        Would it surprise you to know that the government

9    has found child pornography on his computers?

10   A.        Yes, it would.  I was shocked when I heard the

11   news.

12   Q.        Surprising to know that he admitted to

13   investigators that he is, in fact, addicted?

14   A.        Yes, it would surprise me.

15   Q.        Okay.  Would it be something that he would tell

16   you?

17   A.        We were very close, sir, and if there was anybody

18   in the world that he was going to be able to tell it would

19   have been me.

20   Q.        You said you were deployed?

21   A.        Yes, sir.

22   Q.        Was the defendant deployed with you?

23   A.        No, he was not.

24   Q.        All right.  Nothing further.

25             THE COURT:  Okay.  Mr. Wineman, anything further?

```
1              MR. WINEMAN:  No, Your Honor.  Thank you.
2              THE COURT:  Sir, you're welcome to stay or free
3    to go, or you're welcome to stay.  Thank you very much for
4    coming.  Once again, thanks for your service, and glad to
5    see you're home safe and sound.
6    A.        Thank you, Your Honor.  I appreciate it.
7              THE COURT:  One thing I can remember as a young
8    boy, as a child, is my mom picking up after me and my
9    brother and sister and crying, boy, I wish your father were
10   here.  I understand what it meant to you and your family.
11   Thank you.
12             Mr. Wineman, your next witness.
13             MR. WINEMAN:  Yes, I'd like to call Karl C.
14   Rogers, Your Honor.
15             THE COURT:  Okay.
16                  KARL C. ROGERS,
17   was herein, called as if upon examination, was first duly
18   sworn, as hereinafter certified, and said as follows:
19             THE COURT:  Good morning, sir.
20   A.        Good morning.
21             THE COURT:  You've got to move up to about this
22   far from the microphone, otherwise -- the acoustics in
23   here -- jurors I'm sure will tell you if they can't hear,
24   I've encouraged them to do so.
25             Please introduce yourself to the ladies and
```

1    gentlemen.  Tell them who you are.

2    A.        I am Karl C. Rogers.

3              THE COURT:  And a couple questions, and what is

4    your community of residence?  What city or town do you live

5    in?

6    A.        Oh, I live in Orville, here in Ohio.

7              THE COURT:  Okay.  And how do you happen to know

8    the defendant?

9    A.        The defendant is my son.

10             THE COURT:  Okay.

11   A.        Karl James Rogers.

12             THE COURT:  So obviously you've known him his

13   entire --

14   A.        Yes.

15             THE COURT:  Okay.  Mr. Wineman?

16                       DIRECT EXAMINATION

17   BY MR. WINEMAN:

18   Q.        Karl, what do you do for a living?

19   A.        Right now I'm a weekend and night dispatcher at a

20   trucking company.

21   Q.        And you were in the Marine Corp. up until when?

22   A.        I was discharged from the Marine Corp., actually

23   retired in 1997.

24   Q.        And did you work for trucking companies since

25   then?

```
 1    A.          Yes, I have.
 2    Q.          Okay.  Now, we know that you're Karl's dad, and I
 3    need to ask you, from the time he was in his early teens,
 4    did you ever observe Karl indicate any type of activities,
 5    through words or actions, of being addicted to child
 6    pornography?
 7    A.          No, I did not.
 8    Q.          And I take it the first time you learned of
 9    anything like that is when these charges were filed, is
10    that true?
11    A.          That would be a fair statement, yes.
12    Q.          Okay.  And during the years after he had left
13    home, you had contact with him on a regular basis?
14    A.          You mean as when he left home and went in the
15    Marine Corp.?
16    Q.          Yeah, when he went into the Marine Corp.
17    A.          I would -- I would -- occasional contact, yes.
18    Q.          Okay.  And during that period of time, did he
19    ever say anything to you that would have led you to believe
20    that he was addicted to child pornography?
21    A.          No, he did not.
22    Q.          Okay.  Now, I take it that you're aware of any
23    other criminal activity, or lack there of, that he's been
24    involved in; is that right, Karl?
25    A.          I'm not aware of any other activity he's involved
```

1    in, criminal or otherwise.

2    Q.        Never had any other charges of any kind that

3    you're aware of; is that right?

4    A.        That would be a fair statement, correct, yes.

5    Q.        Were you -- were you and Karl fairly close as far

6    as communication?

7    A.        Maybe not as close as I should have been.

8    Q.        Okay.  Well, I understand that.  You understand

9    now, based upon the charges that he's facing and probably

10   based on contact you've had with him since those charges

11   have been filed, that he has, in fact, admitted that he was

12   addicted to child pornography.  Do you understand that?

13   A.        No.  Please say that again.  I didn't fully

14   understand that.

15   Q.        Okay.  Well, the evidence that's been presented

16   here, through his own statements, indicated that.  If I

17   told you that, would you, in fact, understand that he is,

18   in fact, addicted?

19   A.        I don't have any knowledge of that.

20   Q.        Okay.  I'm not asking for an expert opinion.  Let

21   me ask you this, would you and your wife be willing to

22   support him in dealing with the addiction of being addicted

23   to child pornography?

24   A.        Yes, he's our son.  I said, yes, we would,

25   especially my wife.

1    Q.        Okay.

2              THE COURT:  Actually, sir, perhaps just a

3    fraction of an inch or so back from the microphone.  Thank

4    you for following my instruction, but too close tends to

5    muffle.  It's hard to get the right distance, about the

6    distance, hand length like this is fine.  Should work.

7    Thank you, sir.

8              MR. WINEMAN:  Okay.  I have no further questions,

9    Your Honor.

10             THE COURT:  Okay.  Ms. Tangeman and Mr. Simko?

11                        CROSS-EXAMINATION

12   BY MR. SIMKO:

13   Q.        All right.  Sir, my name's Matthew Simko, United

14   States attorney's Office.  You indicated that you would

15   support your son, you and your wife would support your son

16   through his addiction to child pornography, is that what

17   your testimony is?

18   A.        Yes.

19   Q.        Because you're his family, right?

20   A.        Yes.

21   Q.        And you would do anything for him, right?

22   A.        I don't know where you're going with that, but I

23   would do a lot to help support him.

24   Q.        Nothing further.

25             THE COURT:  Okay.  Sir, you may step down.

```
 1              MR. WINEMAN:  Your Honor --
 2              THE COURT:  I'm sorry, Mr. Wineman, redirect?  My
 3     apologies.
 4                        REDIRECT EXAMINATION
 5     BY MR. WINEMAN:
 6     Q.       You wouldn't get up on that stand and lie for
 7     him, would you?
 8     A.       No, sir.
 9     Q.       Okay.  And, amazingly, the base he actually
10     served on in the Marine Corp. was the same base you were
11     assigned to, or one of the same bases; is that right?
12     A.       Correct, same one I spent the majority of my time
13     at, yes.
14     Q.       Okay.  All right.
15              MR. WINEMAN:  Nothing further, Your Honor.
16              THE COURT:  Sir, I've informed the jury and let
17     the former witness know that my dad was a former Marine,
18     very proud of his service, and thank you for your service.
19     A.       We appreciate your support.
20              THE COURT:  Sincerely.  You're free to go or
21     you're welcome to stay.  It's entirely up to you.  Thank
22     you for coming.
23              Mr. Wineman, you got another witness?
24              MR. WINEMAN:  I would call Michael Rogers, Your
25     Honor.
```

```
 1                    MICHAEL ROGERS,
 2   was herein, called as if upon examination, was first duly
 3   sworn, as hereinafter certified, and said as follows:
 4              THE COURT:  Good morning, sir.
 5   A.        Good morning.
 6              THE COURT:  You've got to get about this
 7   distance, about a hand's distance from the microphone, far
 8   away -- far away nobody can hear you, get too close you get
 9   kind of mumbled.  We'll let you know if there's a problem.
10              Please tell the ladies and gentlemen who you are.
11   A.        Michael R. Rogers.
12              THE COURT:  And I assume that you're related to
13   him?
14   A.        Correct --
15              THE COURT:  -- to the defendant?
16   A.        Brother.
17              THE COURT:  Older, younger?
18   A.        He's my older brother.
19              THE COURT:  And what town or city are you living
20   in now?
21   A.        North Lawrence, Ohio.
22              THE COURT:  Okay.  What do you do for a living?
23   A.        I have two jobs.  I work full time for a plumbing
24   company doing excavating on a three-man operation, and I
25   also own my own excavating company.
```

1          THE COURT:  Okay.  Mr. Wineman?

2                    DIRECT EXAMINATION

3    BY MR. WINEMAN:

4    Q.        Okay.  Mike, you've known your brother obviously

5    all your life, you're quite a bit younger than he is, is

6    that right?

7    A.        Five years.

8    Q.        Five years, okay.  And during the period of time

9    when you were growing up, or during the period of time

10   since you left home, did you ever observe, or did Karl ever

11   say anything to you about being addicted to kiddy porn?

12   A.        No, we actually lived in the same bedroom for

13   quite many years on top of bunk beds, and there was no --

14   nothing about that, nothing that I ever saw.

15   Q.        Okay.  He said anything and you never saw

16   anything.  Are you pretty close, and have you been pretty

17   close with him since you left home?

18   A.        Yeah.  I mean, we don't see each other every day,

19   call each other once a week or text.  And then generally at

20   least visit each other once a month, whether it be at my

21   house or his house.

22   Q.        Okay.  Did you ever observe anything at his house

23   or anything or in the way that he behaved that would give

24   you an indication that he was addicted to child

25   pornography?

1    A.        No.

2    Q.        Okay.  And it's been pretty much established

3    through the testimony that he is, in fact, addicted to

4    child pornography.  In the future, would you be willing to

5    give him support in dealing with that addiction?

6    A.        Absolutely.

7    Q.        I have nothing further.

8              THE COURT:  Okay.  Ms. Tangeman and Mr. Simko,

9    your witness.

10             MS. TANGEMAN:  Thank you.

11                       CROSS-EXAMINATION

12   BY MS. TANGEMAN:

13   Q.        Good morning, sir.

14             When was the last time you lived together with

15   the defendant?

16   A.        I believe it's been six years since I moved out.

17   Q.        And he lived alone at the Bullhead residence, did

18   he not?

19   A.        Correct, to my knowledge.

20   Q.        And he had lived there alone for several years;

21   is that correct?

22   A.        I believe it's been two years without checking

23   dates, but, yes.

24   Q.        Has he ever lived with a person at that location?

25   A.        To my knowledge, no.

1   Q.      And sir, you're his brother, you obviously love

2   him, right?

3   A.      Correct.

4   Q.      And you'd hate to see him put in harm's way,

5   wouldn't you?

6   A.      Correct.

7           THE COURT:  I couldn't hear you.

8   BY MS. TANGEMAN:

9   Q.      I said he'd hate to see his brother put in harms

10  way.

11  A.      Correct.

12  Q.      Is that yes?

13  A.      Correct.

14          MS. TANGEMAN:  I don't have anything further.

15          THE COURT:  Mr. Wineman, anything further for

16  Mr. Rogers?

17          MR. WINEMAN:  Nothing from him.

18          THE COURT:  Sir, thank you for coming.  You're

19  free to go, or you're welcome to stay.  It's entirely up to

20  you.  Thanks, again, for coming.

21          Mr. Wineman, your next witness?

22          MR. WINEMAN:  Yeah, I'd like to call the

23  defendant, Karl Rogers, your Honor.

24                      KARL J. ROGERS,

25  was herein, called as if upon examination, was first duly

1    sworn, as hereinafter certified, and said as follows:

2           THE COURT:  Good morning.  You've heard me say

3    about the microphone, so -- and I know the jury knows your

4    name, but why don't you introduce yourself to the jury.

5    A.       As you know, I'm Karl J. Rogers, the defendant in

6    this case.  As far as employment, I've worked for the

7    railroad for about the past 14, 15 years.  I took a short

8    break to serve four years in the Marine Corp., and before

9    that I was in school.  I, pretty much right out of school,

10   went to working full time.

11          THE COURT:  Did you graduate from high school?

12   A.       Yes, I did.

13          THE COURT:  What high school?

14   A.       It was Orville High School, but I did a two-year

15   program at the Wayne County School -- Career Center also.

16          THE COURT:  And then did you -- did you enlist in

17   the Marine Corp. then?

18   A.       No, I didn't enlist right away.

19          THE COURT:  So how long had you been out of

20   school before you enlisted, about?

21   A.       It was around six years.  I got out of school in

22   2002, and I enlisted when work started slowing down.

23          THE COURT:  So about what years were you in

24   the -- in the Marine Corp?

25   A.       I enlisted in 2009, and I got out at the end of

1    2013.

2              THE COURT:  And were you, like your companion,

3    also deployed?

4    A.         No, I was never deployed.

5              THE COURT:  Okay.  Anyway, thank you for your

6    service.  You've heard me say no greater respect that

7    persons like yourself and others who served -- served in

8    Marine Corp.

9              And what railroad have you worked for?

10   A.         I worked for -- the whole time for the Wheeling

11   Lake Erie Railway.

12             THE COURT:  What did you do?

13   A.         Well, until the case started I was a locomotive

14   engineer.

15             THE COURT:  Okay.  And I'm not familiar, where

16   does that railroad run, does that run to Sandusky or

17   whatever?

18   A.         The Wheeling and Lake Erie railway has track all

19   the way from -- their own track all the way from Bellevue

20   to Connellsville, Pennsylvania.

21             THE COURT:  Is it a coal hauling railroad?  Just

22   what does it do?

23   A.         Right now, because of -- because of the boom in

24   hydraulic manufacturing, the main product is natural gas.

25             THE COURT:  Okay.  Mr. Wineman?

```
 1              MR. WINEMAN:  Thank you.
 2                      DIRECT EXAMINATION
 3  BY MR. WINEMAN:
 4  Q.         First of all, I'd like to start out, and we've
 5  heard your statements that were made to the law enforcement
 6  officers that were at your home, but would you indicate,
 7  please, when and how it came about that you first became
 8  addicted to child pornography?
 9  A.         Well, I guess it started -- I just happened to
10  cross something on the internet when I was younger, and it
11  was -- I guess you could say more of, like, a nudist photo.
12  And then just after seeing that, then it -- I just happened
13  to cross more and different things.
14  Q.         Okay.  And as you indicated in your statements,
15  which ladies and gentlemen of the jury have heard part of,
16  you were not an uploader, but you were only a downloader.
17  What does that mean exactly?
18  A.         I never made any kind of attempt to share
19  anything with anybody.  It just content that was already
20  made available on the internet by other people is all I
21  ever had any dealings with.
22  Q.         Okay.  So you only downloaded as opposed to
23  transferring to other individuals; is that right?
24  A.         That's correct.
25  Q.         Okay.  And tell -- tell us a little bit about the
```

1    first contact you had with law enforcement concerning this

2    particular matter.

3    A.          Well, I parked my vehicle at the railroad.  I

4    was -- I was actually walking into work, and I -- an Agent

5    Anschutz approached me, and he told me who he was and that

6    they were there, and they had a warrant to search my house.

7    Q.          Okay.  And did you go with them voluntarily then?

8    A.          I did go back, and I was told that if I didn't

9    give the keys to them, that they would have to force entry

10   into the house.

11   Q.          Okay.  So you gave the keys to them?

12   A.          Yes.

13   Q.          Okay.  And then once you were in the house, you

14   identified certain areas where computers with evidence was

15   contained; is that correct?

16   A.          Yes, after -- after being questioned for quite a

17   bit of time.

18   Q.          Okay.  About how long?

19   A.          I'd say at least 30 to 40 minutes.

20   Q.          Okay.  And then you identified where the

21   computers were and where the videos were containing the

22   pornography?

23   A.          Yes.

24   Q.          And did you give them the combination to the one

25   safe that appears in the pictures?

1    A.        Yes, I did.

2    Q.        Okay.  All right.  Now, in your interview, it's

3    clear that at the time, and I believe Detective Allen that

4    was questioning you, you clearly indicated that you

5    believed you were addicted to child pornography; is that

6    right?

7    A.        Yes.

8    Q.        Okay.  Is that the first time you ever talked to

9    anybody about that addiction?

10   A.        That's correct.

11   Q.        Okay.  And now, at that point in time, and as you

12   sit there today, do you accept the fact that you are

13   addicted to child pornography?

14   A.        Yes.

15   Q.        Okay.  And are you willing to go at any lengths

16   to deal with that addiction to prevent that type of

17   activity from taking place in the future?

18   A.        Yes, I'm willing to seek out, I guess, counseling

19   treatment.

20   Q.        Okay.

21             THE COURT:  Excuse me.  Deanna -- keep going.  I

22   apologize for interrupting.  You can continue, Mr. Wineman,

23   please.

24             MR. WINEMAN:  Pardon me?

25             THE COURT:  Go ahead, Mr. Wineman.

```
 1              MR. WINEMAN:  Thank you.

 2   BY MR. WINEMAN:

 3   Q.         Okay.  Karl, once again, we were talking about

 4   the conversation you had with Detective Allen that day, and

 5   that was -- were both agents present during that?

 6   A.         For the majority of the time they were both

 7   there, but there was a time where one or the other had

 8   left.

 9   Q.         Okay.  Now, we've talked a little bit about up

10   loading and downloading.  During your time that you

11   obtained and possessed these materials, did you ever give

12   any of those materials to anybody else?

13   A.         No, I didn't.

14   Q.         Okay.  Did you take measures to prevent the

15   materials from being obtained by anybody else?

16   A.         Yes.

17   Q.         What were those measures?

18   A.         Well, I locked the computers in a safe.

19   Q.         Okay.  Okay.  And any other technical things you

20   did to avoid transfer of that information?

21   A.         The files were also encrypted.

22   Q.         Okay.  And that's in your statement about --

23   well, I believe one of the detectives asked you about

24   whether or not they were encrypted, and you told them they

25   were; is that right?
```

1   A.        That's correct.

2   Q.        Okay.  Did you ever show any of these films or

3   depictions, as the ones we observed yesterday, to anybody

4   else?

5   A.        No, I didn't.  That's why I was so puzzled when

6   they showed up on my door step.

7   Q.        Okay.  Okay.  The wonders of the internet I

8   guess; is that right?

9   A.        Correct.

10  Q.        Okay.  Now, you have, I'm going to say or call it

11  hit bottom when they were at your house that day, and you

12  admitted to them that you had this addiction, and you

13  understand there's a long way to go to deal with that

14  addiction beyond what's happened.  You understand that?

15  A.        Yes.

16  Q.        And you're willing to do that?

17  A.        Yes.

18  Q.        Okay.  I have nothing further.

19            THE COURT:  Okay.  Ms. Tangeman or Mr. Simko?

20                      CROSS-EXAMINATION

21  BY MS. TANGEMAN:

22  Q.        Good morning, sir.

23  A.        Good morning.

24  Q.        Just so we're clear, you lived alone at the

25  Bullhead residence that we're talking about; is that

1    correct?

2    A.        Yes.

3    Q.        And that master bedroom was your bedroom,

4    correct?

5    A.        I wouldn't call it a master bedroom, but that was

6    the bedroom I stayed in.

7    Q.        The bedroom that held all of the electronics and

8    safes and lockboxes, that was your bedroom, correct?

9    A.        Yes.

10   Q.        And you obviously had a lot of tech savvy, right,

11   because you were using various kinds of electronics, would

12   that be fair to say?

13   A.        Yes.

14   Q.        That included radios, scanners, gaming systems,

15   laptops, hard drives, computer disks, wouldn't that include

16   that?

17   A.        A lot of those things were used in relation to

18   employment I had.

19   Q.        You were still using them, though, correct?

20   A.        Yes.

21   Q.        And you knew how to use them, didn't you?

22   A.        Yes.

23   Q.        Now, tell the jurors what a fleshlight is.

24             THE COURT:  I'm sorry, I didn't hear the word

25   myself.

```
 1   BY MS. TANGEMAN:

 2   Q.        Tell the jurors what a fleshlight is.

 3   A.        It's a sex toy.

 4   Q.        And it's used for your sexual gratification,

 5   correct?

 6   A.        I didn't know that that was illegal.

 7   Q.        Did you use it for your sexual gratification?

 8   A.        Yes.

 9             MS. TANGEMAN:  And, Ms. Ramone, could you pull up

10   Exhibit 24, please?

11   BY MS. TANGEMAN:

12   Q.        You kept it in a lockbox under your bed, is that

13   right?

14   A.        Yes.

15   Q.        And those are several fleshlights, is that

16   correct?

17   A.        Yes.

18   Q.        And if we could go to Exhibit 23, please.

19             The item that we're seeing right here is actually

20   a sleeve for a fleshlight, is it not?

21   A.        No, it actually isn't.

22   Q.        It's just another sex toy then?

23   A.        It's a different kind.

24   Q.        Is that a yes?

25   A.        Yes.
```

1    Q.         Would it also be fair to say that the sex toy is

2    in close proximity, in fact, right underneath some computer

3    disks, is that right?

4    A.         That's only a box, that's not the toy itself.

5    Q.         Answer my question, please.  Is that sex toy

6    found underneath some computer disks?

7    A.         Yes.

8    Q.         And that sex toy is found underneath computer

9    disks with child pornography next to some girl's underwear,

10   aren't they?

11   A.         Yes.

12   Q.         Now, if we can pull up Exhibit 17, please.

13              We're seeing another fleshlight in this Exhibit

14   17, are we not?

15   A.         Yes.

16   Q.         And that's right underneath the Dell laptop that

17   we heard contained all of that child pornography as well,

18   correct?

19   A.         Yes.

20   Q.         And there is also the fleshlight being kept right

21   near some other disks that contain child pornography,

22   correct?

23   A.         Yes.

24   Q.         You may clear it out.

25              And that's because, as you've told us here today,

1   you're addicted to child pornography, aren't you?

2   A.        Yes.

3   Q.        And an addiction is powerful, it makes you want

4   to do things over and over again, doesn't it?

5   A.        Yes.

6   Q.        And in your case with your addiction, it makes

7   you want to look and receive and seek out more and more

8   child pornography, correct?

9   A.        That was the case in the past.

10  Q.        Well, wasn't that the case when the FBI came into

11  your house and came to you?

12  A.        Yes.

13  Q.        And in order to be able to feed that addiction,

14  you have to be able to get child pornography, don't you?

15  A.        Yes.

16  Q.        And you weren't producing it at your house,

17  right?

18  A.        No.

19  Q.        You weren't producing child pornography anywhere

20  else, right?

21  A.        No.

22  Q.        And that means you had to get it from the

23  internet, right?

24  A.        Yes.

25  Q.        And in order to be able to get it from the

1    internet, you have to download it, don't you?

2    A.        Yes.

3    Q.        Now, you mentioned also that you encrypted your

4    computers, but you also had encrypted containers within

5    your Dell laptop; is that correct?

6    A.        That's not accurate, only there was encrypted

7    containers, the system itself was not encrypted.

8    Q.        But there were encrypted containers on the Dell

9    laptop?

10   A.        Yes.

11   Q.        So that's an encryption, basically, inside of a

12   computer that's under lock and key, is that right?

13   A.        Yes.

14   Q.        And you also used cleaning programs, like

15   BleachBit to wipe your computer every now and then, right?

16   A.        Yes.

17   Q.        Because you wanted to get rid of some of the

18   things that were on your computers, your electronics,

19   right?

20   A.        That wasn't the only purpose.

21   Q.        That was one of them, wasn't it?

22   A.        Yes.

23   Q.        Now, you admitted to the -- to the police at the

24   scene to your downloading or receiving of child

25   pornography, would that be fair?

```
 1   A.        Yes.

 2   Q.        And you're not denying that here today, are you?

 3   A.        No.

 4   Q.        And, sir, would it be fair to say, too, that you

 5   were cooperative with the detective who interviewed you?

 6   A.        Yes.

 7   Q.        And would it also be fair to say that the people

 8   who interviewed you were professional with you?

 9   A.        Somewhat.

10   Q.        Well, they didn't raise their voice with you, did

11   they?

12   A.        No.

13   Q.        They gave you water, right?

14   A.        Well, it was my water out of my refrigerator.

15   Q.        They gave you water, though, didn't they?

16   A.        Yes.

17   Q.        They didn't cuff you before the interview, right?

18   A.        Not that I recall.

19   Q.        And you weren't cuffed during the interview

20   either, were you?

21   A.        No.

22   Q.        And at one point after you had made admissions,

23   they even said to you we're not going to talk to you any

24   differently, right?

25   A.        Yes.
```

1    Q.        And they never threatened you or promised you

2    anything either, did they?

3    A.        No.

4    Q.        One moment, please.

5              MS. TANGEMAN:  I have nothing further.

6              THE COURT:  Mr. Wineman, redirect?

7              MR. WINEMAN:  Thank you.

8                        REDIRECT EXAMINATION

9    BY MR. WINEMAN:

10   Q.        Now, Karl, we've looked at some of these things

11   in boxes as far as those sexual devices and all that type

12   of thing.  Did you ever in any way molest any children over

13   the years?

14   A.        No.

15   Q.        And I take it you never used those devices on any

16   children?

17   A.        No.

18   Q.        And never -- never been charged with or convicted

19   of any felony in the past, have you?

20   A.        No.

21   Q.        Okay.

22             MR. WINEMAN:  Nothing further.

23             THE COURT:  Okay.  Recross?

24             MS. TANGEMAN:  Nothing further.  Thank you.

25             THE COURT:  Okay.  Sir, you may step down.  Thank

1   you.

2          Mr. Wineman, do you have any further witnesses,

3   or does that conclude?

4          MR. WINEMAN:  No, Your Honor, no additional

5   witnesses.

6          THE COURT:  Okay.  Does the government have any

7   rebuttal testimony?

8          MS. TANGEMAN:  We do not, Your Honor.

9          THE COURT:  Okay.  Both sides rest subject to the

10  admission of exhibits, which we'll handle in a moment.

11          Ladies and gentlemen, we're going to take a

12  break.  You've heard all the evidence and have seen

13  whatever exhibits will be back with you in the jury room.

14  I anticipate that they'll all be admissible, but I'm not

15  sure, so we'll have to wait and see.  I'll work with the

16  lawyers on that shortly.  That may take a while, and I

17  can't really predict.  I doubt whether they'll take too

18  long.  Quite candidly, and, once again, I have to

19  apologize, my staff is working and putting the final

20  touches on the final jury instructions.  The case has

21  actually concluded somewhat sooner than we anticipated,

22  which is ultimately good.  I mean, it's fortunate and good

23  for you and for everybody else.  So I have to tend to that

24  and just have the lawyers look at the final version.  I'm

25  sure it will be perfectly okay, it's fairly standard legal

1   language, somewhat different, in some respects, in regard

2   to what you heard earlier, primarily having to do with your

3   duties as a juror and how you go about performing those

4   duties once the case is in your hands.  I expect we're

5   going to be at least 15, 20 minutes, perhaps longer.  So

6   why don't we expect maybe -- at the earlier I would assume

7   10:15 we would have you back in the courtroom, perhaps a

8   bit later.  I'll talk to the lawyers right now, and then

9   we'll have Deanna let you know.

10          Don't start talking about the case, even though

11   you've heard all the evidence, and you'll say, gee, Judge,

12   come on now, you told us the instructions before, we

13   have -- we recall those, we've seen the evidence.  We've

14   heard the evidence.  Well, again, you don't have the

15   exhibits with you so you don't know for sure which of those

16   will be in.  I expect all of them, but I can't be assured

17   of that.  I haven't heard from the lawyers.  But most

18   importantly, you haven't heard my final charge, which, in

19   essence, is what you've already heard, but, nonetheless,

20   you can't start deliberating until you get my final charge,

21   the additional instructions that are in there.  So find

22   something else to talk about for a while.  The case will be

23   in your hands if not before noon, then certainly sometime

24   this afternoon.  And we will adjourn no matter what in

25   ample time for those of you who desire to go over to St.

1    Francis or elsewhere on Ash Wednesday to attend those

2    services.  We'll have ample opportunity to do that as well.

3    So as I said, the case will be with you sometime today.

4    And at that point, you set the time table and I'll explain

5    that to you a little later.

6            So still keep an open mind.  Don't talk about the

7    case, and don't have anything to do with any of us or

8    anything to do with the case here in the courtroom or in

9    the courthouse.  So you may step down, and I'll be working

10   with the lawyers.  Thank you.

11           (Whereupon the jury was excused.)

12           THE COURT:  You may be seated.  You should have,

13   or will be getting very shortly the final instructions.

14   And, again, my apologies.  You were very efficient, and I

15   appreciate that, both of you.  Nicely tried.

16           What I'd like to do is if you can look, take a

17   glance at the final instructions, I think they're okay.

18   It's basically boiler plate, we may have tidied up one or

19   two little things which Tracey, I think you have noted, I

20   can't recall exactly, I would like to give those before

21   closing argument.  Otherwise, quite candidly, I'd like to

22   have you do closing argument, or we can simply adjourn

23   until 1:30, which is kind of a long time to wait, but if we

24   can do either of those tasks, preferably the jury

25   instructions, I'd really like to do so.  And I trust that's

1    okay with you guys, Tracey, Matt?

2            MS. TANGEMAN:  Yes, that is fine.  Would you like

3    to handle exhibits, Your Honor?

4            THE COURT:  Yes, absolutely, right now.  Let's

5    wait for Deanna so that we have the professional clerk to

6    keep track rather than the amateur.

7            Okay.  Let's turn to the government.  And

8    Mr. Wineman, I will assume that you'll renew your Rule

9    21 -- 29 motion shortly, but go ahead.

10           MR. WINEMAN:  Yes, Your Honor.

11           MS. TANGEMAN:  Thank you, Your Honor.  So the

12   government would be moving for admission, and we'll just

13   take these in sections, of Exhibits 1, which is the

14   representative sample of child pornography.  We would not

15   be moving for admission of Exhibit 2, that was only marked

16   for appellate purposes.

17           THE COURT:  Mr. Wineman, I assume you have no

18   objection unless you speak up as she's going through the

19   list.

20           MR. WINEMAN:  I understand that, yeah.

21           THE COURT:  Do you expect to have any objection

22   to anything?

23           MR. WINEMAN:  Pardon me?

24           THE COURT:  Do you expect -- do you presently

25   anticipate any objection?

1          MR. WINEMAN:  Not at this point, Your Honor.

2     We've seen the exhibits and --

3          THE COURT:  Okay.  Go ahead and admit them, and,

4     unless otherwise objected to, they will be admitted.  Go

5     ahead, Ms. Tangeman.  I think we can move through fairly

6     quickly.

7          MS. TANGEMAN:  Exhibit 3 is the disk of the

8     forensic examination by Investigator Howell, and noting

9     that that is a clean copy that does not contain child

10    pornography.  Exhibit 4 and Exhibit 5 are his two reports,

11    4 being the Investigative Analysis Report, and 5 being the

12    Investigation Protocol Report.  Exhibit 6 is his CV.  And

13    Exhibit 7 is the Excel spreadsheet of the child pornography

14    files from the time frame in question, October 7th to

15    December -- December 13th, 2017.  Exhibit 8 is the

16    subscriber record from Frontier Communications with regard

17    to the IP address.  However, we would note it does have the

18    DOJ subpoena attached to it that was not identified, so

19    we'd be happy to admit just the first two pages, which are

20    the fax cover sheet and the record itself, and we could

21    remove the DOJ subpoena from that.

22          THE COURT:  Okay.

23          MS. TANGEMAN:  Exhibits 9 through 25 are

24    photographs that were all authenticated as fair and

25    accurate.  We would not be admitting and did not show

1    Exhibits 26 and 27.  We would be admitting Exhibit 28,

2    which is portions of the defendant's interview.  29 would

3    not be admitted.  That is a disk of the defendant's

4    interview in its entirety and is strictly for appellate

5    purposes.  Exhibit 30 would be admitted, it is the

6    transcript of the portions of the defendant's interview.

7    Exhibit 31 would not be admitted.  We are not moving for

8    its admission.  It is the transcript of the defendant's

9    interview in its entirety, and is only for appellate

10   purposes.  Exhibit 32 is not being offered and was not

11   shown.  Exhibits 33 through 35 are not being admitted and

12   were not shown.  Exhibit 36 would not be admitted.  It was

13   shown to refresh recollection only.  That's a report that

14   was shown to Detective Anschutz.  We would move for

15   admission of Exhibits 37 through 39, which are the

16   electronic devices in this case containing the child

17   pornography, the Dell laptop, the Silicon Power Hard Drive,

18   and the 11 CDs and DVDs.  And then, for the record, we do

19   have Exhibits 40 through 64 marked, which were the

20   individual clips from the portions of the interview.  Those

21   were only added to the exhibit list in case they were

22   needed on cross-examination.  They were not used, and so we

23   will not be moving for their admission.

24            THE COURT:  Okay.  And Mr. Wineman -- there being

25   no objection, the exhibits that are offered into evidence

1    will be admitted.  Mr. Wineman?

2         MR. WINEMAN:  Yes, Your Honor we'd like to move

3    for the admission of Defendant's Exhibits A, B and C, which

4    are documents obtained from the Missing and Exploited

5    Children Law Enforcement Services Portal, and the one

6    witness, I believe it was Mr. Howell, was questioned about

7    those and certain language contained in those.

8         THE COURT:  Okay.  There being no objection,

9    those will be admitted.  I assume there's no objection?

10        MS. TANGEMAN:  No objection, Your Honor.  Thank

11   you.

12        THE COURT:  Okay, they'll be admitted.

13        Okay, Deanna, you indicated that the -- counsel

14   have the proposed final instructions.  Why don't you take

15   about 10, 15 minutes to go through those, should be pretty

16   brief.  I mean, they're wrap-around boiler plate is my

17   standard, so take a look at the elements and then the new

18   material.  Are there any changes or corrections that you're

19   aware of?

20        MR. WINEMAN:  Not at this point, Your Honor.

21        THE COURT:  I'm asking Deanna just in case

22   she's --

23        MR. WINEMAN:  I'm sorry.

24        THE COURT:  No problem.

25        COURTROOM DEPUTY:  They haven't had an

1   opportunity to look at them yet.

2           THE COURT:  That's what I'm saying.  I think we

3   should take maybe 10, 15 -- I can't imagine, you take

4   whatever time you need and let me know and Deanna know when

5   you're ready to go, but is it fair to tell the jury maybe

6   another 15 minutes?

7           MS. TANGEMAN:  I think that would be fine, Your

8   Honor.

9           One last thing, we do need to mark the

10  stipulation as a joint exhibit.  It's stipulation number

11  one that was filed --

12          THE COURT:  That's fine.

13          MS. TANGEMAN:  -- on January 22nd of this year.

14          THE COURT:  That's fine.

15          COURTROOM DEPUTY:  Judge, they're going to need

16  more time than that --

17          THE COURT:  Another half hour maybe.

18          COURTROOM DEPUTY:  That would be good.

19          THE COURT:  I can't imagine it's going to take

20  you actually 15 minutes to look at them, but do so --

21  obviously do so thoroughly.  I would expect that they're in

22  good shape because it's basically a reprint, maybe some

23  slight revisions to prior charges.

24          MR. WINEMAN:  Your Honor, we would like to renew

25  our Rule 29 motion.  We believe that there is insufficient

1    evidence to go forward on any indication, either in the

2    case of the state in chief, and certainly considering the

3    testimony of the defendant was given to demonstrate that he

4    distributed child pornography on anyone.

5            THE COURT:  Ms. Tangeman, I think that's quite

6    clear.

7            MS. TANGEMAN:  Correct, Your Honor.  We would

8    respond that the law does not require both, and it's made

9    clear in the jury instructions.  The government is

10   proceeding on receipt of child pornography in the case.

11           THE COURT:  And if that's not clear in the

12   instructions, why don't you just -- I can -- I can have

13   that segment deleted.  I can certainly make it also clear,

14   or, you know, orally if that's as expeditious a way to do

15   it.  Thank you.  That motion will be granted.

16           MS. TANGEMAN:  I'm sorry, did you mean that

17   motion will be denied?

18           THE COURT:  No, in terms of that.

19           MS. TANGEMAN:  The correction in the jury

20   instructions?

21           THE COURT:  Pardon?

22           MS. TANGEMAN:  You're not talking about the Rule

23   29?

24           THE COURT:  No, I am in terms of any allegation

25   or suggestion about distribution.

```
1              MS. TANGEMAN:  Thank you, just want to make that
2    clear.  Just want to make the record clear.
3              THE COURT:  And that's all Mr. Wineman was
4    asking, and it's entirely appropriate that he do so.
5              MR. WINEMAN:  That's correct.
6              THE COURT:  Let's go to work.  Let's tell them
7    11:00, that's fine, and we should be adjourning about 11:30
8    then.  Does that work for you guys?
9              MS. TANGEMAN:  Yes.
10             THE COURT:  That should give Deanna enough time
11   to print the instructions.
12             Any issues with regard to the instructions?
13             MS. TANGEMAN:  Your Honor, I think the only issue
14   was the page that had either or to the defendant
15   testifying, and I understand that's been fixed.
16             THE COURT:  All right.  Good.  We're a little
17   late getting them out of here by quarter of.  Should take
18   just about that time.  Deanna, you can go ahead and put
19   them on the chair or whatever; or, Jim, can you do that
20   while she's getting the jury to save us 90 seconds.  Thank
21   you.
22             (Jury present in open court.)
23             THE COURT:  Don't start reading until you follow
24   along with Deanna, you may mark them up.  There's some
25   additional material, so, Deanna, if we'll get underway, if
```

1   you'll please read them the instructions.

2              COURTROOM DEPUTY:  Number one --

3              THE COURT:  Okay.  May be a little later than

4   quarter of, I apologize.  Go ahead, Deanna.

5              COURTROOM DEPUTY:  Number one, Introduction.

6   These are the final jury instructions which you are to

7   follow in reach willing your verdict.  I repeat many

8   instructions from those given at the outset of the trial;

9   some have variations.  In addition, I have added other

10  instructions.

11             Regardless of what I told you in the initial

12  instructions, you must follow these final instructions.

13  You have copies of the instructions to read as I read the

14  instructions orally.  Do not read ahead, as you must listen

15  carefully to everything I say.  You can write on the

16  instructions if you wish.  You may take them with you to

17  the jury room.

18             If I make changes in these instructions as I read

19  them to you, I will enter -- I will interlineate those

20  changes, and the version which I will send back to you is

21  the one you are to follow.

22             Number two, Juror's Duties.  It is for you to

23  determine whether the government has proven its charge

24  against the defendant beyond a reasonable doubt.

25             You are to decide whether it has done so only on

1    the basis of the testimony -- the answers the witnesses

2    gave in response to questions asked of them -- you heard in

3    this courtroom and the exhibits and stipulations introduced

4    during the trial.

5         You must apply the instructions and the law as I

6    give them to you.  This is so, even if you personally

7    disagree with an instruction or legal doctrine.  Personal

8    beliefs can play no role whatsoever in your decisions.

9         The lawyers may discuss the law during their

10   closing arguments.  If what they say about the law differs

11   from what I say, you must follow what I say.  What I say

12   about the law controls.

13        All the instructions are important, and you

14   should consider them together as a whole.

15        Perform these duties fairly.  Do not let any

16   bias, sympathy or prejudice that you feel toward one side

17   or the other influence your decision in any way.

18        Number three, Note Taking/Transcripts.  You may

19   refer to your notes during deliberations.  But do not let

20   the juror our jurors who may appear to have taken the best

21   notes control your decision or discussion.  Each of you

22   must reach a determination based on your own understanding

23   of the evidence in light of the law that I have given you,

24   and, as well, on the understanding of the evidence and

25   views of your fellow jurors.

1          No single juror -- even if he or she may appear

2     to have taken comprehensive notes -- should control the

3     outcome.

4          Neither read backs nor transcripts of testimony

5     will be available for your consideration during

6     deliberations.

7          Number four, Presumption of Innocence; Burden of

8     Proof; Reasonable Doubt.  The defendant has pled not guilty

9     to the crime charged in the indictment.  An indictment is

10    not evidence; it is simply the formal notice to the

11    defendant of the charge against him.  The mere fact of an

12    indictment cannot create in your minds even the slightest

13    suspicion of guilt.

14         The government has the burden to prove the charge

15    against the defendant beyond a reasonable doubt.

16         The defendant has no burden, or obligation, to

17    prove anything at all.  He is presumed innocent.  This

18    presumption of innocence stays with him until and unless

19    you have unanimously found, solely on the basis of the

20    evidence and law, that the government has met its burden of

21    proving the defendant guilty beyond a reasonable doubt.

22         Proof beyond a reasonable doubt means proof that

23    is so convincing that you would not hesitate to rely and

24    act on it in making the most important decisions in your

25    own lives.

1          Proof beyond a reasonable doubt does not mean

2     proof to an absolute certainty or all possible doubt.

3     Possible doubts and doubts based only on speculation are

4     not reasonable doubts.  A reasonable doubt is a doubt based

5     on reason and common sense.  It may arise from the

6     evidence, the lack of evidence, or the nature of the

7     evidence.

8          If the government fails to meet its burden of

9     proof, you must return a verdict of not guilty.  This is so

10    even if you think or feel that the defendant may be guilty.

11    If you only think or feel he may be guilty of a charge, the

12    government has not met its burden of proof.

13         If you are convinced that the government has

14    proved the defendant guilty beyond a reasonable doubt,

15    return a verdict of guilty.  Otherwise you must return a

16    verdict of not guilty.  If you find that the evidence in

17    this case could not reasonably support either of two

18    conclusions, one of guilt, the other of nonguilt, you must

19    return a verdict of not guilty.

20         MS. TANGEMAN:  Excuse me, Your Honor.  I believe

21    that was just accidentally read could not reasonably

22    support; it should be read could reasonably support.

23         THE COURT:  Okay.

24         MS. TANGEMAN:  Just wanted to note that.

25         THE COURT:  If you'll mark your copy and

1    likewise.  Ladies and gentlemen, if you'll mark your copy.

2              COURTROOM DEPUTY:  I think I just read it wrong,

3    Judge.

4              THE COURT:  Oh, you read it wrong.

5              COURTROOM DEPUTY:  Number five, Evidence;

6    Objections.  You must make your decision based only on the

7    evidence that you heard here in court -- here in court and

8    the exhibits and stipulations that were introduced into

9    evidence.

10             Do not let anything else influence your decision

11   in any way.

12             Sometimes the lawyers have objected to questions,

13   answers, or exhibits because they believed that the rules

14   of evidence do not permit the particular question, answer

15   or exhibit to be heard, seen or considered by you.

16             Do not hold the fact that the lawyers objected

17   against them or their clients.  The lawyer was not trying

18   to conceal something; he or she was simply trying to make

19   sure that the law was followed and the trial is fair.

20             If I sustained an objection, you must disregard

21   the particular question, answer, or exhibit entirely.  Do

22   not wonder why the objection was made or what you might

23   have learned had I not sustained the objection.

24             Likewise, do not speculate about what a witness

25   who was not called to testify might have said, or what else

1  a witness who did testify might have said, had he or she

2  been asked additional questions.

3           Something that you did not hear or see, were not

4  permitted by me to hear or see, or were told to disregard

5  is not evidence.

6           Lawyers' statements, objections, and arguments

7  are not evidence.

8           Likewise, the lawyer's questions are not

9  evidence; the evidence is, rather, what the witnesses --

10  what the witnesses have said in response to the lawyers'

11  questions.

12           Questions I might have asked of the witnesses are

13  not evidence; the evidence is, rather, what the witnesses

14  say in response to my questions, as it is with regard to

15  the lawyers' questions.

16           My legal rulings are not evidence.  They are

17  simply rulings on the law which you must accept and follow.

18           Anything I told you to disregard during the trial

19  is not evidence.

20           Make your decision based only on the evidence, as

21  I have defined it here, and nothing else.

22           Number six, Direct and Circumstantial Evidence.

23  Evidence consists generally of two types; direct evidence

24  and circumstantial evidence.

25           You can consider each type of evidence.

1        Direct evidence is simply evidence -- like the

2    testimony of an eye witness -- which, if you believe it,

3    directly proves a fact.  A witness' statement that he saw

4    rain is direct evidence that it was raining, and you could

5    find that it was raining if you believed the witness'

6    statement.

7        Circumstantial evidence indirectly proves a fact.

8    If someone walked into the courtroom wearing a raincoat

9    covered with drops of water and carrying a wet umbrella,

10   that would be circumstantial evidence from which you could

11   conclude that it was raining.

12       It is for you to decide how much weight to give

13   the evidence.  The law makes no distinction between the

14   weight you should -- should or can give to either one, nor

15   is one any better evidence than the other.

16       You are to consider all the evidence, both direct

17   and circumstantial, and give it whatever weight you believe

18   it deserves.

19       Number seven, Opinion Testimony.  Ordinarily, a

20   witness cannot give his or her opinion; instead, a witness

21   can only testify about facts within his or her personal

22   knowledge.

23       Under some circumstances, a witness who has

24   special knowledge, training, or experience beyond that

25   usually possessed by jurors can present opinion testimony.

1           You do not have to accept opinion testimony or

2    find it conclusive as to the particular subject matter.

3           In deciding what weight to give to opinion

4    testimony, consider how well qualified the witness was to

5    give the opinion and the basis on which he or she reached

6    the opinion.

7           In addition, apply the same considerations you

8    apply to the testimony of other witnesses in determining

9    how credible they are and how much weight to give their

10   testimony.

11          Number eight, Credibility of Witnesses.  You

12   alone -- you alone decide how credible or believable each

13   witness is, and how much weight to give the testimony of

14   each of the witnesses.  You can believe everything that a

15   witness said, or only part of it, or none of it at all.

16   But you must act reasonably and carefully in making these

17   decisions.

18          Some of the things you may consider in evaluating

19   the credibility of weight of a witness's testimony are:

20          Was the witness able to see and hear clearly, or

21   was the witness's ability to see and hear impaired.  Was

22   there anything that may have affected the witness's ability

23   to perceive or remember what he or she tells you.

24          How good the witness's memory seemed to be:  Was

25   the witness able to remember accurately what happened.

1          How did the witness act while testifying.  Did he

2     or she look like he or she was testifying truthfully.

3          Did the witness have any relationship to the

4     government or the defendant or anything or anyone, or

5     anything to gain or lose from the case, that might

6     influence his or her testimony.

7          Did the witness have any bias, prejudice, or

8     other reason for testifying that might cause the witness to

9     testify untruthfully.

10          Did the witness at any time -- whether during his

11     or her testimony or at some other time or times, say or do

12     something different from or inconsistent with his or her

13     testimony.

14          How believable was the witness's testimony in

15     light of all the other evidence:  Was the witness's

16     testimony supported or contradicted by other evidence you

17     found believable.  If contradicted, what was the reason for

18     the contradictions.

19          These are among the things you may consider in

20     deciding how believable each witness was.  You may consider

21     other things that you think shed some light on the

22     witness's believability.

23          In deciding which witness to believe and how much

24     weight to give to their evidence, use your common sense and

25     your everyday experience in dealing with other people.

1    Then decide what testimony you believe, and how much weight

2    you think it deserves.  If your experience tells you that

3    certain evidence reasonably leads to a conclusion, you are

4    free to reach that conclusion.

5         Number nine, Summaries and Other Materials Not

6    Admitted in Evidence.  During the trial you have seen

7    counsel use summaries, charts, drawings, calculations, or

8    similar materials that were offered to assist in the

9    presentation and undertaking of the evidence -- or I'm

10   sorry, understanding of the evidence.  This material is not

11   itself evidence and must not be considered as proof of any

12   acts.

13        Number ten, Number of Witnesses.  Do not make any

14   decisions based only on the number of witnesses who

15   testified about a particular fact or circumstance.  What is

16   more important is how believable the witnesses are, and how

17   much weight you think their testimony deserves.

18        Number 11, Outside Sources.  You cannot try to

19   find out information from other sources, such as

20   dictionaries, books, news accounts (though there won't be

21   any of those, in all likelihood), from the internet, social

22   media, or otherwise from anyone or anywhere else other than

23   the courtroom.

24        This is so for at least three reasons.

25        First, through the rules of evidence, the law

1   controls what jurors can learn.  This is so, so that, to

2   the maximum extent possible, what you learn is likely to be

3   reliable and accurate.

4           Second, the lawyers and parties are entitled to

5   be aware of everything that you will be considering when

6   you deliberate on and reach your verdict.

7           If you could look for information outside the

8   courtroom, the lawyers and defendant would have no way of

9   knowing what you might have learned.  They could not

10  respond to or comment on it.  They could not call your

11  attention to reasons for you to disregard such information.

12          Moreover, for you to learn and consider something

13  from outside the evidence, you would deprive the defendant

14  of his constitutional right to confront the witnesses

15  against him.

16          Third, I would not be able to tell you what you

17  can and cannot consider, which is one of the most -- one of

18  my most fundamental duties as a judge.

19          You must follow my instructions as to what you

20  can and cannot consider.  Failure to do so would violate

21  your oath and deprive the parties of the fair trial to

22  which they are entitled.

23          Number 12, Court's Rulings and Other Actions.

24  Nothing that I have said or done during the trial was meant

25  to influence your decision in any way.

1           Do not interpret my rulings or the lawyers'

2    objections as any indication of how I think the case should

3    be decided.  My rulings will be based on the law and rules

4    of evidence, not on how I feel about the case.

5           Likewise, do not speculate on how I think the

6    case should come out.  My views are not evidence, and, to

7    the extent that you think I have any view or opinion, you

8    must disregard those thoughts entirely.

9           We each have separate duties in a trial.  It is

10   your duty -- and yours alone -- to decide the facts and

11   determine whether the government has met its burden of

12   proving the defendant guilty of the crime charged in the

13   indictment.

14          Number 13, Punishment.  You must consider whether

15   the government has met its burden of proving the defendant

16   guilty beyond a reasonable doubt completely without regard

17   to what punishment the law may require and I may impose as

18   a result of a guilty finding.

19          It is my job, not yours, to determine punishment,

20   and I can do so only after you -- without any consideration

21   of what I might do -- have found the defendant guilty

22   beyond a reasonable doubt.

23          Do not speculate about what sorts of punishment

24   I -- punishment I might impose pose if you return a guilty

25   verdict.  Such speculation is not evidence, and you cannot

1    consider any such speculation in reaching your verdict.

2              Number 14, General Instructions Concluded.  This

3    completes the instructions as to your general duties.  I

4    will now instruct you on the elements of the crime that the

5    defendant is accused of committing.

6              The defendant is only on trial for the crime

7    charged in the indictment.

8              Your job is limited to deciding whether the

9    government has proven beyond a reasonable doubt that the

10   defendant is guilty of the crime charged in the indictment.

11             Element -- Number 15, Elements of this -- of

12   the -- Elements of Offense -- Receipt and Distribution of

13   Child Pornography.  Defendant Karl J. Rogers is charged

14   with one count of receipt and distribution of visual

15   depictions of minors engaged in sexually explicit conduct.

16             You can -- you can find the defendant guilty only

17   if all twelve of you are convinced beyond a reasonable

18   doubt that the government has proven the following

19   elements:

20             One, the defendant knowingly received or

21   distributed a visual depiction;

22             Two, the production of the visual depiction

23   involved the use of a real minor engaging in sexually

24   explicit conduct;

25             Three, the visual depiction was of a minor

1    engaging in sexually explicit conduct;

2         Four, the defendant knew that:  A, at least one

3    of the individuals in the visual depiction was a minor;

4    and, B, the visual depiction was of such minor engaged in

5    sexually explicit conduct; and.

6         Five, the visual depict was received or

7    distributed using a means or facility of interstate or

8    foreign commerce, including a computer.

9         Number 16, Definitions.  As used in the

10   applicable statute, the following terms have the indicated

11   meanings:

12        An act is done "knowingly" when it is done

13   voluntarily and intentionally and not because of accident,

14   mistake, or some other innocent reason.

15        To "receive" a visual depiction means to take

16   possession of it.  This includes the knowing acceptance of

17   a depiction previously requested.  Receiving includes the

18   downloading of a photograph or video by means of the

19   internet.

20        "Distribution" includes knowingly allowing

21   electronic access to a visual depiction stored on one's

22   computer and then downloaded by another person and posting

23   the depiction on a website for public viewing.

24        "Visual depiction" includes any photograph,

25   image, film, video or picture, including undeveloped film

1    or videotape -- and videotape, and data stored on computer

2    disk or by electronic means which is capable of conversion

3    into a visual image, whether or not stored in permanent

4    format.

5          "Means or facility of interstate commerce"

6    includes the internet or the telephone.

7          "Computer" means any electronic, magnetic,

8    optical, electrochemical, or other high speed data

9    processing device performing logical, arithmetic, or

10   storage functions, and includes any data storage facility

11   or communications facility directly related to or operating

12   in conjunction with such device, but such term does not

13   include an automated typewriter or typesetter, a portable

14   hand held calculator or other similar device.

15         "Minor" means any person under the age of 18

16   years.

17         "Sexually explicit conduct" means actual or

18   simulated:  Sexual intercourse including genital to

19   genital, oral to genital, anal to genital, or oral to anal,

20   whether between persons of the same or opposite sex;

21   bestiality; masturbation; sadistic or masochistic abuse; or

22   lascivious exhibition of the genitals or pubic area of any

23   person.

24         The government is not required to prove that the

25   defendant was involved in any way in the production of the

1  visual depictions.

2        The government is not required to prove that the

3  defendant knew that a means or facility of interstate

4  commerce had been or would be used when he received or

5  distributed the visual depictions.

6        Number 17, Lascivious Exhibition-Defined.  As

7  mentioned, "sexually explicit conduct" may include

8  "lascivious exhibition of genitals or pubic area of any

9  person."

10        Not every exposure of the genitals or pubic area

11  constitutes lascivious exhibition.  Whether a picture or

12  image of the genitals or pubic area constitutes -- I'm

13  sorry, constitutes such a lascivious exhibition requires

14  that you consider -- consider of the overall content of the

15  material.

16        To determine whether a particular visual

17  depiction constitutes a lascivious exhibition, you may

18  consider the following factors:

19        Whether the focal point of the picture or image

20  is on the child's genitals or pubic area;

21        Whether the setting of the picture or image is

22  sexually suggestive, that is, in a place or pose generally

23  associated with sexual activity;

24        Whether the child is depicted in an unnatural

25  pose or in inappropriate attire, considering the age of the

1   child;

2          Whether the child is fully or partially clothed,

3   or nude;

4          Whether the visual depiction suggests sexual

5   coyness or a willingness to engage in sexual activity; and

6          Whether the visual depiction is intended or

7   designed to elicit a sexual response in the viewer.

8          This list is not exhaustive, and an image need

9   not satisfy any single factor to be determined lascivious.

10   Instead, you must determine whether the visual depiction is

11   lascivious based on its overall content.  It is for you to

12   decide the weight or lack of weight to be given any of

13   these factors.

14          Number 18, Stipulation as to the "Minor" Element.

15   As mentioned previously, the government must prove that the

16   pornographic images in this case depicted real children

17   under the age of 18 years.

18          The parties have stipulated that the persons

19   depicted in the images and videos are actual persons under

20   the age of 18 years of age when the images and videos were

21   created.

22          Therefore, the government need not offer any

23   other evidence as to the age of those persons.  For

24   purposes of your deliberations, the fact is established

25   beyond a reasonable doubt.

1           Number 19, Inferring Required Mental State.

2    Ordinarily, there is no way that a defendant's mental state

3    can be proved directly, because no one can read another

4    person's mind and tell what the -- that person is thinking.

5           But a defendant's state of mind can be proved

6    indirectly from the surrounding circumstances.  This

7    includes things that -- things like what the defendant

8    said, what the defendant did, how the defendant acted, and

9    any other facts or circumstances in evidence that show what

10   was in the defendant's mind.

11          You may also consider the natural and probable

12   results of any acts that the defendant knowingly did, and

13   whether it is reasonable to conclude that the defendant

14   intended those results.

15          This, of course, is all for you to decide.

16          Number 20, On or About.  The indictment charges

17   that the crime happened from "on or about" October 7, 2017,

18   to "on or about" December 13, 2017.  The government does

19   not have to prove that the crime happened on those exact

20   dates.  But the government must prove that the crime

21   happened reasonably close to those dates.

22          Number 21, Defendant's Testimony.  You have heard

23   the defendant testify.  Earlier, I talked to you about the

24   "credibility" or "believability" of the witnesses.  And I

25   suggested some things for you to consider in evaluating

1    each witness's testimony.

2              You should consider those same things in

3    evaluating the defendant's testimony.

4              Number 22, Defendant's Other Acts.  You have

5    heard testimony that the defendant committed acts other

6    than those -- other than the ones charged in the

7    indictment.  If you find that defendant did those acts, you

8    can consider the evidence only as it relates to the

9    government's claim on the defendant's intent, motive,

10   opportunity, plan, knowledge, identity, absence of mistake,

11   absence of accident.  You must not consider it for any

12   other purpose.

13             Remember that the defendant is on trial here only

14   for receipt or distribution of child pornography, not for

15   the other acts.  Do not return a guilty verdict unless the

16   government proves the crime charged in the indictment

17   beyond a reasonable doubt.

18             23, Character and Reputation Evidence of the

19   Defendant.  You have heard testimony about the defendant's

20   good character.  You should consider this testimony, along

21   with all the other evidence, in deciding if the government

22   has proved beyond a reasonable doubt that he committed the

23   crime charged.

24             Number 24, Unanimous Verdict.  Your verdict,

25   whether it is guilty or not guilty, must be unanimous.

1           To find the defendant guilty, every one of you

2     must agree that the government has overcome the presumption

3     of innocence with evidence that proves his guilt beyond a

4     reasonable doubt.

5           To find him not guilty, every one of you must

6     agree that the government has failed to convince you beyond

7     a reasonable doubt.

8           Either way, guilty or not guilty, your verdict

9     must be unanimous.

10          Unanimity Not Required—Means.  One more important

11    point the requirement that your verdict must be unanimous.

12    The -- I'm sorry, one more point about the requirement that

13    your verdict must be unanimous.

14          The indictment accuses the defendant of

15    committing the crime of receipt and distribution of child

16    pornography.

17          The government does not have to prove that the

18    defendant both received and distributed child pornography

19    for you to return a guilty verdict on the charge.  Proof

20    beyond a reasonable doubt of either way is enough.

21          In order to return a guilty verdict, all twelve

22    of you must agree that at least one of these has been

23    proved; however, all of you need not agree that the same

24    one has been proved.

25          26, Closing Argument.  Next you will hear the

1    closing arguments of counsel.

2         I remind you that the closing arguments of

3    counsel are not evidence.  They are counsels' expression of

4    their view of the evidence and how they believe you should

5    interpret it in light of these instructions.

6         Because the government has the burden of proof,

7    its attorney will present closing argument first.  Next,

8    the defendant's attorney will present his closing argument.

9    The government will conclude with its final, or rebuttal,

10   argument.

11        After the attorneys have presented their closing

12   arguments, I will instruct you as to how you are to conduct

13   your deliberations.

14        THE COURT:  Okay.  Ladies and gentlemen -- what

15   time is it?  About quarter of?  Good.  Looks like we're

16   right on time.  Why don't you just leave the instructions

17   on the chair.  We'll adjourn for lunch.  We'll resume at

18   1:30.  As Deanna indicated, we'll have the closing

19   statements by counsel.  I imagine together take half hour,

20   45 minutes, and then the case will be in your hands, and

21   the time table will be yours to set.  At that point you can

22   begin deliberations, if you desire, or you simply wish to

23   adjourn for the day.  It's totally up to you.  And as I

24   say, the schedule is up to you.  So okay.  If you can be

25   back by 1:30, if there's any problem getting back, that's

1    fine.  Obviously we'll wait for you.

2         Don't talk about the case.  Keep an open mind.

3    Don't have anything to do with any of us who have anything

4    to do with the case.  Thank you.

5              (Jury excused.)

6         THE COURT:  Counsel, why don't you approach?

7              (A side bar conference was had on the

8              record.)

9         THE COURT:  Okay.  I gather there's no objections

10   to the jury instructions?

11        MR. WINEMAN:  No.

12        MS. TANGEMAN:  No, Your Honor.

13        THE COURT:  Okay.  Good.  Thank you.  I'll be

14   very candid with you, odd situation, something that the

15   government in particular may well want to brief either --

16   sometime prior to sentencing.  I think he deserves

17   acceptance, just -- at trial and general rule don't get

18   acceptance of responsibility when you go to trial.  On the

19   other hand, I'll be very honest -- candid with you, I think

20   that sure as hell beats what we usually hear.  I made a few

21   mistakes, Your Honor.  Guy's criminal history category's

22   six and he's in here for felon in possession or is holding

23   up a Jimmie John's or whatever, I made a few mistakes.  And

24   I just want you guys to know that.  If you want me now -- I

25   think, quite candidly, I think it's a fair question for us

1    to know why did he take the stand.  My instinct is, you

2    know, it's simply mea culpa, that he felt the sense of the

3    wrongness of what he did, he actually wanted it on public

4    display that -- and he wanted publicly to acknowledge it,

5    and that's an odd and peculiar -- but now I understand why

6    you went to trial.

7              MR. WINEMAN:  I'd emphasize the agents kind of

8    did him a favor because he hit bottom.  You know, he -- and

9    now he understands having accepted the fact that he's got

10   that.

11             THE COURT:  Deal with it --

12             MR. WINEMAN:  -- addiction that he's going to

13   have to deal with.

14             THE COURT:  I'm just saying --

15             MS. TANGEMAN:  And you're not talking about all

16   three points.  You're talking about the parts that just

17   would -- maybe two of those points, for example, or one?  I

18   think there's one point that involves that -- there's also

19   the other that goes to the government having to spend

20   resources in a timely fashion.

21             THE COURT:  That's fair, Tracy.

22             MS. TANGEMAN:  Thank you.  I think you're right,

23   that's an issue that needs to be briefed.

24             THE COURT:  Have you heard anybody as

25   truthfully --

```
 1                MS. TANGEMAN:  I have not in 20 years.

 2                THE COURT:  -- in public admit it's wrong?  And

 3      he didn't say I'm sorry, but, you know, I -- I'm just

 4      astonished.

 5                MS. TANGEMAN:  I also don't think he said it was

 6      wrong, but I agree with The Court that he --

 7                THE COURT:  That's the subtext.

 8                MS. TANGEMAN:  -- that he admitted to the

 9      receipt, correct.

10                THE COURT:  From the get go.  So now I understand

11      why he went to trial.  And that's right, the one point I

12      just can't give that.

13                The other thing, Tracey, I really don't want to

14      have him taken -- I know that's the statute, but, my God,

15      think about it.

16                MS. TANGEMAN:  We'll look into it.  We'll do some

17      research on it.

18                THE COURT:  I know it's the statute.  I've done

19      it before, and I just -- he's got his dad.  Can you imagine

20      a father coming in here, that's happened before --

21                MS. TANGEMAN:  It has.

22                THE COURT:  -- and a brother and --

23                MS. TANGEMAN:  That's happened too.

24                THE COURT:  Just -- so I want to let you know, I

25      gather you're not going to contest that issue, but, if
```

1   anything, I want to put you on notice on it.

2            MS. TANGEMAN:  Correct, I'd like to look into it

3   before we make a formal position.

4            THE COURT:  I agree, but obviously I don't think

5   at this point -- you're right about the two points.  I

6   didn't -- you know --

7            MS. TANGEMAN:  I'll look into it.

8            THE COURT:  Good.  Thanks.

9                 (Side bar concluded.)

10           THE COURT:  Okay.  We'll be in recess until 1:30.

11  Thanks, folks.

12                (A brief recess was taken for lunch.)

13           THE COURT:  I understand that you've been ready

14  to begin your deliberations, and that's great.  Apologize

15  the fact that we were dispersed in one place or another,

16  and I apologize for that.

17           The -- it's my understanding that you indicated

18  to Deanna you had sort of a preliminary question as to the

19  issue of distribution.  It's out of the case totally.

20  There's no -- although that was in the boiler plate, I

21  should have deleted it.  The only issue is receipt.  So you

22  can just treat that issue as a nonissue.  And, in fact, it

23  should have never been in the case because there was no

24  evidence of distribution, which means obviously sharing

25  something, providing something, let somebody else see

1    something.  And the parties agreed at the close of the

2    evidence, out of your presence, that I could properly

3    dismiss that allegation because it's not there.  If you

4    have any questions about that, go back and let me know

5    further.  There's a concluding bit of instruction that

6    Deanna will read to you, and then you may retire to the

7    jury room.

8              COURTROOM DEPUTY:  Do you want me to read this

9    first or closing?

10             THE COURT:  Oh, no, you -- that's right, we'll

11   hold on to that.  Just hold on to those verdict forms,

12   okay.  Before sending you out, we, of course, have to have

13   closing arguments.  The government, because it has the

14   burden of proof, goes first, and it has the opportunity too

15   for rebuttal argument if it chooses, and then the defendant

16   goes second because the defendant doesn't have to prove

17   anything.

18             Go ahead, Mr. Simko or Ms. Tangeman.

19             MR. SIMKO:  Thank you, Your Honor.  Again, may it

20   please The Court, Mr. Wineman, ladies and gentlemen of the

21   jury.  This is closing statements, and this is last time I

22   get to talk to you.

23             First, let me thank you for your jury service.  I

24   know that some of you have come from a ways away,

25   especially early in the morning.  And while this has been a

1    short trial, three days can be disruptive to your lives.

2    And while the trial was short, I think it was difficult.

3    You got to see some pretty intense evidence in this case.

4    But I hope, as citizens, all of us, I think, hope that

5    you'll find this process rewarding.

6         I said in opening statement yesterday that child

7    pornography is the rape of children, both literally and

8    figuratively.  And what you saw on your screens yesterday

9    was the literal rape of children.  And you have the

10   defendant's stipulation that those individuals that you saw

11   were real, real children.  And we also have, through

12   defense exhibits, actually, and through the testimony of

13   Investigator Howell, that some of these individuals have

14   been identified, that they are real people out there that

15   were in those videos.

16        Make no mistake, law enforcement spends

17   considerable resources tracking down individuals in those

18   videos and prosecuting them for what they did to those

19   children in the videos.  But each time these videos are

20   sought out, downloaded, viewed, received, that is the

21   figurative rape of these children all over again.  Child

22   pornography is about supply and demand.  The downloader is

23   an integral part of the crime, so we don't end with the

24   prosecuting of those who supply the videos and hold those

25   people that are demanding them to account as well.

1          I'm going to go through essentially the

2    investigation a little bit, the evidence, the indictment,

3    and how the evidence is going to fit into each of these

4    elements.

5          The investigation.  There's the tool out there

6    that monitors these dark websites, let's us know when

7    somebody is downloading child pornography.  We did get

8    notice that a particular IP address was downloading child

9    pornography.  We were able to identify and link that

10    address to Karl J. Rogers, as the subscriber, and we were

11    able to locate his physical address.  We presented that

12    information to a judge who issued a warrant to search his

13    home and electronics for the presence of child pornography.

14    We seized computers, hard drives, disks, and then we

15    searched and seized them -- searched them forensically.

16    The defendant was interviewed.  He made admissions, videos

17    and images were identified ultimately as child pornography.

18    That was basically the investigation.

19          The evidence in this case.  There was both

20    circumstantial and direct evidence.  Sometimes

21    circumstantial evidence alone can prove somebody's guilt

22    beyond a reasonable doubt.  But in this case, the

23    circumstantial evidence, while it doesn't prove beyond a

24    reasonable doubt necessarily that defendant is guilty of

25    this crime, it supports the direct evidence that he is

```
 1   guilty of this crime.  So the files identified in the
 2   search warrant are not guilt in and of themselves, but they
 3   do provide us with information in this case that is that
 4   the defendant was downloading, and he was downloading child
 5   pornography from these websites.  His possession or having
 6   these programs BleachBit, Eraser, TrueCrypt, and then the
 7   actual search programs TOR and Freenet, they in and of
 8   themselves are not guilt.  These programs, none of them are
 9   illegal to have, but they are indicative of the child
10   pornography or a child pornographer's activity.  So the
11   BleachBit allows you to get rid of stuff on your computer.
12   It's not illegal, but it's consistent with somebody who's
13   downloading child pornography.  Same thing with Eraser.
14   And when you heard testimony earlier yesterday that those
15   three files that with located through the search warrant we
16   couldn't find them on his computer, well we -- we had that
17   testimony for you that he had been running these programs,
18   Eraser and BleachBit over the -- just a few days prior to
19   us getting there, two months earlier, more than two months
20   earlier when we initially saw these files being downloaded
21   into the computer.  So he could have used those programs to
22   essentially take them off his computer.  He also has that
23   program TrueCrypt, which essentially is like a safe inside
24   the computer.  You can put files behind this TrueCrypt
25   program and we can't get to them.  Now, we were able to get
```

1    into two of the areas that he had encrypted, two of these

2    containers, as we called them, and we were able to find

3    quite a bit of child pornography there.  But as the

4    investigator testified, we couldn't get into all of those,

5    so it could be in this red laptop that those files still

6    exist, we just couldn't get to them.  But, again, we're not

7    here for those three files that allowed us to search the

8    property.  We're ultimately here for the pornography that

9    was found.

10           Last, the sex toys and the kid's underwear.

11   Again, that is not illegal to own sex toys.  It's not

12   illegal to have kid's underwear.  But it's indicative in

13   this case of child pornography that he had on his computer

14   and his interest in.  And here the sex toys and the child's

15   underwear were located very near the actual child

16   pornography itself.  So this laptop was in his computer

17   that had the child pornography on it, and we had the sex

18   toys along with it, essentially, right on top of it if you

19   look at those photographs.  In that box itself we have the

20   hard drive with the child pornography in it, and we have

21   the children's underwear inside, so sort of close by.  And

22   what's that's not necessarily illegal to have those items,

23   it is circumstantial evidence of the defendant's guilt.

24           The direct evidence in this case are the actual

25   videos and photographs we identified on his computer.

1   3,732 images of child pornography and 1,947 videos.  Those

2   were found on his laptops, and they had to be downloaded

3   from the internet.  116 of those images and videos were

4   downloaded in the period of October 7th, 2017 through

5   December 13th, 2017.  As we stated in the instructions and

6   stated in the indictment, that's our indictment period.  So

7   we were able to -- we wanted to isolate those for you so

8   you could see in the actual indictment period there's

9   files, these child pornography, these child abuse material

10  is being downloaded in that period of time to cover

11  that element.

12          And then of course you have defendant's

13  statements themselves, both at the scene with the

14  interview -- with the investigators and actually here in

15  trial.  Those were all direct evidence of the defendant's

16  guilt.  All right.

17          The indictment.  There's one count.  And it is

18  receipt and/or distribution of child pornography, that's

19  the title of the charge.  That's not the actual

20  definitions, we break it up down below, but if we were to

21  look it up in the book that's the title of the charge,

22  that's not actually what we have to prove of in and of

23  itself.  That's where we get the and/or.  These are the

24  different elements we have to prove, and, again, they're

25  all listed and defined for you in the instructions that you

1    have.  But that on or about October 7th, 2017 to on or

2    about December 13, 2017, we have to prove that the crime

3    happened around, within that time period or reasonably

4    close to that time period.

5              Then the defendant knowingly received or

6    distributed -- distributed a visual depiction, production

7    of the visual depiction involved the use of a real minor,

8    visual depiction was of a minor engaging in sexually

9    explicit conduct, that the defendant knew that at least one

10   of the individuals in such visual depiction was a minor,

11   and knew that the visual depiction was of such minor

12   engaging in sexually explicit conduct, and that such visual

13   depiction was received or distributed using the means or

14   facility of interstate or foreign commerce, which is going

15   to include a computer.

16             So taking all these elements sort of in turn, so

17   on or about October 7th, 2017, to on or about

18   December 13th, 2017, first in this case you have the

19   defendant's own statements.  When they were questioning him

20   in the interview period, they were asking him, you know,

21   how recently had you done this.  And he said I had used

22   that TOR program a couple days before you got here, just

23   this past weekend, which is about a couple days, and then I

24   used the Freenet program a couple weeks earlier.

25             Now, we were also able to use our forensic

1    analysis to figure out he actually used it a little more

2    recently than that, the Freenet program, but it wasn't too

3    much earlier than the FBI getting there.  So he had used

4    those programs within that period of time.

5            Also, as I indicated earlier, we were able to

6    isolate 116 images and videos that qualified as that child

7    abuse material, and all of those were downloaded within

8    that time frame.

9            Also, I'll indicate to you we have to prove that

10   the -- this happened within the Northern District of Ohio.

11   You heard testimony that Willard, Ohio is in the Northern

12   District, and that's why we're here in this courtroom as

13   opposed to somewhere in Southern Ohio or Michigan or

14   somewhere like that.

15           All right.  The defendant acted knowingly.  Now,

16   knowingly is important in every case, mens rea, as we call

17   it in law, how somebody came to do a particular act.  The

18   Judge has instructed you that an act is done knowingly when

19   it is done voluntarily and intentionally and not because of

20   accident, mistake or some other innocent reason.  And to

21   further break that out, I'll tell you that, you know, we're

22   not expecting you to be mind readers, right.  We can't look

23   into the mind of another, so we have to look at the sort of

24   the circumstances around what they do in order to figure

25   out did they act knowingly or not.  And in this case, you

 1    have the defendant's statements that he had been doing this

 2    for quite a long time, all the way back as far as high

 3    school.  That he and the digital forensics prove that he

 4    had been downloading this stuff for quite a period of time,

 5    had different dates on which these things were downloaded

 6    over quite a long period of time.  That he has gone out and

 7    sought these TrueCrypt and BleachBit programs which further

 8    supports he acted knowingly.  That he went out and was

 9    using these dark web web sites.  He didn't find this

10    stuff -- as they indicated, you can't find this stuff on

11    Google, it wasn't an accident something you would stumble

12    into.  You have to take several steps in order to get to

13    this type of stuff.  To get to TOR, to download TOR, to

14    start up those browsers you have to go through several

15    steps before you can even get there even before you try to

16    find the child pornography.  All this goes to help prove

17    the element of knowingly.

18            Defendant knowingly received or distributed a

19    visual depiction.  Here's the definition in your

20    instructions for received.  To receive a visual depiction

21    means to take possession of it, that includes the

22    knowingly -- knowing acceptance of a depiction previously

23    requested, and then here it says receiving includes the

24    downloading of a photograph or video by means of the

25    internet.  You download something, it's here in the

1    instructions, that's another way of saying receiving.  And

2    he did say he downloaded it, these images, so he did

3    receive these images as far as that definition is

4    concerned.

5            And here's what we kind of got caught up with a

6    couple times in this case, especially with defendant's

7    testimony, and that is it's received or distributed.

8    There's an or in there.  We don't have to prove one or the

9    other.  Either one will do.  And as you heard The Judge say

10   here, there's actually no evidence of distribution.  We

11   have not brought any evidence of that.  We don't have any

12   evidence of that.  But we can prove -- we've focused our

13   case and our evidence on receiving.  And as long as the

14   defendant has received pornography, as long as he has

15   downloaded child pornography, that is sufficient for this

16   element.  And then of course defendant knowingly received

17   or distributed a visual depiction.  Sometimes that's -- we

18   define a lot of things in the law.  Visual depictions would

19   be all those things you saw on your screen yesterday, any

20   image or video.  We do have a definition of it here.

21   Visual depiction includes any video or picture, including

22   data stored on a computer disk or by electronic means which

23   is capable of conversion into a visual image.  Whether or

24   not stored in permanent format, this gets --

25            THE COURT REPORTER:  I'm sorry, I can't hear you.

1          MR. SIMKO:  These are technically ones and zeros

2     you know, binary codes that are in the computer somewhere,

3     no, they actually are images and they come up on there, and

4     those all qualify.  There is no technical reason why you

5     wouldn't call it a visual image.  These are all visual

6     images.

7          Production of visual depiction involved the use

8     of a real minor.  Term minor means any person under the age

9     of 18 years.  You heard the defendant say that he

10    considered child pornography to be anything under 10 years.

11    His definition doesn't matter.  It's what's under the law.

12    Anybody under 18 years is going to qualify.

13         Here we have the stipulation that the individuals

14    you saw on your screen yesterday and all of the child

15    pornography that we have presented to you, the thousands of

16    images and videos, are all real minors.  You can consider

17    this element as proved per the stipulation.

18         The visual depiction was of a minor engaging in

19    sexually explicit conduct.  Here we define what is sexually

20    explicit conduct.  Sexual intercourse, including genital to

21    genital, oral to genital, anal to genital, or oral to anal,

22    whether between persons of the same sex or opposite sex,

23    has to include a minor, bestiality, masturbation, sadistic

24    or masochistic abuse, or lascivious exhibition of the

25    genitals or pubic area of any person.

```
 1              Now, you're going to have -- first of all, you
 2    have the testimony of -- well, first of all, you have your
 3    own viewing of those images, you saw young children,
 4    sometimes infants, involved in sexual acts.  You were able
 5    to see those for yourself.  But you also have testimony of
 6    Jason Howell, who went through every single image.  He had
 7    to view those and classify them based on his training
 8    whether or not those would be child pornography, whether or
 9    not those would have this type of conduct within them.  And
10    he did.  He went through and did that for you.  State's
11    Exhibit -- I'm sorry, Government's Exhibit 5 is actually
12    his report, which kind of breaks that out.  You can go in
13    the forensic report if you want to look at all the
14    thousands of images in that large spreadsheet, you can
15    certainly do so.  There's also the report that kind of
16    breaks that out for you.  And in here when he's talking
17    about videos and images, he checks off there are each of
18    these categories within the thousands of images and videos.
19    There is sexual intercourse, which you saw yesterday,
20    plenty of those videos, there is bestiality in these
21    pornographic videos, there's masturbation, sadistic or
22    masochistic abuse.  Those types of images are in this group
23    of pornography that was found on the defendant's computer,
24    his hard drives.  And we've broken that out for you here.
25    But just one would qualify, here we have thousands.  And
```

1   also, as I point out there, not only is there thousands

2   overall, but they're -- even in a time period there's over

3   100, 116 to be exact.

4          The defendant knew that at least one of the

5   individuals in such visual depiction was a minor, and knew

6   that the visual depiction was of such minor engaged in

7   sexually explicit conduct.  You have the stipulation, of

8   course, that the defendant has agreed that all these images

9   were, in fact, minors.  You have the representative sample

10  that you had to view yesterday.  You can see for your own

11  self that these children in here were not only just young,

12  but very young, infants at times.  You had investigator

13  Jason Howell's report that these were, again, minors, very

14  young sometimes, involved in sexually explicit conduct.

15  And you have reason and common sense.  And he knew that

16  fact, right.  So you have -- you have to say that, yeah, he

17  knows this.  Well, why does he know this, you have reason

18  and common sense.  He's been downloading these for a long

19  period of time.  He told you he's addicted to it, right.

20  This is the stuff that excites him.  He knows by opening

21  those, by viewing those, he can see as clearly as you can

22  that those are little kids, infants at times, involved in

23  this activity.

24          And that such visual depiction was received or

25  distributed by means of a facility of interstate or foreign

1    commerce, including a computer.  Our ability to prosecute

2    this case involves some form of interstate commerce, which

3    the law defines as just using a computer.  As long as you

4    use a computer in order to download these images and

5    videos, then you qualify for this element.  Here you have

6    the Dell laptop computer here, this red one.  You have the

7    Silicon hard drive.  You have multiple disks.  You also

8    have the forensic examination that showed these were being

9    downloaded and where they were downloaded too.  And you

10   have the defendant's statements, multiple times with the

11   investigators where he said I was downloading this stuff.

12   I downloaded them.  They asked him when was the last time

13   you downloaded, well, I downloaded them add few days ago.

14   And even on the stand here, he said, yes, I was downloading

15   them.

16          So here's the element of the offense again, and

17   all of the evidence we talked about meets all these

18   elements beyond a reasonable doubt.  The physical evidence

19   alone, without the defendant's statements, without his

20   testimony, would meet all of the elements.  There is enough

21   evidence there to meet all of the elements.  But the

22   defendant's statements at the scene, as well as his

23   testimony, further go to prove those elements.  There is

24   nothing that is in dispute in this case as far as the

25   elements are concerned.  Look through it, there's

1    nothing in there that's been anything disputed that we do

2    not meets these elements.

3           There may be a question in your mind about why

4    would he get on the stand and say that he has been

5    receiving or downloading this pornography, there must be

6    some defense here that we're not aware of.  It's okay to

7    put the government to its proof, and we have done that in

8    this case.  I submit to you that we have proven every

9    element beyond a reasonable doubt, and we're asking you now

10   to return a verdict of guilty and hold the defendant

11   accountable for the crime in which he was charged.  Thank

12   you.

13          THE COURT:  Okay.  Mr. Wineman?

14          MR. WINEMAN:  Thank you, Your Honor.

15          THE COURT:  Ladies and gentlemen, I neglected to

16   mention two things.  Once again, as indicated in the

17   instructions, the opening and closing -- opening statements

18   and closing arguments are not evidence, they're the

19   attorneys' comments of what they think the evidence shows.

20          And then the other thing, the indictment is not

21   evidence.  Indictment is not evidence of anything.  It's

22   simply a charge returned by the grand jury, doesn't affect

23   presumption of innocence, it's not evidence.  Go ahead.

24          MR. WINEMAN:  Thank you.  Good afternoon, ladies

25   and gentlemen.  First of all, I want to thank you for all

1    the attentiveness and time that you've given to the trial.

2    As the magistrate and The Judge have indicated, this is one

3    of the most important things you can do as a citizen of the

4    United States.

5            Next thing I want to do is apologize to you for

6    what we all had to watch yesterday.  It certainly wasn't

7    pleasant.  And on behalf of Karl and his family, apologize

8    to you for that.  And without -- I'm not going to go into a

9    great amount of detail.  I don't recall any bestiality

10   being shown, but certainly that's not highly relevant under

11   these circumstances.

12           I would like to talk to you a little bit about --

13   and, again, thank you because in your role as jurors,

14   whether you know it or not, you are going to assist Karl in

15   dealing with his addiction.  And I think it's clear from

16   the statements he made to this gentleman at his home and

17   the testimony he's given, that he has now accepted the fact

18   that he's an addict.  And, you know, it's amazing, we all

19   learn new things about life every day.  The older you get,

20   sometimes the more you think you learn.  You know, I

21   learned that I had a preconception of the evils of the

22   internet until I got into this case a little bit.  I grew

23   up in a -- internet did not exist.  We had little TVs we

24   used to watch, you know, very few TV shows.  I had an

25   incident with the internet not too long ago.  Unfortunately

1   my died -- my wife died in August of last year, about a

2   month after we bought a new house, my step-son was living

3   with me, and ended up moving out a couple months later

4   because I cut off the internet.  Well, part of the problem

5   I thought with him was I thought he was addicted to these

6   internet games and wasn't working, and I thought, geez,

7   what is this internet stuff.  And I didn't realize that it

8   could be the source of the type of thing that, you know,

9   began Karl's addiction in this case.  An addiction it is.

10  And, you know, I lost my wife to addiction.

11          And one of the biggest things -- and that's why I

12  thank Karl for being here today -- in life is if you

13  believe one of your kids is suffering, it's a terrible

14  thing.  And you've got to learn to be supportive and all

15  that type of thing.  And, you know, that happened in

16  between her death and the trial today that I had the

17  inclination that my middle son who was very close to -- had

18  become addicted to pain killers.  And I think anybody that

19  reads the news knows that pain killers can lead to heroin

20  very quickly and very easily.  And thank God for my

21  daughter because she came forward, and this is the

22  importance of sibling support, I guess, and paid for him to

23  go to a treatment facility in Tennessee, and everything

24  turned out all right.  As a matter of fact, this week I had

25  a water break, and who was there for me, my middle son.

1    He's about Karl's age, as a matter of fact.

2            So, you know, addiction is unbelievable the way

3    it touches people's lives, and it's a terrible thing.  And

4    part of the addiction, and the biggest part of it is

5    acceptance at the very beginning.  Once the addiction is

6    identified, is acceptance.  And I've got to thank this

7    gentleman and the other people that were involved in the

8    investigation because that acceptance only came on the day

9    they went to his house.

10            And I'll be honest with you, our biggest concern

11   in trying the case was that he'd be accused of being a

12   dealer or a distributor.  And I think that's kind of gone

13   by the way side now, according to what The Judge instructed

14   you on and The State's arguments, I think that has been

15   resolved.  That was one of his main concerns.  And, you

16   know, once again, he appreciates your attentiveness that

17   you've given us over the last several days.

18            And, you know, there's many things he's going to

19   have to go through to accomplish rehabilitation.  But this

20   has been a tremendous help, this investigation and this

21   trial.  And what he's going to need in the future, and

22   that's why I asked Karl and Mike about support in the

23   future because that's going to be something that he will

24   need, acceptance.  In this type of case resentments can be

25   very dangerous also.  And he's had some of those, but I

```
 1    think a lot of those have gone by the way side with the
 2    trial that's gone forward.  And he needs to identify a
 3    higher power for himself, and he needs to kind of turn his
 4    life over to that higher power, whoever that may be.  I'm
 5    certainly not here to preach to him or advocate, you know,
 6    what or who the higher power's going to be, but I can tell
 7    you that there's a need for support, community support.
 8    One of the resentments, if you'll recall in his interview,
 9    was that alcoholics get all the help, okay, or alcoholics
10    have things available to them, right.  That's true.  You
11    know, that's true.  But I am sure there are groups, there
12    are counselors that will be available to help, and, you
13    know, once that problem's been identified, to support him
14    on a day-to-day basis.  That support is so important.  I
15    was so fortunate after I lost my wife because I had a new
16    employee who was rehabbing herself who took over a lot of
17    the tasks at home.  I've got a 91-year-old sister who has
18    Alzheimer who lives with me.  And this girl is a nurse, and
19    she helped with the medication, helped take care of her.
20    And, you know, it was all because of the program that I was
21    involved in that allowed me to make contact with this
22    person.  And I find out Monday she's leaving to go work for
23    Ohio State University.  So that's another loss that's going
24    to be -- we're going to have to deal with.  But it
25    certainly has been a God sent to me, and that's what Karl
```

1    will need to have is God sents through family, through

2    community, and that type of thing to get through the

3    addiction.

4         And once again, I want to thank you, ladies and

5    gentlemen, for the attentiveness you've given.  Thank The

6    Court for the courtesy that's been provided to us.  And ask

7    you to pray for Karl.  Thank you.

8         THE COURT:  Okay.  Any rebuttal on behalf of the

9    government?

10        MS. TANGEMAN:  Yes.  First of all, lets start

11   with one thing, you're not here to concern yourself with

12   the redemption or the rehabilitation of this defendant.  It

13   is not your job.  Nor are you to accept invitations to feel

14   sympathy and let that guide your deliberations.  No matter

15   what any attorney says, this is not about the defendant's

16   struggles with his addiction, and it's not about anybody

17   else's struggles with any of their addictions, okay.  So

18   set that aside.  The jury instructions clearly say you do

19   not let sympathy guide your decision.  The reason why we're

20   here is because the defendant committed a crime.  The

21   internet did not commit a crime, the defendant did, okay.

22   He doesn't get a pass for that because the internet might

23   welcome some addicts.  That doesn't negate the crime.  The

24   crime occurred.

25        And while he took the stand and he admitted to

 1    it, he also seemed to suggest like it was a little less

 2    serious because he didn't distribute it.  Well, let me tell

 3    you, folks, the crime in and of itself of receiving child

 4    pornography is a crime.  We don't have to prove

 5    distribution.  Don't know how many times we're going to

 6    have to say that, but we'll say it one more, okay.  And

 7    whether he's sorry about it, whether he's not sorry about

 8    it, whether he plans to get treatment, or whether or not he

 9    doesn't, that is not what's at issue.  Whether or not he's

10    willing to deal with it, whether or not his family is

11    willing to support him is not the issue.  The issue is the

12    evidence that came from the witness stand, all the exhibits

13    in evidence, and the agreed-upon stipulation.  You take

14    that, and you apply it to the law.  That's what your job

15    is.  And invitations to shirk your job by going off on

16    different tangents about the human side of this defendant

17    and his addiction, that is not your job.  Don't accept

18    those invitations.

19          Good people can commit crimes.  Bad people can

20    commit crimes.  All kinds of people can commit crimes.  You

21    are not here to sit in moral judgment.  You are here to sit

22    in legal judgment.  You follow the evidence and the law.

23    That's what your job is.

24          And, you know, ladies and gentlemen, the only

25    thing that we're asking is that you find this defendant

 1    accountable.  That's what we're asking you to do.  Because

 2    he, like everyone else, when he turns on his computer, has

 3    the choice to do something legal or to do something

 4    illegal.  And he chose, not on one occasion, not on two

 5    occasions, not one year, not two years, but year after year

 6    after year, to do the wrong thing, at the expense of the

 7    children you watched.  Hold him accountable for that

 8    because that's what we're here for, the truth, the evidence

 9    and the law.  Find him guilty.

10         THE COURT:  Okay.  Ladies and gentlemen, that

11    completes the presentation of the case by the parties.

12    Deanna will now read you the final concluding instructions,

13    after which I will excuse the alternate and have you retire

14    to the jury room to begin your deliberations.  Deanna.

15         COURTROOM DEPUTY:  Number 27, Deliberations.  You

16    are about to retire to the jury room to begin your

17    deliberations.

18         You are free to talk about the case in the jury

19    room.

20         In fact, it is your duty to talk with each other

21    about the evidence, and to make every reasonable effort to

22    reach unanimous agreement.  Talk with each other, listen

23    carefully and respectfully to each other's views, and keep

24    an open mind as you listen to what your fellow jurors have

25    to say.  Try your best to work out your differences.  Do

1    not hesitate to change your mind if you are convinced that

2    other jurors are right and that your original position was

3    wrong.

4           But do not change your mind just because other

5    jurors see things differently, or just to get the case

6    over.  In the end, your vote must be exactly that, your own

7    vote.  It is important for you to reach unanimous

8    agreement, but only if you can do so honestly and in good

9    conscience.

10          No one will be allowed to hear your discussions

11   in the jury room, and no record will be made of what you

12   say.  You should all fee free to speak your minds.

13          Listen carefully to what the other jurors have to

14   say, and then decide for yourself if the government has

15   proved to the defendant guilty beyond a reasonable doubt of

16   the charge in the indictment.

17          The first thing you should do in the jury room is

18   to choose your foreperson.  This person will help to guide

19   your discussions, and will speak for you here in court.

20          Once you start deliberating, do not talk to the

21   clerk, or me, or anyone else except each other about the

22   case.  Your discussions, moreover, can occur only when the

23   twelve of you are together in the jury room.  If any juror

24   is not in the jury room, do not discuss the case until that

25   juror joins you.

1          While your deliberations are continuing, do not

2     discuss the case outside the jury room, either with your

3     fellow jurors or anyone else.

4          If you have any questions or messages, they

5     should be written, signed by the foreperson, and given to

6     the clerk to give to me.  I may have to talk to the lawyers

7     before responding, so it may take me some time to get back

8     to you.

9          In any communication with The Court or clerk, do

10    not write down, tell, or indicate in any way whatsoever how

11    you stand on your votes.

12         Remember that you must make your decision based

13    only on the evidence that you saw and heard here in court.

14    Do not try to gather any information about the case on your

15    own while you are deliberating.  Likewise, do not

16    communicate with anybody outside the jury room until you

17    have reached your verdict and it has been announced in open

18    court.

19         If you unanimously find the defendant guilty

20    beyond a reasonable doubt, then it will be my job to decide

21    what the appropriate punishment will be.  Deciding what the

22    punishment should be is my job, not yours.  It would

23    violate your oaths as jurors to even consider the possible

24    punishment in deciding your verdict.

25         Your verdict, whether it is guilty or not guilty,

1  must be unanimous.

2          To find the defendant guilty, every one of you

3  must agree that the government has overcome the presumption

4  of innocence with evidence that proves his guilt beyond a

5  reasonable doubt.

6          To find the defendant not guilty, every one of

7  you must agree that the government has failed to convince

8  you beyond a reasonable doubt.  Either way, guilty or not

9  guilty, your verdict must be unanimous.

10          I have -- I have prepared verdict forms for you

11  to record your verdict.  On the completion of your

12  deliberations, after you have reached unanimous agreement

13  as to the verdict, sign the appropriate form and notify the

14  clerk that you have concluded your deliberations.

15          Do you want me to read the verdict form, Judge?

16          THE COURT:  Read the verdict form.

17          COURTROOM DEPUTY:  In United States District

18  Court for the Northern District of Ohio, United States of

19  America versus Karl J. Rogers, we the jury unanimously fine

20  the defendant not guilty as charged in the indictment.

21          And the second verdict read -- form reads in

22  United States District Court for the Northern District of

23  Ohio, Western Division, United States of America versus

24  Karl J. Rogers, we the jury unanimously find the defendant

25  guilty as charged in the indictment.

1            I remind you that nothing I have said or done

2       during this trial has been meant to influence your decision

3       in any way.  You decide for yourselves if the government

4       has proved the defendant guilty beyond a reasonable doubt.

5            The exhibits will be sent back to you shortly.

6            The jury may now retire.

7            THE COURT:  Ladies and gentlemen, before you step

8       out, I just want to do one -- somewhat unhappy chore, and

9       that is to advise juror seven that you are the alternate,

10      and your service is no longer needed because we conclude

11      the submission of the case and jury begins deliberations

12      with full complement of 12, of course, which requires

13      concurrence of all 12 jurors, not 13, to return a verdict

14      of guilty or not guilty.  I don't want you to feel that

15      your service is not appreciated, quite the contrary.  You

16      were available in the event that some unforeseen

17      circumstance got in the way of another juror being able to

18      continue as part of the jury.  You're welcome to go, or

19      you're certainly welcome to stay.  It's entirely up to you.

20      But I'm afraid that you cannot join your fellow jurors with

21      whom you've been the last 30 hours or so, plus during voir

22      dire, during the course of deliberations, which, of course,

23      is the ultimate purpose of jury service is to make that

24      determination.  So thank you very much.  I will see to it

25      that you get a certificate and a small momento of your

1    service.  You're welcome to stay if you wish.  It's

2    entirely up to you.  Thank you very much.

3         MS. TANGEMAN:  Your Honor, I think the jurors are

4    a little confused as to which person is the alternate

5    because at the initial voir dire they were told to use

6    their juror numbers.

7         THE COURT:  Deanna, if you'll read the first name

8    and the last --

9         COURTROOM DEPUTY:  Kurt H.

10        THE COURT:  Thank you, sir.  You're welcome to

11   stay if you wish, or you're free to go.  It's entirely up

12   to you.  Thank you for your service.

13        Okay.  Counsel, is there anything further before

14   I permit the jury to retire and begin deliberations?

15        MS. TANGEMAN:  Not on behalf of the government.

16        THE COURT:  Mr. Wineman?

17        MR. WINEMAN:  No, Your Honor.

18        THE COURT:  Okay.  Ladies and gentlemen, you may

19   begin your deliberations.  Thank you.

20             (Jury retired to deliberate at 2:11 p.m.)

21        THE COURT:  You may be seated.  Will you be here

22   in the building or over at your office?  What's your

23   pleasure.

24        MS. TANGEMAN:  We'll probably stick around for a

25   little bit, Your Honor.

 1            THE COURT:  Okay, that's fine.  Reese, will you

 2   be around in the building?

 3            MR. WINEMAN:  Yes, Your Honor.

 4            THE COURT:  Okay.  Very well.  There is space

 5   upstairs in the library if you want to go up there.  And

 6   quite candidly, if you and your client want to spend the

 7   time some other way, than simply looking at the window or

 8   each other, I've got some books and magazines in my office.

 9   Feel free to pick a couple up.  Whatever you want.  I know

10   that for everybody involved in trial, this is probably the

11   most agonizing period.

12            MR. WINEMAN:  True.

13            THE COURT:  Okay.  I want to say something, quite

14   sincerely.  Case was very well tried by both sides.  And

15   Mr. Rogers, I think that you were very well served by your

16   lawyer, I really do.  And likewise, the government, as

17   always, was capably and effectively served by its

18   attorneys.  It's been a pleasure to have the trial, and I

19   don't think we had a single objection, did we?

20            MS. TANGEMAN:  Maybe one.

21            THE COURT:  Pardon?

22            MS. TANGEMAN:  Maybe one.

23            THE COURT:  If it was, it was so --

24            MR. WINEMAN:  There was one, yes.

25            THE COURT:  It was so insignificant I can't even

1    recall what it was, so that's a sign of a well-prepared,

2    well-tried case, and Judges always appreciate that.  If I'm

3    not called upon to make any decisions, I can't make any

4    wrong decisions, so thank you very much.  I'll be upstairs

5    working on work some other stuff, and we will wait for the

6    jury's verdict.  Thank you, folks.

7                    (Whereupon a recess was taken.)

8             THE COURT:  I understand the jurors have a

9    verdict.  Deanna, please get the jury.  I will tell the

10   jurors, I'll go back and let them know -- I'll spend 10 or

11   15 minutes with them.  I also tell them if they have any

12   interest in talking to the lawyers at all, I understand

13   this, that or other in terms of any suggestions or tips and

14   so forth.  Some jurors do, lots of jurors go home, so if

15   you want to stick around for that, that's fine.  It's

16   entirely up to you folks.

17                    (Jury has entered the courtroom.)

18            THE COURT:  You may be seated.

19            Okay.  Ladies and gentlemen, I understand you

20   have a verdict.  And if the foreperson will please hand the

21   verdict forms to the -- to Deanna.  Thank you.

22            If the clerk will please read the verdict.

23            COURTROOM DEPUTY:  In the United States District

24   Court for the Northern District of Ohio, Western Division,

25   case number 3:18CR26, United States of America versus Karl

1    J. Rogers, we the jury unanimously find the defendant

2    guilty as charged in the indictment.

3              Signed by all 12 jurors.

4              THE COURT:  Does either counsel wish to have the

5    jury polled?

6              MS. TANGEMAN:  No, Your Honor.

7              MR. WINEMAN:  Yes, Your Honor, please.

8              THE COURT:  I'll begin here and go down with

9    juror number one, is that your verdict?

10             JUROR:  Yes.

11             THE COURT:  Number two, is that your verdict?

12             JUROR:  Yes.

13             THE COURT:  Number three, is that your verdict?

14             JUROR:  Yes.

15             THE COURT:  Number four, is that your verdict?

16             JUROR:  Yes.

17             THE COURT:  Number five, is that your verdict?

18             JUROR:  Yes.

19             THE COURT:  Number six, is that your verdict?

20             JUROR:  (Nonverbal response).

21             THE COURT:  Okay.  I didn't hear an answer.

22             JUROR:  Yeah.

23             THE COURT:  Okay.  Thank you.  Number seven --

24   now number seven?

25             JUROR:  Yes.

```
1              THE COURT:  Number eight, is that your verdict?

2              COURTROOM DEPUTY:  We're on number nine now,

3      Judge.

4              THE COURT:  Pardon?

5              COURTROOM DEPUTY:  We let number seven go so

6      we're on nine --

7              THE COURT:  I meant sitting -- is that your

8      verdict?

9              JUROR:  Yes.

10             THE COURT:  Sir, is that your -- or, ma'am, I

11     can't see, I'm sorry.  Is that your verdict?

12             JUROR:  Yes.

13             THE COURT:  Okay.

14             JUROR:  Yes, Judge.

15             THE COURT:  Is that your verdict too?

16             JUROR:  Yes, Your Honor.

17             THE COURT:  Okay.

18             JUROR:  Yes.

19             THE COURT:  Very well.  I think we've gotten --

20     all 12 have confirmed that that's their verdicts.  The

21     verdict and judgment will be entered accordingly.

22             Ladies and gentlemen, your services are now done.

23     If you're agreeable I'd like to come back and say a few

24     words to you personally about how deeply and sincerely and

25     how grateful I am, the parties are, the community is, for
```

1    your service.  And trust you took to heart -- I won't

2    repeat what I said yesterday morning at the outset, but I

3    think that the American jury system is the finest ball work

4    against tyranny any and government overreach and

5    unrestrained governmental power in terms of both the life

6    and liberty of its citizens that the mind of man has ever

7    created.  And also for a brief span you have been the most

8    important part in the best judicial system, the best system

9    for deciding right and wrong, adjudicating disputes that

10   the mind has ever created.  No matter what other critics

11   may say about the Federal Judiciary, think about it, think

12   what you've experienced.  There has never been anything

13   that has stood more strongly and firmly as protecter of our

14   rights and the integrity of the Republic than the American

15   jury, 12 ordinary citizens.  I use that term in the most

16   positive way possible, ordinary citizens.  Every one of you

17   had something else you were going to be doing this past

18   couple of days when you came for voir dire, every one of

19   you, we know that, we understand it.  But unlike so many

20   other people, some people don't even register to vote

21   because they don't want to do jury service.  I hope you go

22   away with a sense of not only shame on you because that

23   ballot was fought with bodies and bullets beginning at

24   Lexington and it's still happening today.  And to throw it

25   away because you do not want to do the job that you have

1    done, not only shame on people of that mind set or others

2    that don't want to do that job, but I hope you go away

3    feeling just a little bit sorry for them because of what

4    they've missed.  As difficult as that job is, our liberties

5    and our security depend upon you, the ordinary citizen,

6    much more than they do on me.  They really do.  So thank

7    you very much.

8            If you have a few more minutes I'd like to come

9    back and thank you each personally.  Thank you very much

10   for your service, your patience, your deliberation and your

11   verdict.

12            (Jury excused.)

13            THE COURT:  You may be seated.  Anything further

14   for the government?

15            MS. TANGEMAN:  Yes, Your Honor.  We would ask

16   that the defendant be remanded into custody.

17            THE COURT:  I understand.  Mr. Wineman, anything

18   further, do you accept that --

19            MR. WINEMAN:  Your Honor, we believe that Karl

20   does not represent a flight risk.

21            THE COURT:  I agree completely.  Quite candidly,

22   Ms. Tangeman, the government's right, I think it's

23   mandatory, but I think that the -- even though he no longer

24   is clothed in the presumption of innocence, and even though

25   the law properly gives me the authority and power to return

1  him -- to remand him to custody, I think as an important

2  aspect of due process of law that I make that

3  determination.

4       MR. WINEMAN:  Yes, Your Honor.

5       THE COURT:  This young man is going to be far

6  better off spending the next three or four weeks or

7  whatever at home with the people who have come here, one of

8  the most dreadful experiences of their lives, and said I

9  stand up for my boy, I stand up for my brother.  That's the

10  kind of support you're going to need that you're looking

11  forward eagerly to take.  I think everybody who saw you

12  testify understands that.  And that is not to excuse the

13  role that you played in what happened, what everybody saw.

14       And so over the government's objection with the

15  right to appeal, the defendant will be allowed to report

16  when and as The Bureau -- The Bureau of Prisons, the

17  Marshal Service notifies him when and where to report.

18  Probably be two to four weeks I think.  That's usually

19  typical time, isn't it, Jim -- Matt, I'm sorry, I can't

20  see.  It's about four weeks, but you'll be told when and

21  where to go.  And that's after the sentence of course.  So

22  I've got to impose the sentence -- the sentencing date will

23  be --

24       COURTROOM DEPUTY:  Sometime in late August.

25       THE COURT:  I haven't picked the date, we'll give

1    it to you later.  There'll be -- a pretrial service

2    probation officer will have an interview with you.

3    Mr. Wineman has a right to attend, I would too -- under all

4    circumstances, I would have my lawyer with me, very

5    thorough background check, usually about 20, 30 pages long.

6    Lawyers get a copy, Mr. Wineman will go over it with you.

7    If there are any mistakes at all, he'll call them to the

8    officer's attention.  He or she will correct them.  If

9    there's some that aren't corrected to your satisfaction,

10   then I will adjudicate those at sentencing, and that will

11   be sometime in August.  Okay.  I really think --

12            MR. WINEMAN:  Thank you.

13            THE COURT:  The government's standpoint, I think

14   that all of us are better off if this young man is home and

15   beginning to work at this very serious and awful problem.

16            Once again, I want to commend the lawyers for a

17   case well tried.  I really appreciate it.  So, Matt, if you

18   want to stick around a little longer, that's fine too.

19            Thank you.  We'll be in recess.

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    s:/Angela D. Nixon              December 14, 2020

7    --------------------------              -----------

8    Angela D. Nixon, RMR, CRR       Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               **I N D E X**

2     WITNESS                           PAGE      LINE

3     Dylan McLaughlin
      Direct Examination by Mr. Wineman             200   1
4     Cross-Examination y Mr. Simko      201       4

5     Karl C. Rogers
      Direct Examination by Mr. Wineman             204   16
6     Cross-Examination by Mr. Simko                207   11
      ReDirect Examination by Mr. Wineman  208      4

7

8     Michael Rogers
      Direct Examination by Mr. Wineman             210   2
9     Cross-Examination by Ms. Tangeman  211        11

10    Karl J. Rogers
      Direct Examination by Mr. Wineman             215   2
11    Cross-Examination by Ms. Tangeman  219        20
      ReDirect Examination by Mr. Wineman  226      8

12

13

14

15

16

17

18

19

20

21

22

23

24

25